**ZENITH RADIO CORPORATION**

v.

**MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al.**

**NATIONAL UNION ELECTRIC CORPORATION**

v.

**MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al.**

**In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION.**

**Civ. A. Nos. 74–2451, 74–3247 and M.D.L. No. 189.**

United States District Court, E. D. Pennsylvania.

May 7, 1975.

10. Mr. Cranston, the protagonist in a once popular radio series, was also known as "The Shadow."

Edwin P. Rome, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for plaintiffs.

Carl W. Schwarz, Metzger, Noble, Schwarz & Kempler, Washington, D. C., for defendants Hitachi, Ltd. and Hitachi Kaden.

Henry T. Reath, Duane, Morris & Hechscher, Philadelphia, Pa., for defendant MELCO.

A. Paul Victor, Weil, Gotshal & Manges, New York City, for defendants MEI, MET, and MEC.

Peter J. Gartland, Wender, Murase & White, New York City, for defendant Sharp Corp.

Dugald Campbell Brown, Whitman & Ransom, New York City, for defendant Sanyo DENKI.

Irving Jaffe, Acting Asst. Atty. General; Robert E. J. Curran, U. S. Atty.; Andrew P. Vance, Chief, Customs Section; and Velta A. Melnbrencis, Civil Division, Dept. of Justice, for United States, intervenor.

## OPINION

HIGGINBOTHAM, District Judge.

## INDEX

|  |  | Pages |
|---|---|---|
| INTRODUCTION | | 266–268 |
| I. | HISTORY OF THE ZENITH ACTION, C. A. NO. 74–2451 | 266–267 |
| II. | HISTORY OF THE NUE ACTION, C.A. NO. 74–3247 | 267–268 |
| FINDINGS OF FACT | | 268–284 |
| I. | PRELIMINARY CONSIDERATIONS | 268 |
| II. | DEFENDANTS' RESPONSES IN THE ZENITH ACTION AS ADOPTED BY THE COURT | 268–284 |
| | A. HITACHI LIMITED AND HITACHI KADEN | 268–272 |
| | 1. Corporate Relationships for 1965–1974 | 268–270 |
| | a. Stock Ownership | 268–269 |
| | b. Interlocking Directors and/or Officers | 269–270 |
| | 2. Sales | 270 |
| | 3. Contacts | 270–271 |
| | a. Trademark Use | 270–271 |
| | b. Presence in Pennsylvania | 271 |
| | c. Corporate Agreements | 271–272 |
| | B. SANYO ELECTRIC CO., LTD. (DENKI) | 272–274 |
| | 1. Corporate Relationships | 272–273 |
| | a. Stock Ownership | 272 |
| | b. Interlocking Directors and/or Executive Officers for the period 1971–1974 | 272–273 |
| | 2. Sales | 273 |
| | 3. Contacts | 274 |
| | a. Trademarks | 274 |
| | b. Presence in Pennsylvania | 274 |
| | c. Agreements | 274 |

|  |  |  | **Pages** |
|---|---|---|---|
| C. | THE MATSUSHITA GROUP (MEI, MEC, MET) | | 274–279 |
| | 1. | Corporate Relationships | 274–276 |
| | | a. Stock Ownership | 274–275 |
| | | b. Interlocking Directors and/or Executive Officers | 275–276 |
| | 2. | Sales | 276–277 |
| | 3. | Contacts | 277–279 |
| | | a. Trademarks | 277 |
| | | b. Presence in Pennsylvania | 277–278 |
| | | c. Agreements | 278–279 |
| | |    1. MEI | 278–279 |
| | |    2. MEC | 279 |
| | |    3. MET | 279 |
| | 4. | Other Jurisdictional Information | 279 |
| D. | MELCO | | 279–283 |
| | 1. | Corporate Relationships | 279–280 |
| | | a. Stock Ownership | 279–280 |
| | | b. Interlocking Directors and/or Executive Officers | 280 |
| | 2. | Sales | 280–281 |
| | 3. | Contacts | 281–283 |
| | | a. Trademark | 281–282 |
| | | b. Presence in Pennsylvania | 282–283 |
| | | c. Agreements | 283 |
| E. | SHARP CORPORATION | | 283–284 |
| | 1. | Corporate Relationships | 283 |
| | | a. Stock Ownership | 283 |
| | | b. Interlocking Directors and/or Executive Officers | 283 |
| | 2. | Sales | 284 |
| | 3. | Contacts | 284 |
| | | a. Trademarks | 284 |
| | | b. Presence in Pennsylvania | 284 |
| | | c. Agreements | 284 |
| III. | DEFENDANTS' RESPONSES IN THE NUE ACTION AS ADOPTED BY THE COURT | | 285–288 |
| A. | HITACHI KADEN | | 285 |
| | 1. | Corporate Relationships for 1965–1970 | 285 |
| | 2. | Sales | 285 |
| | 3. | Contacts | 285 |
| | | a. Trademark | 285 |
| | | b. Presence in New Jersey for 1965–1970 | 285 |
| | | c. Agreements | 285 |
| B. | MELCO | | 285–286 |
| | 1. | Corporate Relationships | 285 |
| | | a. Stock Ownership | 285 |
| | | b. Interlocking Directors and/or Executive Officers | 285 |

|  |  | Pages |
|---|---|---|
| 2. | Sales | 285–286 |
| 3. | Contacts | 286 |
| | a. Trademark | 286 |
| | b. Presence in New Jersey | 286 |
| | c. Agreements | 286 |
| C. | DENKI | 286–288 |
| 1. | Corporate Relationships | 286–287 |
| | a. Stock Ownership | 286 |
| | b. Interlocking Directors and/or Executive Officers | 286–287 |
| 2. | Sales | 287 |
| 3. | Contacts | 287 |
| | a. Trademark | 287 |
| | b. Presence in New Jersey | 287–288 |
| | c. Agreements | 288 |
| IV. | PLAINTIFF'S PROPOSED FINDINGS OF FACT IN THE NUE ACTION AS ADOPTED BY THE COURT | 288–309 |
| A. | HITACHI KADEN | 288–295 |
| B. | MELCO | 295–303 |
| C. | DENKI | 303–309 |
| V. | ADDITIONAL FACTUAL FINDINGS ADOPTED BY THE COURT | 309–317 |
| A. | HITACHI LIMITED AND HITACHI KADEN | 309 |
| B. | DENKI | 309–310 |
| C. | MEI, MEC AND MET | 310–312 |
| D. | MELCO | 312–317 |
| E. | THE MOVING DEFENDANTS GENERALLY | 317 |
| DISCUSSION | | 317–330 |
| I. | VENUE | 317–328 |
| II. | JURISDICTION: THE CONSTITUTIONAL TEST | 328–329 |
| III. | SERVICE OF PROCESS | 329–330 |
| CONCLUSION | | 330 |

INTRODUCTION

I. *HISTORY OF THE ZENITH AC-TION, CIVIL ACTION NO. 74–2451.*

On September 20, 1974, plaintiff Zenith Radio Corporation filed this antitrust action in the Eastern District of Pennsylvania, naming twenty-one Japanese and American corporations as defendants. On October 29, 1974, certain of the defendants moved, pursuant to 28 U.S.C. § 1407, to transfer this action to the District of New Jersey for consoli-

dated pretrial proceedings with the previously filed case of *National Union Electric Corporation v. Matsushita Electric Industrial Co., Ltd., et al.*, Civil No. 1706/70. On November 25, 1974, the Judicial Panel on Multidistrict Litigation transferred the *NUE* action to this Court. That same day, ·this Court directed the defendants to file whatever pleadings they intended to file with respect to the complaint on or before January 2, 1975. On that date, eight defendants herein—Matsushita Electric Industrial Co., Ltd. ("MEI"), Matsushita Electronics Corporation ("MEC"), Matsushita Electric Trading Co., Ltd. ("MET"), Sharp Corporation ("Sharp"), Hitachi, Ltd. ("Limited"), Hitachi Kaden Hanbai Kabushiki Kaisha ("Kaden"), Mitsubishi Electric Corporation ("MELCO"), and Sanyo Electric Co., Ltd. ("DENKI")—moved this Court pursuant to Rule 12(b) of the Federal Rules of Civil Procedure to dismiss the action as to them for lack of personal jurisdiction, improper venue, and insufficient service of process. These issues were briefed, then argued for four days, from February 3, 1975 to February 6, 1975. In addition, the Court propounded to the moving defendants interrogatories designed to elicit facts that were not yet of record but were relevant to the determination of the issues of venue, jurisdiction and process. The defendants having answered these interrogatories, the issues are now ripe for decision. I have examined these answers, as well as the affidavits and exhibits submitted by the plaintiff and the defendants in support of their respective positions.[1] On the basis of my examination of this extensive factual record, I have concluded that this Court may exercise jurisdiction over each of the moving defendants, that venue is proper for each of them in this district, and that each of them has been adequately served with process. Accordingly, their motions to dismiss will be denied.

## II. *HISTORY OF THE NUE ACTION CIVIL ACTION NO. 74–3247.*

Plaintiff National Union Electric Corporation filed this antitrust action in the District of New Jersey on December 21, 1970. The complaint named as defendants seven Japanese manufacturing corporations and seven United States sales subsidiaries or affiliates of those Japanese manufacturing corporations. An amended complaint added three other Japanese corporations as defendants. In their responses to the NUE complaint, six defendants raised defenses related to venue, jurisdiction and service of process. Three of those defendants have since withdrawn those defenses, so that presently only Hitachi Kaden Hanbai Kabushiki Kaisha ("Kaden"), Mitsubishi Electric Corporation ("MELCO"), and Sanyo Electric Company, Ltd. ("DENKI") contest venue, jurisdiction and service of process.

After extensive discovery related to these issues, NUE moved in June, 1973, pursuant to Rule 12(d) of the Federal Rules of Civil Procedure, for a hearing and final determination prior to trial of the defenses of improper venue, lack of personal jurisdiction and insufficiency of service of process. As of November 25, 1974, however, when the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407, transferred the action to this Court for consolidated pretrial proceedings, no determination of the validity of these defenses had been made.

In February, 1975, during oral argument on other issues in this multidistrict litigation, counsel for both sides waived argument on these defenses and submitted the issues to the Court on briefs, as supported by the affidavits and exhibits filed by the respective parties, and as supplemented by the answers of the contesting defendants to interrogatories propounded by the Court at the oral argument. The issues are now ripe for de-

---

1. I have also reviewed, to the extent that they are also applicable to an action filed in the Eastern District of Pennsylvania, the factual submissions made by the respective parties in the *NUE* action, which was originally filed in the District of New Jersey.

cision, and for the sake of procedural consistency with the parallel *Zenith* action, I shall treat them as raised by motions to dismiss made by Kaden, MELCO and DENKI pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.[2]

My examination of the voluminous factual record of this action leads me inexorably to the conclusion that the three moving defendants are amenable to jurisdiction and venue in the District of New Jersey, and have been adequately served with process. Their motions to dismiss will therefore be denied.

## FINDINGS OF FACT

I. *PRELIMINARY CONSIDERATIONS.*

In support of their defenses based on lack of personal jurisdiction, improper venue, and insufficient service of process, the various defendants have filed numerous affidavits, some of them sworn to by defense counsel, others by officers of the defendant corporations. In large part, these affidavits recite a litany of non-contacts with the Eastern District of Pennsylvania in the *Zenith* action, and with the District of New Jersey in the *NUE* action and a similar litany of non-control over the day-to-day operations of their subsidiary or affiliated corporations. Each of the affidavits is offered to bolster one or both of the moving defendants' two basic contentions: (1) that their non-transaction of business in the relevant forums immunizes them from jurisdiction, venue and process; and/or (2) that they do not exercise day-to-day control of their subsidiaries who do transact business in the relevant forums, and therefore may not be reached through these subsidiaries for purposes of jurisdiction, venue and process. In both actions, however, plaintiffs introduced evidence sufficient to

make me hesitate to render a decision on the basis of defendants' often conclusory affidavits. Accordingly, I propounded interrogatories to the appropriate defendants in both the *Zenith* and *NUE* actions, seeking more detailed information about their corporate relationships, their sales and their contacts with the two districts where the plaintiffs attempt to establish jurisdiction and venue. In order to make the factual basis for my decisions on the instant matters clear, I now set forth and find as facts (1) defendants' answers to the Court's interrogatories in the *Zenith* and *NUE* actions; (2) those of plaintiff's proposed findings of fact in the *NUE* action that are reasonably supported by the evidence;[3] and (3) other factual submissions of the plaintiffs that are relevant to the issues raised by the moving defendants.

II. *DEFENDANTS' RESPONSES IN THE ZENITH ACTION AS ADOPTED BY THE COURT*

A. *Hitachi Limited and Hitachi Kaden.*

1. Corporate Relationships for 1965–1974.

a. Stock Ownership.

Until 1973, Kaden was a wholly-owned subsidiary of Limited, a Japanese manufacturing corporation. In April, 1973, Limited sold 21.8% of Kaden's stock to the public, retaining the remaining 78.2%. Kaden wholesales consumer products, purchased from Limited and others, throughout Japan and the world. Prior to 1969, Kaden had confined its wholesaling activities to the domestic Japanese market.

Hitachi Sales Corporation of America ("HSCA") has been a wholly-owned subsidiary of Kaden

---

**2.** Kaden and MELCO have in fact filed such motions.

**3.** See footnote 1, *supra.*

since 1969, when Kaden purchased all of HSCA's stock from Limited for more than $1 million cash. HSCA distributes consumer products, purchased from Kaden and others, throughout the mainland United States. Since January, 1973, HSCA has been manufacturing in California and these products now account for approximately 10% of HSCA's sales.

b. Interlocking Directors and/or Officers.

Mr. M. Naito was general manager of Limited's Second Export Sales office from January, 1965 to August, 1965, and deputy general manager of Limited's Consumer Electronics Division from August, 1965 to November, 1967. He was executive managing director of Kaden from November, 1967 to November, 1973, and has been senior executive managing director of Kaden from November, 1973 to the present. He was a director of HSCA from January, 1965 to July, 1968.

Mr. T. Shoubouchi was deputy general manager of Limited's Consumer Electronics Division from February, 1965 to August, 1965, general manager of Limited's Yokohama Works from August, 1965 until February, 1969, and deputy general manager of Limited's Consumer Products Group from February, 1969 to November, 1969. He was a director of Kaden from May, 1968 to May, 1970. He was a director of HSCA from January, 1965 to July, 1968.

Mr. K. Nishi was executive managing director of Limited from January, 1965 to March, 1965, senior executive managing director from March, 1965 to November, 1969, and a director of Limited from November, 1969 to November, 1971. He was president of Kaden from January, 1965 to November, 1973, and

has been chairman of Kaden from November, 1973 to the present. He was a director of HSCA from May, 1966 to June, 1973.

Mr. B. Hayashi has been general manager of Limited's Subsidiaries Office from January, 1965 to the present. He was a director of HSCA from August, 1965 to July, 1968.

Mr. N. Takahashi was executive managing director of Kaden from January, 1965 to December, 1968, and senior executive managing director from December, 1968 to November, 1973, and has been vice president and director of Kaden from November, 1973 to the present. He was a director of HSCA from July, 1968 to June, 1973.

Mr. T. Komoriya has been a director of HSCA from January, 1965 to the present, and was vice president of HSCA from May, 1966 to April, 1971. Though he has not held any positions with Limited or Kaden, he has been president of Hitachi America, Ltd., a wholly-owned subsidiary of Limited, from 1965 to the present.

Mr. I. Kawamato has been a director of Kaden from May, 1969 to the present. He has been a director of HSCA from June, 1973 to the present.

Mr. T. Yoshida was a director of Limited from January, 1965 to November, 1968, executive managing director of Limited from November, 1968 to November, 1971, and senior executive managing director of Limited from November, 1970 to November, 1973. He was a director of Kaden from January, 1965 to August, 1965, executive managing director of Kaden from August, 1965 to December, 1968, vice president and director of Kaden from December, 1968 to November, 1973, and

has been president and director of Kaden from November, 1973 to the present. He has been a director of HSCA from June, 1973 to the present.

Mr. T. Takahashi has been executive managing director of Limited from November, 1973 to the present. He has been a director of Kaden from November, 1973 to the present.

Mr. H. Arinobu was deputy general manager of Limited's Consumer Products Division from May, 1968 to February, 1969, and deputy general manager of Limited's Consumer Products Group from February, 1969 to November, 1969. He was a director of Kaden from May, 1968 to May, 1970.

Limited's total number of directors has varied from a low of 19 in 1967 to a high of 25 in 1973. Presently Limited has 24 directors. Kaden's total number of directors has varied from a low of 12 in 1971 to a high of 16 in 1969. Presently Kaden has 15 directors. HSCA had a total of 5 directors prior to 1968; from 1968 to date, 6 directors.

2. Sales.

The approximate volume of Limited's and Kaden's sales that were destined for ultimate export to the United States during the relevant time period are listed in the table below. Both Limited and Kaden concede that because HSCA and Hitachi America Limited ("HAL") [4] sell throughout the United States a significant amount of their products ultimately arrive in Pennsylvania and in the Eastern District of Pennsylvania. Both Limited and Kaden deny that they have sold any goods directly to customers in Pennsylvania during the five years preceding the date of the Zenith complaint.

Approximate Sales of Products Ultimately Destined For United States (millions of dollars)

| Fiscal Year | Limited | Kaden |
|---|---|---|
| 1965 | 17 | 0 |
| 1966 | 31 | 0 |
| 1967 | 45 | 0 |
| 1968 | 55 | 0 |
| 1969 | 76 | 12 |
| 1970 | 87 | 13 |
| 1971 | 88 | 15 |
| 1972 | 109 | 28 |
| 1973 | 70 | 24 |
| 1974 (First Half) | 21 | 10 |

Both HSCA and HAL concede that they have made substantial sales into Pennsylvania and the Eastern District of Pennsylvania. Total sales in the United States by both HSCA and HAL are listed in the following table.

Total Sales (in millions of dollars)

| Fiscal Year | HSCA | HAL |
|---|---|---|
| 1965 | 4.7 | 0.3 |
| 1966 | 4.1 | 1.0 |
| 1967 | 5.6 | 3.5 |
| 1968 | 11.3 | 5.8 |
| 1969 | 20.6 | 8.1 |
| 1970 | 31.7 | 8.2 |
| 1971 | 47.4 | 25.1 |
| 1972 | 52.1 | 39.7 |
| 1973 | 56.6 [5] | 79.9 |
| 1974 (First Half) | 27.3 | N.A. |

3. Contacts.

Trademark Use.

Limited and Kaden concede that the "Hitachi" trademark was used in advertisements, publications and brochures which were distributed in Pennsylvania between 1965 and 1974.

---

4. Another Hitachi subsidiary, not a party to this action.

5. In January, 1973, pursuant to a license from Hitachi, Ltd., HSCA began manufacturing some of the products it sells at its California plant. At the present time, approximately 10% of HSCA's sales are accounted for by products which are self-manufactured. HSCA's license agreement with Limited provides for royalties to be paid to Limited on the products manufactured (3% with regard to television receivers).

Institutional-type advertisements were placed by Limited in the following publications:

Wall Street Journal (1969–1972, 4 times per year)

Fortune (1965–1974, 4 times per year)

Time (1965–1974, 5 times per year)

Business Week (1968–1974, 4–5 times per year)

Scientific American (1974, 4 times per year)

Playboy (1969–1974, 2 times per year)

Reader's Digest (1967–1973, 2 times per year)

Life (1965–1972, 4 times a year)

Life (Special Edition) (1974, 1 time per year)

Electronics Magazine (1965–1974, 1–2 times per year)

Telephony Magazine (1965–1974, 1–2 times per year)

No advertising placed by Kaden circulated anywhere in the United States.

Substantial advertising, brochures, promotional literature, etc., placed, distributed or generated by HSCA and HAL were distributed and circulated throughout the entire United States, including Pennsylvania, during the 1965–1974 period and most, if not all, of this material carried the "Hitachi" trademark or logo.

b. Presence in Pennsylvania.

According to Limited's own estimate, there have been approximately 50 or more visits per year by Limited employees to Pennsylvania during the past 5 years. The visits have been one or two days in length, except for employees who have come to Pennsylvania as students at a university or seminar and have no business purpose. The students visits are included in the estimated number of visits given above. Limited estimates that fewer than 10% of its visitors to Pennsylvania have any sales purpose, the remainder being engineers or technicians seeking technical information (estimated 65% of visitors) or concerned with patent licenses (estimated 25% of visitors).

Approximately seven employees of Kaden have visited Pennsylvania since 1969. In 1970, Mr. H. Horiguchi, Department Manager, First Sales Department, International Division, visited Philadelphia. Mr. N. Miyazaki, First Sales Department, International Division, visited Pittsburgh to discuss possible business with Westinghouse. Mr. S. Suzuki, Manager, North America Sec., International Division, visited Pennsylvania for research purposes.

In 1971, Mr. K. Tsukino, North America Sec., International Division, visited Pittsburgh to attend an search purposes.

In 1972, Mr. K. Sugiyama, North America Sec., International Division, visited Pittsburgh to attend an HSCA regional show.

In 1973, Mr. T. Sato, North America Sec., International Division, visited Pittsburgh to attend an HSCA regional show. Mr. J. Ino, First Sales Department, International Division, visited Philadelphia to purchase samples at Procter-Silex Inc., Philadelphia.

Kaden estimates that each visit has been one or two days in length.

c. Corporate Agreements.

Limited has entered into patent licensing agreements with seven corporations having their principal places of business in Pennsylvania. These are:

Licensor: Selas Corporation of America (Dresher, Pa. 19025)
Licensee: Hitachi, Ltd.

Executed: August 1, 1974 (Renewal) (Former agreement remained effective from December, 1966 until this agreement was made.)
Effective: November 15, 1974– November 14, 1984.

Licensor: The Benfield Corporation (640 Spruce Lane, Berwyn, Pa. 19142).

Licensee: Hitachi, Ltd.

Executed: December 20, 1968.

Effective: February 18, 1969–February 17, 1979.

Licensor: Westinghouse Electric Corporation (Westinghouse Building, Gateway Center, Pittsburgh, Pa. 15222).

Licensee: Hitachi, Ltd.

Executed: August 16, 1970.

Effective: December 7, 1970–September 29, 1976.

Licensor: Philco-Ford Corporation (Tioga and C Streets, Philadelphia, Pa. 19134).

Licensee: Hitachi, Ltd.

Three Licenses:

Executed: January, 1972; August 8, 1973; February 25, 1974.

Effective: March 21, 1972–July 8, 1975; October 16, 1973–October 17, 1983; April 16, 1974–September 27, 1982, respectively.

Licensor: Blaw-Knox Foundry & Mill Machinery, Inc. (One Olive Plaza, Pittsburgh, Pa. 15222).

Licensee: Hitachi, Ltd.

Executed: April 27, 1967.

Effective: August 29, 1967–August 28, 1977.

Licensor: Hitachi, Ltd.

Licensee: Blaw-Knox

Executed: June 11, 1969

Effective: June 11, 1969–June 10, 1979.

Licensor: Hitachi, Ltd.

Licensee: Westinghouse

Executed: December 27, 1973

Effective: December 27, 1973–December 26, 1983.

Limited has agreements with other corporations having their principal place of business outside of Pennsylvania, but which may or may not have "business facilities" in the Commonwealth of Pennsylvania. For example, Limited has a major licensing agreement with RCA Corporation, a large New York corporation which probably has some facility in Pennsylvania. Limited has a patent licensing agreement with Zenith, an Illinois-based company that has a recently acquired plant in Pennsylvania, and Limited has an agreement with General Electric Corp., New York, which also has facilities in Pennsylvania.

Kaden has no agreements with any corporation having any facilities in Pennsylvania.

B. *Sanyo Electric Co., Ltd. (Denki).*

1. Corporate Relationships

   a. Stock Ownership.

   DENKI, a Japanese manufacturing corporation, owns 83% of the stock of Sanyo Electric Trading Co., Ltd. ("TRADING") and owned that same percentage of TRADING's stock throughout the period 1965–1974. The other 17% of TRADING's stock is owned by third persons. Since 1972 DENKI and TRADING have each owned 50% of the stock of Sanyo Electric, Inc. ("INCO"). During the period 1965 to 1972 DENKI owned 100% of the stock in INCO. In 1972 DENKI sold 50% of its stock holdings in INCO to TRADING.

   b. Interlocking Directors and/or Executive Officers for the Period 1971–1974.[6]

   Mr. Y. Iue was director and chairman of the Board of DENKI. He was director and chairman of the board of TRADING.

   Mr. K. Iue was a director of DENKI, TRADING and INCO. He was president and chief executive officer of DENKI, and president of TRADING. In 1971, he was chairman of

---

6. DENKI has made available to the Court information on directorships and executive officer positions for the years 1970–1974, but was not able to develop similarly detailed information for the years 1965–1970. DENKI has informed its counsel that there is no substantial difference in the degree of overlap between the year 1971 and the six immediately prior years (1965–1970).

the board of INCO, and in 1970 and prior years he was president of INCO.

Mr. Komuro was a director of DENKI, TRADING and INCO.[7] He was executive managing director and chief executive officer of TRADING.

Mr. Yanase was a director of DENKI and TRADING.[8] He was managing director of DENKI, and executive managing director of TRADING.

Mr. Nakai was a director of DENKI and INCO, and managing director of DENKI.

DENKI's Board of Directors consists of 27 members, several of whom are outside directors and four of whom are on the twelve-man Board of TRADING. Of those four on the Board of TRADING, two are on the nine-man Board of INCO. One other director of DENKI is also a director of INCO.

2. Sales

Sales by TRADING to United States customers, including INCO, were as follows (converted to dollars and rounded):

| 1965 | $18,306,000 | 1970 | $ 94,144,000 |
| 1966 | 36,950,000 | 1971 | 109,564,000 |
| 1967 | 36,892,000 | 1972 | 128,890,000 |
| 1968 | 62,161,000 | 1973 | 117,214,000 |
| 1969 | 87,858,000 | 1974 | 128,050,000 |

The above sales figures are for fiscal years ending in November. Since most of TRADING's United States customers sell nation-wide, such as INCO, Sears and Magnavox, a percentage of its customers' sales undoubtedly were made to ultimate consumers in Pennsylvania.

Counsel for DENKI have informed the Court that, on the average, approximately 99 percent of TRAD-ING's dollar sales figures for the 1965–1974 period were of DENKI manufactured products. This 99 percent figure represents the known sales of all DENKI manufactured products to United States customers in each of the fiscal years indicated. DENKI does sell its products to Japanese trading companies other than TRADING, and these companies may in turn resell and export these DENKI products to customers in the United States. DENKI's counsel have informed the Court that these sales are "small and sporadic" when compared with TRADING's sales to United States customers.

INCO's dollar sales in the United States, and in Pennsylvania separately, during the calendar years 1972, 1973 and 1974, were as follows:

| 1972 | Penna. | $ 2,130,087 |
| 1972 | U. S. | 63,607,749 |
| 1973 | Penna. | 2,579,646 |
| 1973 | U. S. | 88,924,411 |
| 1974 | Penna. | 3,740,598 |
| 1974 | U. S. | 95,706,611 |

Although figures on INCO sales in Pennsylvania for years prior to 1972 are not available, the following figures represent INCO's total sales in the United States for the fiscal years ending March 31:

| 1965 | $ 5,905,980 | 1969 | $24,072,124 |
| 1966 | 5,546,736 | 1970 | 17,901,270 |
| 1967 | 9,978,257 | 1971 | 31,976,125 |
| 1968 | 11,059,891 | | |

All sales by INCO from 1965 through 1970 were sales to private label customers. For the years 1972, 1973 and 1974, where INCO does have data on sales by its private label department to customers by state, the records show that there were no sales to Pennsylvania-based customers.

---

7. He was not a director of DENKI prior to 1971.

8. He was not a director of DENKI prior to 1971.

3. Contacts

a. Trademarks.

Prior to 1971, no Sanyo brand name products were marketed in the United States. Between 1971 and 1974, the Sanyo trademark was used in advertisements that appeared in national magazines such as *Home Furnishings Daily*. Most such publications are distributed in Pennsylvania. INCO places the advertisements for Sanyo brand name products in nationally distributed United States publications, but was not able to list the national publications in which such advertisements appeared or the issue dates thereof in the time allotted to answer the Court's interrogatories.

Local retailers regularly use trademarks of their suppliers in advertisements which the retailers place in local newspapers. Thus the Sanyo trademark has appeared in various advertisements of local retailers in most of Pennsylvania's metropolitan area newspapers. INCO, in the years 1971 to 1974, also has distributed sales brochures utilizing the Sanyo trademark to wholesalers and retailers in Pennsylvania. These brochures are generally printed and distributed annually.

b. Presence in Pennsylvania.

In September and October, 1971, Mr. T. Naitoh visited Sears in Philadelphia to supervise the repair of television receivers.

In March, 1972, Mr. T. Shigematsu visited Lancaster to view facilities of the Hamilton Watch Company.

In July, 1972, Messrs. M. Satoh and R. Kozuki visited West Chester to view facilities of Lasko Metal Parts, Inc.

In November, 1972, Mr. H. Doi visited West Chester to view the same facilities.

In April, 1973, Mr. S. Nakamura visited West Chester to view the same facilities.

In June, 1973, Messrs. S. Furushita and T. Mizutani visited West Chester to view the same facilities.

In June, 1973, Messrs. T. Yamano and H. Ozu visited Lancaster, Montgomeryville and Conshohocken to view the facilities of the Hamilton Watch Company, the Solid State Scientific Company and Sunstein Engineering Corporation respectively. Mr. M. Watanabe also visited Sunstein in June, 1973, for the same purpose.

In November, 1973, Mr. T. Kameyama visited West Chester to view the facilities of Lasko Metal Parts, Inc.

In December, 1973, Mr. T. Yokota visited West Chester to view the same facilities.

In February, 1974, Messrs. M. Takuma, H. Doi and I. Morimoto visited West Chester to view the same facilities.

In April, 1974, Mr. I. Odaki visited West Chester to view the same facilities.

In July, 1974, Messrs. Y. Miyake and Mr. Naba visited West Chester to view the same facilities.

Each of these visits was at most a few days in duration.

c. Agreements.

DENKI did not enter into any contracts or agreements with corporations that have business facilities located in Pennsylvania.

C. *The Matsushita Group (MEI, MEC, MET).*

1. Corporate Relationships.

a. Stock Ownership

As of November 20, 1974,[9] MEI, a Japanese manufacturing corpora-

---

9. Counsel for MEI, MET, and MEC have informed me that I may safely assume that the same percentages of stock ownership exist-ed on September 20, 1974, the date the complaint herein was filed.

tion, owned 65% of MEC's stock (N. V. Philips Gloeilampen-fabrieken owned the remaining 35%). On the same date, MEI owned 54.4% of MET's stock (the public owned the remainder). On the same date, MEI owned 100% of the stock of Matsushita Electric Corporation of America ("MECA"), and MECA in turn owned 100% of the stock of Quasar Electronics Corporation ("QEC").

MEI's stock ownership of MET and MEC for the period 1965–1974 was:

| YEAR | MET | MEC |
|------|-------|-----|
| 1965 | 57.4% | 70% |
| 1966 | 52.4 | 70 |
| 1967 | 52.4 | 70 |
| 1968 | 52.4 | 65 |
| 1969 | 52.4 | 65 |
| 1970 | 52.2 | 65 |
| 1971 | 53 | 65 |
| 1972 | 53 | 65 |
| 1973 | 54.4 | 65 |
| 1974 | 54.4 | 65 |

MEI's 100% stock ownership of MECA has existed since 1959.

MECA's 100% stock ownership of QEC has existed since 1974.

MET owned about 0.2% of MEI's stock in 1973–74, and about 0.1% in 1969–72.

MEC owned about 0.4% of MEI's stock in 1973–74, and about 0.3% in 1969–72.

b.  Interlocking Directors and/or Executive Officers.

Mr. K. Matsushita was chairman of MEI from 1965 to 1972, and a director of MEI as of 1974. He was chairman of MECA from 1965 to 1974. He was a director of MET from 1965 to 1973. He was president of MEC in 1965, chairman of MEC from 1966 to 1970, and a director of MEC as of 1974.

Mr. M. Matsushita was president of MEI from 1965 to 1974. He was a director of MECA from 1965 to 1974,

and chairman of MECA in 1974. He was a director of MET from 1965 to 1974. He was a director of MEC from 1965 to 1971, and chairman of MEC from 1972 to 1974. He was a director of QEC in 1974.

Mr. T. Nakao was senior managing director of MEI from 1965 to 1967, and executive vice president of MEI from 1967 to 1974. He was a director of MECA and MEC from 1967 to 1974.

Mr. A. Takahashi was executive vice president of MEI from 1965 to 1972, and chairman of MEI in 1973 and 1974. He was a director of both MECA and MEC from 1965 to 1974. He was chairman of MET from 1965 to 1974.

Mr. H. Tanimura was a managing director of MEI in 1965 and 1966, senior managing director of MEI from 1967 to 1970, and executive vice president of MEI from 1972 to 1974. He was a director of MET from 1965 to 1970. He was a director of both MECA and MEC from 1965 to 1974.

Mr. M. Hino was a managing director of MEI from 1965 to 1974. He was auditor of MET from 1965 to 1974, and auditor of MEC from 1966 to 1974.

Mr. K. Matsuno was a director of MEI from 1965 to 1969, and a managing director of MEI from 1967 to 1972. He was a director of MET from 1965 to 1972.

Mr. K. Takeoka was senior managing director of MEI in 1974. He was vice chairman and a director of MECA in 1974. He was chairman and chief executive officer of QEC in 1974.

Mr. K. Isomura was a director of MEI in 1969 and 1970, and managing director of MEI from 1971 to 1974. He was president of MECA from 1965 to 1972, and a director of MET from 1971 to 1974. He was a director of QEC in 1974.

Mr. A. Harada was a director of MEI from 1972 to 1974. He was president of MECA during those years and a board member and director of MECA from 1971 to 1974. He was also vice chairman of QEC in 1974.

Mr. T. Inai was a director of MEI from 1966 to 1970, managing director of MEI in 1971 and 1972, and senior managing director of MEI in 1973 and 1974. He was also a director of MECA from 1970 to 1974.

Mr. K. Ogawa was a managing director of MEI from 1965 to 1974, and a director of MEC during the same years.

Mr. M. Miyoshi was a director of MEI from 1965 to 1974. He was senior managing director of MEC from 1965 to 1969, executive vice president of MEC in 1970, and president of MEC from 1971 to 1974.

Mr. S. Matsumoto was a director of MEC from 1965 to 1967. He was executive vice president of MEC in 1965, and president of MEC in 1966 and 1967.

Mr. T. Fujio was a managing director of MEI in 1965 and 1966, and senior managing director of MEI from 1967 to 1970. He was also a director of MEC from 1965 to 1970.

Mr. H. Saeki was a director of MEI from 1967 to 1970, a managing director of MEI in 1971 and 1972, and a senior managing director of MEI in 1973 and 1974. He was also a director of MEC from 1968 to 1974.

2. Sales.

MEI, MEC and MECA have requested that the figures for their sales of goods in the United States (for MECA) or destined for the United States (for MEI and MEC) be kept confidential. Though I see little need for such a request, I will honor it. The sales figures submitted by these three corporations have there-fore been impounded. They will, of course, be available for review by an appellate court.

In round figures, MEI's sales of goods destined for the United States during the years 1965–1974 ranged from a low of $31,100,000 to a high of $288,000,000. During the same period, MEC's sales of goods destined for the United States ranged from a low of approximately $430,000 to a high of approximately $6,425,000. For the years 1970–1974, MECA's sales of goods in the United States ranged from a low of about $200,000,000 to a high of about $400,000,000.

MET has made no request for confidentiality. Its sales of goods destined for the United States during the relevant time period were as follows:

| 1965 | — | $ 33,354,000 |
| 1966 | — | 56,332,000 |
| 1967 | — | 87,660,000 |
| 1968 | — | 126,519,000 |
| 1969 | — | 178,337,000 |
| 1970 | — | 221,070,000 |
| 1971 | — | 282,142,000 |
| 1972 | — | 327,430,000 |
| 1973 | — | 303,602,000 |
| 1974 | — | 322,010,000 |

MEI, MET and MEC could not trace the amount of their merchandise which ultimately arrived in Pennsylvania or the Eastern District of Pennsylvania, with the exception of $424,000 worth of MET goods which was shipped to the port of Philadelphia in 1973. (Affidavit of S. Ozaki, ¶4.)

Sales from MECA's warehouses into Pennsylvania were approximately $15 million in 1974; $14.4 million in 1973; and $12.1 million in 1972. These figures may include sales of MECA to Leeds-Fox, an independent distributor headquartered in New Jersey responsible for distribution of Panasonic products for the eastern half of Pennsylvania including the Philadelphia area, as well as New Jersey and the Wilmington, Delaware area, in those years. At all events, Leeds-Fox's sales of Panasonic

merchandise into Pennsylvania would be substantial in 1972, 1973 and 1974.

3. Contacts.

  a. Trademarks.

The Panasonic trademark is owned by MEI. MECA frequently places advertisements in national magazines, such as *Time, Newsweek, Business Week, Fortune, Playboy, Sports Illustrated,* and the like in which the Panasonic trademark is used. These magazines are, of course, distributed in Pennsylvania, including the Eastern District. In addition, MECA's products under the Panasonic mark are advertised on either national or local television programs, including local ads in the Philadelphia and Pittsburgh areas. Similarly, MECA's Panasonic products are advertised on the radio, in national trade journals and in local dealer advertisements. In the late 1960's MEI also placed some national ads in the United States.

  b. Presence in Pennsylvania.

*MEI.* On three occasions in 1974, MEI personnel participated in one-day seminars conducted by MECA in Philadelphia in connection with distributor shows and in Pittsburgh. One took place in May, one in October and one in November. On October 29, 1974, the Panasonic Caravan was in Pittsburgh where another presentation was made. The May visit involved a one-day presentation by MECA personnel in Philadelphia, assisted with respect to technical matters by Messrs. Takaobushi, Tatsumi and Uemuta, MEI employees visiting from Japan. Also in 1974, there were visits by certain MEI-salaried engineers to the Philco-Ford plant in Lansdale, Pa., once every two or three months. Those engineers are located in either New York or Chicago. Although paid by MEI, they are employed by MECA to provide techno-logical assistance and assist MECA in the sale of components. The visits to the Philco-Ford plant were made by one (or possibly two) of these engineers for the purpose of soliciting business on behalf of MECA. These visits resulted in sales of products by MECA in Pennsylvania.

In 1974, Mr. Y. Yoshida, an MEI employee, made two visits to the United States from Japan, accompanied by Mr. K. Uegaki, an employee of an MEI subsidiary, National Tire Co., Ltd. In April and in October, 1974, these gentlemen visited Pennsylvania with Mr. Stewart Silbaugh, Assistant Sales Manager of MECA's Bicycle Department, to be present at the opening of new MECA bicycle accounts. These trips lasted about three days and some 10–15 dealers were visited in such towns as Pittsburgh, Harrisburg and Philadelphia.

In 1973, there were three one-day visits by Messrs. Silbaugh and Yoshida to Pittsburgh, Greenville and Lancaster, Pennsylvania. These visits were for the same purpose as the 1974 visits previously described.

In 1973, Mr. Tom Hiroki, an MEI-salaried employee on loan to MECA as a trainee, visited dealers and checked to see that televisions in their stores were functioning and properly displayed. Although the majority of his visits were in Ohio, Mr. Hiroki also visited dealers' stores located in the western part of Pennsylvania. Also in 1973, an MEI employee made a one-day visit to Harrisburg, Pa., to investigate the price and availability of motors for certain other home appliances.

In November, 1973, Mr. K. Kato, an employee of MEI's television products division, accompanied Mr. C. Toda, an MECA employee, on a one-day trip to the Philco-Ford cabi-

net factory located in Watsontown, Pennsylvania to investigate the availability and price of parts for cabinets. He also went with Mr. Toda to Cabinet Industry, a company located in Danville, Pennsylvania for the same purpose.

In 1972, one (possibly two) MEI employees from Japan visited, Harrisburg, Pa., in connection with electric motors for vacuum cleaners.

In 1970, there were two visits by MEI employees from Japan to Philadelphia to attend a video demonstration show and to visit certain dealers in the area.

In 1969, Mr. M. Higuchi, MEI's general manager for the manufacture of electric motors, visited the United States. On one day, he visited Schick Electric Company in Lancaster, Pennsylvania.

In 1964–66, Mr. Yamamoto, an MEI employee, lived in Philadelphia while he worked with the Philco-Ford plant in Lansdale in connection with the latter's purchase of black and white television picture tubes from Japan.

*MEC.* In 1974, Mr. Tatashi Suyama, an MEC-salaried engineer working for MECA in Chicago, visited the Philco-Ford plant in Lansdale, Pa., two or three times for one day each. These visits were for the purpose of soliciting sales of electronic components on behalf of MECA. Mr. Suyama made a similar visit to Lutron Electronics in Coopersburg, Pa. in 1974.

In 1973, Mr. Suyama made one or two visits to the Philco-Ford plant in Lansdale, Pa., for a similar purpose. Also, there were one or two courtesy visits by one or two MEC employees from Japan to the Philco-Ford plant in 1973.

*MET.* In May, 1974, Mr. Tazuke visited McDanel Refractory Porcelain Co. of Beaver Falls, Pennsylvania. In February, 1974, Mr. Shimamura visited the offices of Ajax International Corp. of Erie, Pennsylvania.

In May, 1969, Mr. R. Yanagiuchi, an MET employee working for MECA, escorted two employees of a Japanese subsidiary of MEI, to Bluebell, Pennsylvania for a courtesy visit to Philco-Ford.

In either January or February, 1968, Mr. S. Iimura of MET made a courtesy visit to Philco-Ford's Bluebell plant, accompanied by Mr Yanagiuchi.

c. Agreements

1. *MEI*

MEI has over sixty license agreements with U. S. companies still in effect where MEI is the licensee. Although MEI cannot say with certainty whether any of those companies are Pennsylvania corporations, or have their headquarters in Pennsylvania, this seems not to be the case. At all events, approximately sixteen of those companies appear to have facilities in Pennsylvania, including such companies as General Electric, Dynamics Corp., Philco-Ford, CBS, Honeywell, RCA, Airco, Inc., Magnavox, Scovill Manufacturing Co., Singer, and Zenith. MEI has approximately six agreements with U. S. companies as licensor, none of which appear to be Pennsylvania corporations or headquartered in Pennsylvania. Those companies are Data Technology Corp. of California, Minnesota Mining of St. Paul, Minnesota, P. R. Mallory & Co. of Indiana, Carborundum Company of Niagara Falls, New York, SCM Corp. of New York and General Electric Co. of New York. There were some twelve license agreements between MEI and U. S. companies that have been terminated, but again, those compa-

nies appear to be located outside of Pennsylvania, although they may have facilities in Pennsylvania. These include agreements with Admiral, Bell & Howell, Bendix Westinghouse, Corning Glass, Globe Union, Kelvinator International, McGraw Edison, Singer and Standard Kollman Industries.

### 2. *MEC*

MEC has one license agreement in the United States, with Texas Instruments of Dallas, Texas. MEC does not know whether that company has any Pennsylvania facilities.

### 3. *MET*

MET has some twenty-four distributorship agreements with U. S. companies under which MET sells those companies' products in Japan. Including in this group are three companies with Pennsylvania addresses: Ajax International Corp. of Erie, Pa.; McDanel Refractory Porcelain Co. of Pennsylvania; and Palmer Products, Inc. of Worcester, Pa. MET could not ascertain whether these or the other companies have facilities in Pennsylvania. MET also has an agreement with Vivitar Corp. of Los Angeles, Calif.

### 4. *Other Jurisdictional Information.*

On February 5, plaintiff's counsel provided the Court with copies of two newspaper articles, one captioned "TV Sets Made by Matsushita Ordered Recalled by the F. D. A." *(New York Times,* January 12, 1975) and the other headlined "Japanese Recall 407,000 TVs for Radiation Woe" (*Philadelphia Bulletin,* January 14, 1975). Defendants have supplied the Court with the following information about the substance of those articles.

On December 12, 1974, MECA, not MEI, was directed by the Bureau of Radiological Health (part of the Food and Drug Administration) to present a plan for the repair of certain color television sets manufactured by MEI and some of its affiliated companies so as to bring them into compliance with the applicable federal radiation standards, and to notify consumers, dealers and distributors of how their sets can be corrected. Those sets are sold under the brand name Panasonic. The approximate number involved is 300,000. A similar direction was sent to the J. C. Penney and W. T. Grant companies, not MEI, with respect to certain of their color television sets which were manufactured by MEI and some of its affiliated companies, which sets are sold under the private brand names of those companies. The approximate number of sets involved for those two companies was between 65,000 and 100,000. Insofar as the articles suggest that MEI, as distinguished from MECA, J. C. Penney or W. T. Grant, must submit a plan for correction, etc., those articles are incorrect.

### D. *MELCO.*

#### 1. Corporate Relationships.

##### a. Stock Ownership.

Both MELCO, a Japanese manufacturing corporation, and Mitsubishi Corporation (a/k/a Mitsubishi Shoji Kaisha and hereinafter referred to as "MSK") are both publicly held companies whose stocks are exchanged on the Tokyo Stock Exchange and other principal Japanese stock exchanges. There is no stock ownership between MELCO and Mitsubishi International Corporation ("MIC"). MELCO has provided the following information

about the stock ownership between MELCO and MSK:

a. The total number of outstanding shares of MELCO is 1,175,447,918.

b. The highest price of a single share of MELCO stock on the Tokyo Stock Exchange during the calender year 1974 was 155 Yen (U.S. $0.52) and the lowest price was 97 Yen (U.S. $0.32). At present, a single share of MELCO stock trades for approximately 113 Yen (U.S. $0.38).

c. The total current value of all outstanding shares of MELCO is 126,948,375,144 Yen (U.S. $423,161,250).

d. MSK owns 19,981,000 shares of MELCO's stock. Accordingly, the total value of the shares of MELCO stock owned by MSK is 2,124,468,000 Yen (U.S. $7,081,560).

e. The total number of shares outstanding of MSK's stock is 697,943,722 shares.

f. The highest price of a single share of MSK's stock on the Tokyo Stock Exchange during the calender year 1974 was 490 Yen (U.S. $1.63) and lowest price was 265 Yen (U.S. $0.88).

g. The total current value of all the outstanding shares of MSK's stock is 222,415,259,426 Yen (U.S. $741,384,198).

h. The total amount of shares of MSK's stock owned by MELCO is 13,671,000 shares. Accordingly, the total value of MELCO's ownership of MSK's stock is 4,552,443,000 Yen (U.S. $15,174,810).

i. As of December 31, 1974, MELCO owned 2.0% of MSK's stock and MSK owned 1.71% of MELCO's stock.

j. The respective percentages of ownership in the stock of MELCO and MSK, as described above, have been substantially the same for the years 1964–1974.

k. As of September 30, 1974, there were 159,082 shareholders of MELCO's stock.

b. Interlocking Directors and/or Executive Officers.

Mr. Ken Okubo, president and managing director of MELCO, was a nominal director of MSK during the period 1964 to May, 1974. In May, 1974, Mr. Okubo resigned his position as a nominal director of MSK and was replaced by Mr. Sadakazu Shindo who is the current president of MELCO and a director of MELCO.

Mr. Chujiro Fuino, a managing director of MSK, was also a nominal director of MELCO during the period 1964 through 1974.

Other than these two individuals, there are no other directors of MELCO who are also directors of MSK and vice versa.

There are no officers of MELCO who are also officers of MSK and vice versa.

With respect of MIC, there are neither directors nor officers of MELCO who are also directors or officers of MIC and vice versa.

2. Sales.

At oral argument on MELCO's jurisdictional motion, counsel for MELCO represented that MELCO and MSK are totally independent and unrelated corporations. In response to the Court's interrogatories, MELCO's counsel further averred that MELCO had no idea of the transactions that may have occurred between MSK and MIC involving customer electronic products sold in Japan by MELCO to MSK. MELCO has, however, reconstructed records

with respect to consumer electronic products sold to MSK which MELCO believes were intended for export to the United States by MIC, the U. S. subsidiary of MSK. Additionally, MELCO has reconstructed records of consumer electronic products sold to U. S. companies other than MIC, said products being imported by the other U. S. companies to the United States. Accordingly, for such sales to these U. S. companies, or to MSK, MELCO has provided the following sales figures for consumer electronic products:

### BLACK AND WHITE TELEVISION SETS

| Year | No. of Units | | Value in Dollars |
|------|------|------|------|
| 1964 | 41,846 | (U.S. $) | 2,047,000 |
| 1965 | 23,292 | | 1,294,000 |
| 1966 | 22,751 | | 1,264,000 |
| 1967 | 12,150 | | 675,000 |
| 1968 | 18,306 | | 1,017,000 |
| 1969 | 77,094 | | 4,283,000 |
| 1970 | 75,402 | | 4,189,000 |
| 1971 | 78,506 | | 4,618,000 |
| 1972 | 18,636 | | 1,167,000 |
| 1973 | 1,536 | | 77,000 |
| 1974 | No Record | | No Record |

### COLOR TELEVISION SETS

| Year | No. of Units | | Value in Dollars |
|------|------|------|------|
| 1970 [10] | 27,501 | (U.S. $) | 4,278,000 |
| 1971 | 60,289 | | 11,200,000 |
| 1972 | 39,810 | | 8,597,000 |
| 1973 | 49,786 | | 9,460,000 |
| 1974 | No Record | | No Record |

With respect to consumer electronic products other than black and white television sets and color television sets, the quantities which may have been imported to the United States are, according to MELCO, de minimis and MELCO does not have any record of these figures.

MELCO is unable to determine what portion of the quantities of black and white and color TV sets manufactured by MELCO and imported to the United States were sold in either the State of Pennsylvania or in the Eastern District of Pennsylvania.

3. Contacts.

a. Trademark.

MELCO owns the three-diamond logo trademark. Throughout the relevant time period, MELCO licensed the trademark to MIC.

10. Color television sets manufactured by MELCO in Japan were not imported to the United States by MELCO's customers until 1970. Accordingly, none of the color TV sets manufactured by MELCO ever found their way into the United States market until 1970.

MIC sold TV sets manufactured by MELCO under the trade name "MGA" which is not trademarked. Because MIC desired to utilize the trade name "MGA" which MELCO owns, MELCO licensed MIC to utilize the trade name "MGA" in connection with consumer electronic products which MIC purchased from MELCO and imported from Japan. Television sets which MELCO manufactures and sells in Japan are sold in the Japanese market under the "Mitsubishi Electric" trade name only, and not "MGA," which is the trade name utilized exclusively by MIC in the United States market. Many of the products sold by MIC which were not manufactured by MELCO also contained the trade name "MGA." Among such suppliers of MIC other than MELCO, to which MIC affixed the trade name "MGA," are the following companies: Tensho Denki of Japan; Shodensha of Japan; Technisound of Chicago, Illinois; Lucasey Manufacturing of Oakland, California; Dura-Tube Bending Company of Chicago, Illinois; O'Sullivan Manufacturing Company of Lamar, Missouri; BSR McDonald Ltd., of Worley, England; and Wells Gardner Electronics of Chicago, Illinois. Upon the organization of MELCO SALES, INC. and MELCO SALES INC.'s acquisition of the MGA Division of MIC, the license to utilize the trade name "MGA" was transferred to MELCO SALES, INC., as of October 1, 1974.

With respect to the use of the trade name "MGA" and the three diamond trademark in advertising or publications distributed in Pennsylvania between 1964–1974, because MELCO has no knowledge of the marketing practices of the MGA Division of MIC, MELCO was unable to answer this interrogatory. MELCO believes, however, that some advertising of MIC containing the trade name "MGA" and the three diamond trademark might have found its way into the State of Pennsylvania between 1964–1974 as the MGA Division of MIC was engaged in marketing its products, a substantial number of which were manufactured by MELCO and imported from Japan, throughout the northeast region of the United States.

b. Presence in Pennsylvania.

In connection with MELCO's license agreement with Westinghouse Electric Corporation, representatives of MELCO occasionally visit the head office of Westinghouse at Pittsburgh, Pennsylvania for technical discussions and related matters. MELCO has not retained a record of these visits by its representatives to Pittsburgh during the period 1964–1974 other than technical liaison representatives who remained in Pittsburgh for extended periods of time pursuant to the license agreement. The following list includes all of the technical liaison representatives who have visited Westinghouse's facilities at Pittsburgh, Pennsylvania in connection with the aforesaid license agreement during the period 1964-1974. After each year is set forth the individual's name and his particular engineering designation:

1964:     Keizo Takagi (Communications Engineer)

1965:     Toshiya Shiraoka (Communications Engineer)

1966:     Toshiya Shiraoka (Communications Engineer)
Sanpei Kameyama (Switchgear Engineer)
Masatoshi Kawasaki (Assistant Engineer)

1967:     Sanpei Kameyama (Switchgear Engineer)
Masatoshi Kawasaki (Assistant Engineer)

1968:     Hiroshi Yokohama (Control Board Engineer)
Shiichi Hirose (Assistant Engineer)

1969:     Hiroshi Yokohama (Control Board Engineer)
Shiichi Hirose (Assistant Engineer)
Takeshi Mori (Relay Engineer)

1970:     Takeshi Mori (Relay Engineer)
Tatsuo Torii (Assistant Engineer)

1971:     Shigeo Aida (Railway Engineer)

1972:     Shigeo Aida (Railway Engineer)
Masao Nogami (Manufacturing Engineer)
Shiichi Ibuki (Assistant Engineer)
Gai Kobayashi (Rectifier Engineer)

1973:     Masao Nogami (Manufacturing Engineer)
Shiichi Ibuki (Assistant Engineer)
Gai Kobayashi (Rectifier Engineer)

1974:     Masao Nogami (Manufacturing Engineer)
Shiichi Ibuki (Assistant Engineer)
Gai Kobayashi (Rectifier Engineer)

---

c.   Agreements.

MELCO entered into a license agreement with Westinghouse Electric Corporation which is headquartered in Pittsburgh, Pennsylvania. The agreement in question, dated April 1, 1966, remained in effect through 1974.

E. *Sharp Corporation*

1. Corporate Relationships.

a.   Stock Ownership.

Sharp owned 100 percent of the stock of Sharp Electronics Corporation (SEC), its American subsidiary.

b. Interlocking Directors and/or Executive Officers.

Mr. T. Hayakawa was president of Sharp from 1965 to 1970, and chairman of Sharp's board from 1970 to 1974. He was also chairman of SEC from 1965 to 1971.

Mr. A. Saeki was executive director of Sharp from 1965 to 1974, and president of Sharp from 1970 to 1974. He was a director of SEC from 1965 to 1974, and SEC's president from 1965 to 1971.

Mr. K. Saitoh was a director of Sharp from 1970 to 1974. He was a director of SEC from 1965 to 1974, executive vice president of SEC from 1966 to 1971, and president of SEC from 1972 to 1974.

Mr. M. Furubayu was executive director of Sharp from 1965 to 1970. He was a director of SEC from 1965 to 1971, and vice president of SEC during the same years.

2. Sales.

Like MEI, MEC and MECA, Sharp and SEC have requested that their sales data be kept confidential. Again, I see no need for such a request, but I will honor it. The data will be impounded and will be available for review by an appellate court. It suffices to say that both corporations have made substantial sales of goods, either for export to the United States (in Sharp's case), or in the United States itself (in SEC's case). For the period 1965–1974, Sharp's annual sales of such goods ranged from roughly 1¼ billion Yen in value to almost 34 billion Yen in value. During the same time, SEC's annual sales ranged in value from roughly $5,000,000 to roughly $93,000,000. Approximately 4% of SEC's dollar sales figures represent sales in Pennsylvania, and approximately 2% of those figures represent sales in the Eastern District of Pennsylvania.

3. Contacts.

a. Trademarks.

SEC has used trademarks owned by Sharp in advertisements, publications and brochures in connection with the sale of goods by SEC. SEC has distributed such advertisements, publications and brochures continuously in Pennsylvania throughout the period of 1965–1974. An exact list of the publications and brochures with dates is presently unavailable, advertisements appeared in national except that throughout this period advertisements appeared in national trade publications such as *Home Furnishings Daily*, and other national publications such as *Time, Fortune* and *Good Housekeeping* magazines.

b. Presence in Pennsylvania.

During the period 1965–1974, SEC had no employees who resided and worked in Pennsylvania. However, in that same period of time, employees of SEC visited Pennsylvania on a regular basis. Such visits were made in order to contact persons, firms and corporations who either engaged in purchasing products offered for sale by SEC or who were potential purchasers of such products, and in order to attend trade shows. The purpose was to promote SEC's products, to advise concerning after-sales service, to solicit orders for SEC's products, and to attend to collection of SEC's accounts receivable from customers.

During the period from 1965–1974 Sharp had no employees who resided and worked in Pennsylvania. However, in that same period two employees of Sharp visited Pennsylvania. In 1973, Mr. T. Sasaki spent two days in Pennsylvania and met with a Mr. Kopp of AMP Incorporated for the purpose of discussing an exchange of technology. In 1974, Mr. T. Ebiike spent two days in Pennsylvania and visited with Fogel Commercial Refrigerator Company in Pennsylvania concerning possible importation into Japan of that company's products.

c. Agreements.

SEC has had numerous agreements from 1965–1974 with businesses located in Pennsylvania concerning distribution and service of its products. Many such agreements continue in effect, while others have terminated from time to time during the period 1965–1974.

Sharp has no agreements with Pennsylvania businesses. Sharp does not have knowledge as to whether corporations with whom it has agreements have any facilities in Pennsylvania except: (1) plaintiff has represented on the record herein that Zenith, with whom Sharp has a license agreement which is a part of the record in this action, had a facility in Pennsylvania; and (2) AMP, Inc., a New Jersey corporation with which Sharp has an agreement relating to technology, has a facility in Pennsylvania.

## III. DEFENDANTS' RESPONSES IN THE NUE ACTION AS ADOPTED BY THE COURT.

### A. HITACHI KADEN.

1. Corporate Relationships for 1965–1970.

In answer to these interrogatories of the Court, Kaden adopted its joint response with Limited in the *Zenith* case without change. For that response, see *supra*, at 5–8.

2. Sales.

In answer to these interrogatories as well, Kaden adopted its joint response with Limited in the *Zenith* case without change. For that response, see *supra*, at 8–9.

3. Contacts.

a. Trademark.

Advertisements, publications and brochures in which the "Hitachi" trademark or logo was used have been distributed in New Jersey. Kaden did not place any of these. Limited has placed institutional-type advertising which has circulated in New Jersey (see earlier response), but has not advertised in local New Jersey publications. HSCA and HAL have placed locally circulated advertisements and brochures bearing the "Hitachi" trademark or logo.

b. Presence in New Jersey for 1965–1970.

Three Kaden employees visited New Jersey during the relevant time period. All of their visits took place in 1970. Mr. H. Takakua, manager, First Export Department, visited New Jersey to discuss the sale of radios to Nissan Motors and to NUE. Mr. M. Misu, assistant manager, First Export Department, visited New Jersey to discuss the sale of radios to RCA Corporation. And Mr. M. Watanabe, of the First Export Department, also visited New Jersey to discuss radio sales to RCA.

c. Agreements.

Kaden has not, to its knowledge, entered into any agreements with a corporation having business facilities located in New Jersey.

### B. MELCO.

1. Corporate Relationships.

a. Stock Ownership.

During the years 1965–1970, MELCO owned approximately 2.0 percent of MSK's stock, and MSK owned 1.71 percent of MELCO's stock. There was no stock ownership between MELCO and MIC.

b. Interlocking Directors and/or Executive Officers.

Mr. Ken Okubo, president and managing director of MELCO was a director of MSK during the years 1965–1970. Mr. Chujiro Fujino, a managing director of MSK, was a director of MELCO during the years 1965–1970. There was no corporate interlock between MELCO and MIC during 1965–1970.

2. Sales.

MELCO produced the following figures for sales of black and white television receivers destined for export to the United States during 1964–1970:

| 1964 | $2,047,000 |
| 1965 | 1,294,000 |
| 1966 | 1,264,000 |
| 1967 | 675,000 |
| 1968 | 1,017,000 |
| 1969 | 4,283,000 |
| 1970 | 4,189,000 |

Color television receivers manufactured by MELCO in Japan were not imported to the United States by MELCO's customers until 1970. In that year, sales of MELCO manufactured color-television receivers intended for export to the United States totaled $4,278,000.

MELCO professes ignorance about other MELCO manufactured consumer electronic products which ma~

have been imported into the United States during 1965–1970. It also professes ignorance about the quantities of MELCO manufactured television receivers sold in New Jersey during 1965–1970.

3. Contacts.

a. Trademark.

MELCO owns both the tradename "MGA" and the three diamond trademark. During the years 1965–1970, it licensed both to MIC. MELCO asserts that its ignorance of MIC's marketing practices prevents it from furnishing the Court with detailed information about the use of either the tradename or the trademark in advertisements or publications that circulated in New Jersey during the relevant time period. It admits, however, that some MIC advertising using the tradename and/or the trademark may have found its way into New Jersey during 1965–1970, for the MGA Division of MIC was then marketing its products throughout the northeastern United States.

b. Presence in New Jersey.

MELCO denies that any MELCO representatives worked in New Jersey during the years 1965–1970. It believes that some MELCO representatives may have visited Westinghouse facilities in New Jersey during those years for technical discussions. It also believes that a Mr. M. Ichimura, a fluorescent lamp engineer from MELCO, may have visited the fluorescent lamp facility of Westinghouse in Bloomfield, New Jersey in 1967. Additionally, a number of MELCO engineers visited the RCA Research Laboratory in Princeton, New Jersey, during the relevant time period.

c. Agreements.

During the relevant time period, MELCO had technical agreements with Westinghouse, RCA Corporation, Western Electric Co., Ltd., Aircraft Radio Corporation, Plessey Airborn Corporation, and AIRCO, Inc., all of which are either headquartered in New Jersey or have facilities there.

C. *DENKI*

1. Corporate Relationships.

a. Stock Ownership.

Sanyo Electric Co., Ltd. ("DENKI"), is a Japanese corporation which manufactures electrical and electronics products and sells only in Japan to various purchasers, including TRADING. Sanyo Electric Trading Co., Ltd. (TRADING), is a Japanese corporation which purchases products in Japan from DENKI and others, and exports them to various countries, including the United States. Sanyo Electric, Inc. (INCO), is a New York corporation which purchases products from TRADING and imports them into the United States. During the years 1965–1970, DENKI owned 83 percent of TRADING's stock (third persons owned the remaining 17 percent) and 100 percent of INCO's stock.

b. Interlocking Directors and/or Executive Officers.

At the time the *NUE* action began, in December, 1970, the following individuals held positions of responsibility with DENKI and/or TRADING and/or INCO.[11] Mr. Y. Iue was a director of DENKI and chairman of its board. Mr. K. Iue was a director of all three corporations, president of all three corporations, and chief executive officer of DENKI. Mr. Nakai was a director of DENKI and INCO, and managing director of DENKI.

11. Counsel for DENKI has informed the Court that there was no significant difference in the degree of overlap during the preceding five years (1965–1970).

In addition to the directors named above, DENKI had 21 other directors, none of whom was a director or officer of TRADING or INCO. TRADING had six other directors, one of whom was a director and officer of INCO, and one other who was a director of INCO. INCO also had six other directors, two of whom were directors of TRADING.

2. Sales.

TRADING's sales to customers in the United States, including INCO, were as follows for the years 1965–1970:

| 1965 | $18,306,000 |
|---|---|
| 1966 | 36,950,000 |
| 1967 | 36,892,000 |
| 1968 | 62,161,000 |
| 1969 | 87,858,000 |
| 1970 | 94,144,000 |

These sales figures are for fiscal years ending in November. TRADING does not know precisely in which states of the United States its products were sold to ultimate consumers. Since most of its United States customers, including INCO, do sell nation-wide, a percentage of its customers' sales were undoubtedly made in New Jersey.

Though DENKI does not sell directly to the United States, in the *Zenith* action DENKI's counsel informed the Court that approximately 99 percent of TRADING's sales to United States customers during the 1965–1974 period were of DENKI manufactured products. See, *supra*, at 272. Obviously, the same percentage would apply during the relevant time period of 1965–1970 in this, the *NUE* action.

INCO does not have figures for sales in New Jersey during 1965–1970. Its total sales in the United States during those years were as follows for fiscal years ending March 31:

| 1965 | $ 5,905,980 |
|---|---|
| 1966 | 5,546,736 |
| 1967 | 9,978,257 |
| 1968 | 11,059,891 |
| 1969 | 24,072,124 |
| 1970 | 17,901,270 |

All INCO and TRADING sales during 1965–1970 were to private label customers. Neither had direct customers for private label television receivers in New Jersey during that time period. In 1967–1969, however, TRADING did sell color television receivers to a Japanese trading company, C. Itoh & Co., Ltd., which in turn sold them to the Emerson Television Sales Corporation whose warehouse was located in New Jersey.

3. Contacts.

a. Trademark.

No Sanyo brand-name products were marketed in the United States during the relevant time period. DENKI has never placed product or corporate advertising in the United States.

b. Presence in New Jersey.

Mr. K. Iue visited INCO's offices in Moonachie, New Jersey in 1969 and 1970. He also visited facilities of Emerson Radio & Television Corporation in 1969. Numerous other DENKI employees visited INCO's offices in Moonachie during the relevant time period.[12] In 1967, DENKI employees visited New Jersey to repair approximately 3,700 DENKI manufactured television receivers sold by TRADING to C. Itoh & Co., Ltd., and in turn sold to Emerson Radio & Television Company. Mr. S. Iue, a DENKI director, also visited INCO in New Jersey in October, 1969 and September, 1970. Finally, nine other DENKI employees visited

12. DENKI insists that no business was transacted during these visits or during the visits of Mr. Iue.

the United States during the relevant time period. Their precise destination in the United States was not known, so they may have visited New Jersey. None of the visits by DENKI employees was more than a few days in duration.

c. Agreements.

DENKI did not enter into any contracts or agreements with firms having business facilities located in New Jersey.

## IV. PLAINTIFF'S PROPOSED FINDINGS OF FACT IN THE NUE ACTION AS ADOPTED BY THE COURT.[13]

### A. Hitachi Kaden.[14]

1. Defendant Hitachi Limited is a corporation organized under the laws of Japan and has its principal of business in Tokyo, Japan. Hitachi Ltd. is engaged in the manufacture and sale of a wide variety of products including electrical machinery, appliances and consumer electronic products (App. B–1, Answer #1).

2. Hitachi Ltd. is one of Japan's largest industrial enterprises having net sales in fiscal 1970 of over $2.8 billion and employing over 144,000 persons. In 1970, Hitachi Ltd. had 62 consolidated subsidiaries and 256 non-consolidated subsidiaries (App. B–21, pp. 7, 18 and 20.

3. Counted among Hitachi Ltd.'s 62 consolidated subsidiaries is defendant Hitachi Sales Corporation of Japan (known in Japan as Hitachi Kaden Hanbai Kabushiki Haisha and referred to hereinafter as "Hitachi Kaden") which is a wholly-owned subsidiary of Hitachi Ltd. Hitachi Kaden is a Japanese corporation with its principal place of business in Toyko, Japan, and is engaged in the sale, distribution and export of household electric appliances manufactured by Hitachi Ltd. and two of Hitachi Ltd.'s manufacturing subsidiaries (App. B–1, Answer #3; App. B–3, Answers 1 and 3).

4. Hitachi Kaden was incorporated on May 2, 1955 by Hitachi Ltd. as a sales company for household electric appliances manufactured by Hitachi Ltd. Until the latter 1960's, Hitachi Kaden carried on these sales activities solely in the Japanese domestic market. At that time, Hitachi Ltd. transferred its export trade business in household electric appliances to Hitachi Kaden (App. B–3, Answer #1; App. B–8, p. 35; App. B–48, pp. J00010–J00011).

5. Until 1969, defendant Hitachi Sales Corporation of America, then known simply as Hitachi Sales Corporation ("Hitachi Sales"), was a wholly-owned subsidiary of Hitachi Ltd. At that time stock ownership of Hitachi Sales was transferred to Hitachi Kaden, so that the affairs of Hitachi Sales could be properly looked after by another sales company (Hitachi Kaden) rather than by a large manufacturer (Hitachi Ltd.) (App. B–8, pp. 35–36). Thus, Hitachi Kaden became "the nucleus of the sales activities of Hitachi household electric appliances" (App. B–48, p. J00010).

6. Hitachi Sales is a corporation organized under the laws of the State of California and has its principal place of business in Long Island City, New York.

13. Many of these proposed findings, herein adopted by the Court, are also relevant to the *Zenith* action and are adopted as the Court's findings of fact therein as well. See footnotes 1 and 3, *supra*, and accompanying text.

14. Many of the findings related to Hitachi Limited and Hitachi Kaden are based on the deposition of Mr. K. Nishi of July 11, 1972. Defense counsel has submitted corrections to the transcript of this deposition as submitted by the plaintiff. Mr. Nishi has stated that the deposition, as corrected, accurately reflects the substance of his views. Accordingly, in my review of the deposition, I have relied on these corrections whenever they conflicted with the version submitted by plaintiff. Defense counsel has also submitted a transcript of the deposition of Mr. E. Matsumura, taken in July and August, 1971. In my consideration of this deposition, I have relied on this version rather than the version submitted by plaintiff.

Hitachi Sales has been engaged, since its incorporation by Hitachi Ltd. on February 11, 1964, in the sale and distribution in the United States and New Jersey of household electric appliances manufactured by Hitachi Ltd. (App. B–4, Answers #1 and 58; App. B–8, p. 35; App. B–48, p. J00011).

7. Hitachi Ltd. also owns 100 percent of another Hitachi company (not a defendant herein), Hitachi America, Ltd. ("Hitachi America"), which has its principal place of business in New York City. Hitachi America is engaged in the sale and distribution in the United States of industrial electric products manufactured by Hitachi Ltd. (App. B–1, Answer #3.b).

8. In 1970, approximately 11 percent (or $314,270,000) of Hitachi Ltd.'s net sales were accounted for by products exported to markets throughout the world. Approximately 39 percent of its export sales was to the United States (App. B–21, p. 19). Thus the value of export sales of Hitachi Ltd. manufactured products exceeded $122,500,000 in 1970. Hitachi Ltd. views its future development and success as dependent upon its export sales. In its 1968 Annual Report, Hitachi Ltd. states (App. B–13, at 17):

"Hitachi has traditionally placed great emphasis on the promotion of exports. The future development of the company's business is based squarely on export, and this policy is in accord with the requirements of the nation as a whole."

9. Hitachi Ltd. employs different methods for selling and distributing its products in the United States and in New Jersey. One method is by direct sales of its products to customers located in the United States and in New Jersey (App. B–1 and B–2, Answer #10). The direct sales consist of private label sales or sales to original equipment manufacturer ("OEM") customers. (App. B–8 at 57–59). Hitachi Sales usually plays no role in these sales and the function performed by Kaden is merely clerical. (App. B–8, at 58–59, 61).

10. Hitachi brand household electric appliances, including consumer electronic products, manufactured by Hitachi Ltd. are sold and distributed to numerous dealers and distributors located throughout the United States by Hitachi Sales. The export of these items to the United States had been accomplished by Hitachi Ltd. until 1969, and thereafter was accomplishad by Hitachi Kaden. (App. B–1, Answers #3 and #83; App. B–2, Answer #19; App. B–3, Answer #83; App. B–8 at 57–58). But see App. B–48 at J00010 in which it is stated that responsibility for exportation of Hitachi Ltd. household electric products was transferred to Hitachi Kaden in November, 1967.

11. Industrial electric products manufactured by Hitachi Ltd. are sold and distrubuted to customers located throughout the United States and New Jersey, in part through Hitachi Ltd's wholly-owned New York subsidiary, Hitachi America. The export of industrial products to Hitachi America in the United States is accomplished by Hitachi Ltd. (App. B–2, Answer #19).

12. In connection with the sale and distribution of Hitachi brand household electric appliances and consumer electronic products, Hitachi Sales contracts with sales representatives, each of whom is responsible for a specified geographic area. Hitachi Sales had such a sales representative located in New Jersy in 1966 (App. B–50 and B–51). Within New Jersey are a number of service agencies authorized by Hitachi Sales to perform service repairs on Hitachi products (App. B–52; and B–53).

13. Sales and shipments to customers located in New Jersey of various products manufactured by Hitachi Ltd. have been and continue to be accomplished directly by Hitachi Ltd. Such direct sales and shipments to customers in New Jersey amounted to over $1,000,000 in each of the years 1969 and 1970. In ad-

dition, Hitachi Ltd.'s 1967 direct sales to customers in New Jersey amounted to over $620,000, and in 1968 to over $645,000. Thus, Hitachi Ltd. has been transacting business of a substantial and continuous nature within New Jersey for at least the four years preceding the filing of this action (Limited, App. B–1, Answer #10; App. B–2, Answer #10; App. B–55).

14. In connection with Hitachi Ltd.'s sales of its products directly to customers in the State of New Jersey, Hitachi Ltd. has been in communication with those customers and has solicited potential customers in the State of New Jersey (App. B–1, Answer #14).

15. Hitachi Ltd. advertises its products in newspapers and magazines that are distributed throughout the United States and, in all probability, in the State of New Jersey as well (App. B–1, Answers #11 and 12). In addition, Hitachi Sales (and Hitachi America as well) advertises Hitachi Ltd.-manufactured products in the United States and in New Jersey. Hitachi Ltd. contributes to the advertising expenses incurred by Hitachi Sales in the United States, including advertising by Hitachi Sales in New Jersey (App. B–1, Answer #13).

16. Technical employees and engineers of Hitachi Ltd. have visited the offices of RCA Corporation located in the State of New Jersey in connection with licensing agreements between Hitachi Ltd. and RCA Corporation. The frequency of these visits amounted to over 10 occasions in each year during 1969–1970 (App. B–1, Answers #16 and 25). In addition, technical employees of Hitachi Ltd. have visited plaintiff's plant in Jersey City, New Jersey, in connection with the sale by Hitachi Ltd. to plaintiff of certain consumer electronic products (App. B–1, Answer to #16; App. B–9 at V. II, 87–90, V. III, 83–84).

17. In connection with Hitachi Ltd.'s sales of products to plaintiff for shipment to Jersey City, New Jersey, and in addition to meetings in Jersey City of

Hitachi Ltd. technical personnel, meetings between officers and management personnel of Hitachi, Ltd., and of plaintiff's representatives in Jersey City, New Jersey, have occurred in Tokyo, Japan (App. B–9, Vol. II at 87–90, Vol. III at 83–84; App. B–28; App. B–29; App. B–33 through App. B–35; App. B–47).

18. Officers and other management personnel of Hitachi Ltd. have visited plaintiff's Jersey City, New Jersey, plant and have communicated by letter directly with plaintiff in Jersey City in furtherance of Hitachi Ltd.'s business relations with plaintiff as a customer (App. B–8, at 19–22; App. B–28 through App. B–30; App. B–32; App. B–35; App. B–37 through App. B–40). The meetings referred to above and those meetings occurring in Tokyo, Japan, were part of the business relationship between Hitachi Ltd. and plaintiff.

19. Hitachi Ltd. has entered into a patent license agreement with Esso Research & Engineering Co., Linden, New Jersey. In addition, Hitachi Ltd. and RCA Corporation have entered into patent license agreements and technical assistance agreements involving electronic data processing equipment, programming semi-conductors, camera pick-up tubes, and other products and components. While RCA's headquarters are in New York, the agreements contemplate employees of Hitachi Ltd. coming to RCA's New Jersey facilities on a regular basis for purposes connected with such agreements. (App. B–1 Answer to #25). In fiscal 1970 approximately 14.7% ($411 million) of Hitachi Ltd.'s net sales consisted of products covered by these agreements with RCA (App. B–21 at 20).

20. As shown above, Hitachi Ltd. owns all of the outstanding shares of Hitachi Kaden, which, in turn, owns all of the shares of Hitachi Sales. Of course, until 1969, Hitachi Ltd. owned directly all the shares of Hitachi Sales. In addition, Hitachi Ltd. has another

wholly-owned subsidiary in the United States—Hitachi America.

21. The transfer of stock ownership from Hitachi Ltd. to Hitachi Kaden was suggested shortly prior to March 1969 by K. Komai, President of Hitachi Ltd., to K. Nishi, who at that time was both the President of Hitachi Kaden and Senior Executive Managing Director of Hitachi Ltd. (App. B–8 at 33; App. B–1 Answer #8). The reasons for the transfer were twofold. First, since Hitachi Kaden, like Hitachi Sales, was engaged in the sale of Hitachi Ltd. manufactured and branded household appliances, except solely in the Japanese domestic market, it was felt by Mr. Komai that it would be better that Hitachi Kaden, a sales company, own the stock of another sales company, Hitachi Sales. Second, Hitachi Ltd. being a very large corporate entity was felt not to be in a position adequately to "look after another corporation which was engaged in the field of sales." (App. B–8, at 35–36). The Board of Directors of Hitachi Kaden was not consulted but was merely informed of the transfer at or after the time of the actual transaction (App. B–8 at 34).

22. The financial operating results of these three subsidiaries, Kaden, HSCA and HAL, are included in the consolidated financial statements of Hitachi Ltd. (App. B–1, Answer #74), and included in the 62 consolidated subsidiaries referred to in the June 18, 1970 Prospectus for Hitachi Ltd. common stock (App. B–21).

23. There has been considerable exchange and transfer of employees between and among the three companies (App. B–1, Answer #64(3); App. B–3, Answer #64(e)). Mr. K. Nishi testified that Hitachi Ltd. sends individuals to work at subsidiaries of Hitachi Ltd. (App. B–8, at 106). For instance, Mr. H. Yamada was, until August 1967, a Vice-President of Hitachi Sales. At that time he returned to the "head office," was employed by Hitachi Ltd. in the Consumer Products Division, and from there went to Hitachi Kaden as the Department Manager, 1st Export Department (App. B–3, Answer #74(e); App. B–42). Similar transfers have frequently been made by other employees. Indeed, it would appear that the entire Export Department, Consumer Products Division of Hitachi Ltd. was transferred to Hitachi Kaden when Hitachi Ltd. transferred responsibility for exporting consumer products to Hitachi Kaden in November, 1967 (App. B–42; App. B–54). Kaden did take Limited's place in the same kind of agreement Limited had previously negotiated with HSCA (Id.).

24. Mr. B. Hayashi was in June, 1973 the General Manager of the Subsidiaries Coordination Office of Hitachi Ltd., a position for which Mr. Hayashi may be particularly suited having been a former director of Hitachi Sales (App. B–1, Answer #69). In this connection it is worthy of note that the literal translation of the Japanese name for the Subsidiaries Coordination Office of Hitachi Ltd. is "office in charge of aligned companies", and that no similar or comparable office exists within Hitachi Kaden (App. B–8 at 121–122).

25. Mr. M. Naito, in June, 1973 the Executive Managing Director of Hitachi Kaden (App. B–1, Answer #64(b)), was for the period 1966–1968 "affiliated with" and a director of Hitachi Sales (App. B–8, Answer #64(e); App. B–56), and also at the same time the General Manager, Export Department, Consumer Products Division, of Hitachi Ltd. (App. B–54 at J00025, J00026–J00029). Mr. Naito, despite his dual role in Hitachi Sales and Hitachi Ltd., entered into at least three agreements on behalf of Hitachi Ltd. with Hitachi Sales regarding the payment of commissions to Hitachi Sales in connection with OEM sales made directly to United States customers by Hitachi Ltd. Thus, Mr. Naito was in the position of contracting with his own company on behalf of Hitachi Ltd. (App. B–54, at J00025, J00026–J00029).

26. Moreover, at or about the time that responsibility for handling the export business of Hitachi Ltd. was transferred by Hitachi Ltd. to Hitachi Kaden, Mr. Naito was transferred from Hitachi Ltd. to Hitachi Kaden and became the Executive Managing Director of Hitachi Kaden (App. 8–1, Answer #64(b)). In that capacity, and on behalf of Hitachi Kaden, rather than Hitachi Ltd., Mr. Naito contracted with Hitachi Sales for the payment of commissions to Hitachi Sales in connection with OEM customers in the United States (App. B–54 at J00020–J00022).

27. Hitachi Sales has reported to Hitachi Ltd. or to Hitachi Kaden regarding many of its activities, including (1) hiring of key employees, (2) dismissal or termination of employment of key employees, (3) promotion of key employees, (4) wages or salaries of key employees, (5) transfer of key employees, (6) sales, (7) distribution, (8) warehousing, (9) solicitation of customers, (10) selection of relatively large customers, (11) resale prices of Hitachi Ltd. products, (12) terms or conditions of sale of Hitachi Ltd. products, (13) discounts, rebates and advertising or promotional allowances, (14) advertising or promotional activities, (15) collection of accounts receivable, (16) leasing or purchasing of real property, (17) inventory, (18) change in office or other facility location, (19) capital expenditures and commitments, and (20) acquisitions or sales out of the ordinary course of business (App. B–6).

28. During the time that Hitachi Ltd. owned directly the stock of Hitachi Sales, at least one meeting of Hitachi Sales' Board of Directors was conducted at Hitachi Ltd. headquarters in Toyko, Japan (App. B–57). At that time 3 of the 6 members of Hitachi Sales' Board of Directors were residents of Japan (App. B–56).

29. In connection with the private label sales and sales to OEM customers made directly by Hitachi Ltd. in the United States and New Jersey, Hitachi Sales acted as an "intermediary" (App. B–9, at Vol. II pp. 80–90). Hitachi Sales was compensated for so acting solely by Hitachi Ltd. (App. B–9, at Vol. II pp. 83–84), and its obligation was and is to carry out the wishes of Hitachi Ltd. (App. B–9, at Vol. II p. 81). The function performed by Hitachi Sales in this capacity was to set up meetings, advise the customer of any problems encountered in production or shipment and to convey to Hitachi Ltd. the wishes of the customer with respect to various aspects of the transaction (App. B–9, at Vol. II pp. 80–90).

30. Despite defendants' representation, Hitachi Sales, by Mr. E. Matsumura, President of Hitachi Sales, has sought at least on one occasion the approval of Mr. K. Nishi for the promotion of employees within Hitachi Sales (App. B–8, at 44–45). Mr. Nishi is the president of Hitachi Kaden and a director of Hitachi Ltd.

31. At the apex of a vast corporate enterprise stands Hitachi Ltd. with over 60 consolidated subsidiaries and over 250 nonconsolidated subsidiaries which "constitute the largest industrial enterprise in Japan" (App. B–21 at p. 7). That it is a single enterprise cannot be disputed by Hitachi Ltd. itself. For Hitachi Ltd. has not only represented itself and its 62 consolidated subsidiaries (including Hitachi Kaden and Hitachi Sales) to be one, but believes itself to be one enterprise.

32. In a prospectus dated June 18, 1970, for 25,000,000 shares of common stock of Hitachi Ltd., Hitachi Ltd. and its 62 consolidated subsidiaries are referred to herein as "the Company" (App. B–21 at p. 7).

33. In its English-language Annual Report for 1968, Hitachi Ltd. states (App. B–13 at p. 21):

> "Hitachi has altogether 60 consolidated subsidiaries, as well as 175 nonconsolidated subsidiaries. All of these subsidiary enterprises work together in close cooperation as a single organization."

Mr. E. Matsumura, President of Hitachi Sales, conceded that Hitachi Ltd. and its subsidiaries work together in "close connection" (App. B–9, Vol. II at p. 60).

34. Hitachi, Ltd. (including its 62 consolidated subsidiaries) is represented, in the June 18, 1970 Prospectus for Hitachi Ltd. Common Stock, to have over 144,000 employees (App. B–21 at 20). However, in the Diamond, Japan Business Directory (App. B–11, at 408), Hitachi Ltd. is reported to have only 93,577 employees as of September, 1970. Thus, the remaining 50-odd thousand employees must be employed by the consolidated subsidiaries, among which are Hitachi Sales, Hitachi Kaden and Hitachi America.

35. Mr. K. Komai, President of Hitachi Ltd., stated in the 1968 Annual Report for Hitachi Ltd. (B–13 at 5):

"Under these uncertain conditions, with the co-operation of our 141,450 employees, we intend to move boldly forward with our efforts to revitalize our corporate structure."

In obvious reference to not only Hitachi Ltd., but its consolidated subsidiaries as well, the President of Hitachi, Ltd. himself views the Hitachi corporate structure as a single enterprise engaged in the common goal of the sale and promoting the sale of Hitachi products and views the employees of Hitachi Kaden and Hitachi Sales as employees of Hitachi, Ltd.

36. Persons employed within the Hitachi group of companies view the combine as one enterprise. Eizo Matsumura, Executive Vice-President of Hitachi Sales, when asked what "head office" was referred to in a letter (App. B–23) written by his subordinate within Hitachi Sales, replied (App. B–9, Vol. IV at 22):

"Hitachi has so many factories and branches and agencies, that within Hitachi, Ltd. it is customary to call Tokyo office as a head office. . . ." and further:

"In this letter, it is implied that the head office means Hitachi, Ltd. . . ."

37. In a letter dated April 12, 1967 from H. Yamada, Vice-President of Hitachi Sales, to Harvey A. Tullo of Emerson in Jersey City, New Jersey, Mr. Yamada states, in part (App. B–36):

"In order to comply with the agreement mentioned in your letter, as we have told you repeatedly, we need the approval from the head office. * * * be advised to talk directly with our head office."

Mr. Yamada then goes on to identify Mr. T. Yoshida, an officer of Hitachi Ltd., as the individual with whom Mr. Tullo should meet in Tokyo.

38. In another letter dated August 16, 1967 written by Mr. H. Yamada, Vice-President of Hitachi Sales, to Mr. Tullo, Mr. Yamada states, in part (App. B–42):

"Early in September I am going back to Japan with my family to fill another post in our head office.

* * * * * *

. . . I believe that the head office needs someone who knows America well enough to improve the export business to this country.

* * * * * *

If you come to Japan, please give me a call. You may contact me at Hitachi Ltd., Consumer Products Division, . . . ."

39. Hitachi Ltd. states that it has 32 "overseas representative offices" selling the products it manufactures (App. B–21, at 7 and 18). Included in these overseas offices are 4 United States offices of HSCA, which is characterized as a "major subsidiary" of Hitachi Ltd. (App. B–13 at 20–21). Under the heading "Overseas Offices" on page 20 of its 1968 Annual Report (App. B–31 at 20), Hitachi Ltd. lists six offices in the United States. Two of the six offices are office locations of Hitachi America, Ltd. (known in 1968 as Hitachi New York, Ltd.). The remaining

four "overseas offices" of Hitachi Ltd. located in the United States and listed in the 1968 Annual Report are office locations of Hitachi Sales Corporation of America (known in 1968 simply as Hitachi Sales Corporation).

40. In the Manhattan Yellow Pages, 1972, under "Hitachi" the following listing appears (App. B–53):

"Hitachi
Wide Range
of Popular
Priced Radios,
Color & Black & White
Television Cassette & Reel
Tape Recorders

Quality always comes
first at

HITACHI

Japan's largest
manufacturer

'FOR INFORMATION CALL'
Hitachi Sales Corp. of America
48–50  34 L.I. City .....361–3090"

In the Washington, D. C. Yellow Pages, May, 1971, under "Hitachi" the following listing appears (App. B–53):

"Hitachi
Quality
Always
Comes First
Japan's Largest Manufacturer
The New Revolution In
Solid State Color—Black & White
Televisions—Cassettes—Tape
Recorders

Quality always comes
first at

HITACHI

Japan's largest
manufacturer

'FOR INFORMATION CALL'

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

---

No attempt is made to identify which Hitachi company is "Japan's largest manufacturer." In the Manhattan listing the representation is that Hitachi Sales Corporation of America is "Japan's largest manufacturer."

41. Trade directories and buyers' guides distributed in the United States list Hitachi Sales and Hitachi America as overseas branches or agents of Hitachi Ltd. (App. B–19 and B–20).

42. In the Index of Japanese Electronic Manufacturers and Products, 1968, published by the Electronic Industries Association of Japan, of which Hitachi Ltd. is a prominent member, the following entry is made under the heading "Hitachi, Ltd." (App. B–19):

"HITACHI, LTD.

\*   \*   \*   \*   \*   \*

*Overseas Branches:*

U.S.A. HITACHI NEW YORK, LTD.
666 Fifth Avenue, New York, N. Y.
   10019 U.S.A.

Tel. JUdson 6–4257.

\*   \*   \*   \*   \*   \*

*Overseas Agents:*

U.S.A. (New York)
Hitachi Sales Corporation, 48–50 34th
   Street, Long Island City,
N.Y. 11101, U.S.A.

Tel. 361–3090."

43. On pages 179 and 180 of the Japan Electronic Buyers' Guide, 1970/71, 100 Leaders in the Electric & Electronic Industries (App. B–20), under the entry

for Hitachi, Ltd. there are listed, under the heading "Overseas Offices: U.S.A.," 5 offices of Hitachi Sales and 5 offices of Hitachi America. In the same volume in an advertisement of Hitachi Ltd. products, there appears the following:

"Overseas Representatives: New York/San Francisco/Los Angeles/ Chicago/Indianapolis/Dallas/Honolulu . . . ."

44. These representations have the potential to create in the minds of those who read them the conclusion that Hitachi Ltd., Hitachi Kaden, Hitachi Sales and Hitachi America are one enterprise, promoting the sale of Hitachi products throughout the world. This is irrefutably confirmed by Hitachi Ltd. itself in its 1968 Annual Report, at 17 (App. B–13), in which it is stated: ·

"Together with the activities of our many overseas offices around the world, this program has led us to making extensive inroads into the world market."

### B. *MELCO*

1. Defendant Mitsubishi Electric Corporation ("MELCO") is a Japanese corporation with its principal place of business in Tokyo, Japan and is engaged in the manufacture and sale of a broad range of industrial and consumer electrical and electronic products (App. C–1, Answer # 1).

2. MELCO in fiscal 1969 had net sales totalling over $812 million and as of September 30, 1969, employed over 63,000 persons (App. C–10, pp. 2 and 14).

3. Defendant Mitsubishi Shoji Kaisha, Ltd., now known as Mitsubishi Corporation ("MSK"), is a Japanese corporation with its principal place of business next door to MELCO's headquarters in Tokyo, Japan, and is engaged in general importing, exporting, trading and other mercantile business (App. C–5, Ans. # 1; App. C–6, Vol. 1 at 15). As of May 31, 1972, MELCO owned 1.5% of the outstanding capital shares of MSK and MSK owned 0.72% of the outstanding capital shares of MELCO (App. C–5, Ans. # 2).

4. MSK's total volume of trading transactions in fiscal 1969 amounted to approximately $8.1 billion. It employs over 13,600 persons in Japan and 2,400 in 54 other countries (App. C–70, p. 2).

5. MSK owns 100% of the shares of defendant, Mitsubishi International Corporation ("MIC"), a New York corporation with its principal place of business at 277 Park Avenue, New York, New York (App. C–4, Ans. # 58; App. C–3, Ans. # 1). MIC is engaged in the importation, sale and distribution in the United States of products, primarily supplied by MSK, but which MIC also obtains directly from other Japanese manufacturers, including MELCO (App. C–2, Ans. # 65(c) ).

6. Mitsubishi Electric Corporation was incorporated in Nagoya City under the laws of Japan on January 15, 1921 for an indefinite period as a result of the separation of the Electric Machinery Department from the Mitsubishi Shipbuilding Company (App. C–10, p. 2).

7. MELCO is engaged in the manufacture and sale of electric industrial equipment and consumer products, such as transformers, circuit breakers, electrical generators, instrumentation systems for atomic power plants, elevators and escalators, television sets, home fans, automotive electrical equipment, ground equipment for communication satellites, including radar and large scale antenna equipment, radio communication equipment for automobiles, semi-conductors, integrated circuits, motors, industrial hoists, stereo sets, home and industrial air conditioning units, missile defense systems and industrial process control computers (App. C–10, p. 2).

8. MELCO is generally regarded as one of the three largest producers of heavy electrical equipment and one of the four largest producers of electrical and electronic equipment in Japan although its relative position varies as to

particular products (App. C–10, p. 2). The Report on Mitsubishi Electric Corporation (June, 1969) (App. C–11, p. 2) describes MELCO as "today one of the three largest and most diversified electric and electronic companies along with Hitachi and Toshiba."

9. In 1969, MELCO's exports to world markets amounted to over $56,000,000, or 7% of net sales (App. C–10, p. 2). In 1971, the value of exports by MELCO reached approximately $123,928,000, 19% (or $23,446,000) of which was accounted for by exports to the United States (App. C–58). The exports to the United States have increased year after year since 1967 (App. C–6, Vol. 5, p. 332).

10. In addition to industrial electrical products, consumer electrical products manufactured by MELCO are sold in the United States and in New Jersey under the "MGA" brand and under the private labels of various United States firms (App. C–1, C–2, C–3, C–4, Answers 3, 19 and 23).

11. United States private label customers of MELCO products include Westinghouse Electric Corporation (App. C–63), Trans-American Electronics International Co., Inc. (App. C–49), Broadmoor Industries, Ltd. (App. C–50), Midland International Corp. (App. C–51), Gambles-Skogmo Company (App. C–47), and W. T. Grant (App. C–8, pp. 26–27).

12. Sales of MELCO products were, until March, 1969, limited to private label sales and sales to industrial customers. However, in March of 1969, the MGA Division of Mitsubishi International Corporation was established in the United States to develop a market for consumer electrical products manufactured by MELCO and to sell and distribute those products through independent retail dealers located throughout the United States (App. C–8, pp. 71–72; App. C–6, Vol. 4, pp. 250–256).

13. MELCO had anticipated, even as early as 1966, that it would be market-ing its own products in the United States under its own brand (App. C–6, Vol. 4, pp. 255–256), and since MIC had existed within the United States and had an established sales organization, branch offices throughout the United States, a nationwide servicing organization, an outstanding degree of merchandising skill, and was well-financed, and because it would be difficult for MELCO to put itself in a similar position, MELCO decided to utilize MIC for that marketing task (App. C–6, Vol. 4, pp. 255–256; App. C–6, Vol. 6, pp. 412–419). Thus, MELCO began exporting its consumer electronic products bearing the "MGA" brand to the United States.

14. With respect to the sale of MGA brand products manufactured by MELCO within the United States, MIC was the sole, exclusive distributor (App. C–7, Vol. 3, pp. 131–132; App. C–8, p. 33). MIC, in turn, through its MGA Division, contracts with dealers throughout the country in connection with the retail sale of MGA products. As of June 2, 1971, MIC had sales agreements with 16 dealers in the State of New Jersey, and service agreements with 21 other dealers (App. C–3, Answers 18 and 19).

15. The "MGA" trade name is owned by MELCO (App. C–2, Ans. # 27), not by Mitsubishi International Corp.

16. Prior to May, 1970, products manufactured by MELCO for resale in the United States were distributed through MSK to MIC (App. C–5, Ans. # 2(b)). These products included television receivers, radio receivers and other electrical appliances. After 1970, with the creation of the MGA Division of MIC, MELCO distributed those products directly to MIC (App. C–2, Ans. # 65(c)).

17. "MGA" products manufactured by MELCO are sold to retail dealers in New Jersey for resale to consumers in the State. In 1970, the volume of sales of MGA products amounted to approximately $200,000 (App. C–63; but see App. C–8, pp. 23–24).

18. Solicitation of retail customers in New Jersey is continuous and substantial. Sales personnel of the MGA Division meet regularly in New Jersey with New Jersey dealers (App. C–8, pp. 15–19, 22), advertising by trade publications and radio is conducted within New Jersey (App. C–8, pp. 48–49) and MGA salesmen visit New Jersey on eight or more occasions per month (App. C–8, pp. 19–20).

19. In 1970, with the creation of the MGA Division, MELCO's sales to MIC for resale throughout the United States and New Jersey amounted to over $8,-200,000 (App. C–2, Ans. # 65(c) ), whereas MELCO's sales were previously made partially through MSK (App. C–10, p. 12). MELCO's total sales of products in 1970 in the United States amounted to $11,073,000 (App. C–2, Ans. # 3).

20. MELCO transacts business in the State of New Jersey through its agent, Mitsubishi International Corporation. As stated by MIC's own counsel, MIC "fully admits it is present in New Jersey" (App. C–7, Vol. 2, p. 73).

21. MELCO has patent license or technical assistance agreements with United States corporations pursuant to which royalties are paid by MELCO to the United States licensors (App. C–10, p. 13). The most important of the various agreements are those MELCO has with Westinghouse and RCA Corporation. Indeed, MELCO views the arrangements for the provisions of technical know-how and patent licenses by Westinghouse and RCA to be "essential to the conduct of a significant part of Mitsubishi's present business" (App. C–10, p. 13).

22. MELCO engineers have visited RCA's Research Laboratory in Princeton, New Jersey, in connection with MELCO's agreements with RCA Corporation (App. C–2, Ans. # 16). In late 1967, Mr. Ichimura, Manager of the Ofuna Works of MELCO, visited the Bloomfield, New Jersey plant of West-inghouse for MELCO's business purposes (App. C–67).

23. Pursuant to an agreement dated April 22, 1964, Westinghouse agreed to purchase from MIC a minimum of 50,-000 12-inch portable black and white television receivers to be produced by MELCO and shipped to Westinghouse's facilities in Metuchen, New Jersey. This agreement was fulfilled in 1964 and 1965 (App. C–72; App. C–63).

24. MELCO purchased in 1969 and 1970 products produced by Westinghouse in Bloomfield, New Jersey. The volume of purchases for those two years amount to $13,522 and $14,582 respectively. (App. C–2, Ans. # 17).

25. In May, 1970, after the creation of the MGA Division in MIC for the sale of MELCO products, MELCO played host in Japan to retail dealers of MGA products located throughout the United States and in the State of New Jersey. A number of New Jersey dealers visited MELCO's plant located in Kyoto, Japan (App. C–8, pp. 34–35; App. C–42). Moreover, a meeting of the retail dealers and MELCO personnel occurred in the MELCO office building in Tokyo, Japan, at which time a high-ranking official of MELCO delivered a message (App. C–8, at 34–35). As a result of this visit, the New Jersey dealers placed orders for MELCO products. (App. C–8, p. 45).

26. There exists a network of service agencies in New Jersey authorized by MIC to perform warranty repairs on MGA products manufactured by MEL-CO. Pursuant to the contracts between the service agencies and MIC, the service agencies are required to maintain an inventory of replacement parts manufactured by MELCO (App. C–8, pp. 73–77).

27. MELCO's business success depends to a large extent upon its relations with a number of United States corporations, principally Westinghouse Electric Corporation and RCA Corporation. (App. C–10, p. 13). Indeed, the annual royalties paid by MELCO to

Westinghouse under patent licenses granted by Westinghouse to MELCO increased from $4.5 million in 1967 to $7.6 million in 1971. Royalties payable to Westinghouse are computed on the basis of MELCO's annual dollar volume of sales of products covered by a Westinghouse patent license. Thus, MELCO's annual sales of those licensed products amounted to approximately $454 million in 1970 and over $528 million in 1971—(App. C-68) representing approximately one-half of MELCO's total annual sales.

28. Exhibits appearing in appendices C-65 through C-69 detail the nature of the relationship between MELCO and Westinghouse and the scope of MELCO's activities in the United States in connection with that relationship. MELCO maintains "Resident Representatives" in East Pittsburgh, Pennsylvania, who serve as liaison. (App. C-2, Ans. # 56) Meetings of "top management" of MELCO and Westinghouse occur annually in the United States or Japan. These meetings are attended by, among others, Ken Okubo, Chairman of the Board of MELCO, H. Inoue, Vice-President of MELCO, S. Shindo, Managing Director of MELCO, T. Watabe, Manager of Planning Department of MELCO, and S. Abe, Manager of Overseas Survey & Licensing Department of MELCO (App. C-69). There is a continuous flow of communications between MELCO and Westinghouse (App. C-66 through App. C-69).

29. Many employees of MELCO annually visit the United States for business purposes on a regular basis (App. C-6, Vol. 2, pp. 28-29). Mr. M. Hasegawa, a MELCO employee who had an office at MIC's headquarters at 277 Park Avenue, New York, had the function of assisting personnel of MELCO visiting the United States and accompanied these MELCO personnel on visits to MELCO customers in the United States (App. C-7, Vol. 3, pp. 149-152). A number of MELCO employees were located during the period at MIC's offices in New York, including MELCO engineers who were in the United States to perform warranty repairs on products sold under private label. (App. C-7, Vol. 4, pp. 70, 73-74).

30. MELCO has entered into private label agreements with numerous United States firms for the sale of MELCO manufactured products to those firms in the United States (App. C-46 through C-51; Paragraph 11, supra).

31. As of March 15, 1970, MELCO entered into an agreement with Morgan Guaranty Trust Company of New York ("Morgan"), pursuant to which Morgan was to act as the indenture trustee in connection with the issuance by MELCO of $15,000,000, 7% Convertible Sinking Fund Debentures. That Indenture provided, *inter alia,* for the appointment by MELCO of Morgan as its agent for service of process and for the Indenture to be governed by the laws of New York. (App. C-71, Sections 15.09 and 15.10).

32. MELCO, in its answers to interrogatories (App. C-1, Ans. # 1), listed no offices in the United States at anytime during 1966 through 1970 and this representation was reiterated by Mr. S. Abe of MELCO in his deposition (App. C-6, Vol. 1, pp. 94-96). However, MELCO's corporate name appeared on the entrance to an office at 277 Park Avenue, New York (App. C-8, pp. 30-31). In its Offering Circular dated March 12, 1970, MELCO states (App. C-10, p. 12): "Mitsubishi [MELCO] has 13 representative offices in such cities as New York, Chicago and Los Angeles." Two letters (App. C-44 and C-48) written by an MIC assistant manager show carbon copies going to "MELCO Chicago" or "MELCO/Chicago Office." Three private label agreements to which MELCO is a party provide that all notices or other communication in connection with the agreement shall be sent to MELCO at the following

addresses (App. C–49, p. 8; C–50, p. 8; C–51, p. 12):

"130 East Randolph Drive
Chicago, Illinois 60611
or
"119 East Lake Street
Chicago, Illinois 60601"

The business card of Mr. M. Hasegawa reads, in part, as follows (App. C–56):

"Masaru Hasegawa
· Manager
New York Office
Mitsubishi Electric Corporation
277 Park Avenue
New York, New York 10017"

33. MELCO products are sold and distributed on a continuous and substantial basis in New Jersey by the MGA Division of MIC which carries on all those activities in New Jersey that are normally necessary and incidental to such sales (See Paragraphs 14, 17, 18 and 20, supra).

34. MIC is the principal marketing outlet for MELCO products in the United States, and has been since 1965 (App. C–6, Vol. 4, p. 382). The MGA Division deals primarily in products manufactured by MELCO (App. C–8, p. 33).

35. The MGA tradename, utilized widely by MIC in advertising, letterheads, brochures, and even in the name of the division, is owned by MELCO.

36. MIC is a "trader of commodities" (App. C–65) and, as such, acts as an agent in most transactions. In an Offering Circular of MSK, a Japanese trading company that owns 100% of the shares of MIC, it is stated (App. C–70, p. 10):

"Mitsubishi Shoji acts either as principal or agent in its trading transactions. In substance, the majority of MSK's purchases and sales as principal are more nearly agency transactions . . . ."

(For a discussion of the general functions of a Japanese trading company, see App. C–24, an article by M. Emori, a Managing Director of MSK).

37. In connection with MELCO's dealings with Westinghouse, MIC is used on frequent occasions as liaison or as a go-between, normally looking out for the interests of MELCO. (App. C–65; App. C–69). This is also true with respect to the private label arrangements for supplying MELCO products to United States customers. In the private label agreements themselves there is a recitation that MIC is "authorized" by MELCO to sell the products in the United States. (App. C–46 through App. C–51).

38. MELCO holds out MIC as its agent and representative in the United States. In its Annual Report for 1971 filed with the Securities and Exchange Commission on February 16, 1972, MELCO lists its "overseas representatives" and the following appears there (App. C–13, last page):

"U.S.A. c/o MIC MGA, 7045 North Ridgeway Avenue, Lincolnwood, Illinois 60645 (312) 973–2000"

Lincolnwood, Illinois is the headquarters of the MGA Division of MIC. (App. C–8, p. 11). In its Offering Circular dated March 12, 1970, MELCO states it has representative offices in New York, Chicago and Los Angeles. In each of those cities there is or was a branch office of MIC. (App. C–10, p. 12; App. C–7, Vol. 2, pp. 53–54, Vol. 4, pp. 39–45).

39. In the case of *United States v. Westinghouse Electric Corporation,* No. C–70–852 SAW (N.D.Cal.) the returns of service indicate that service on MELCO was made upon MELCO by serving the manager of MELCO's Los Angeles office (App. C–55) and also by serving Mr. T. Tomabechi, Vice-President and General Manager, Mitsubishi International Corporation, "Authorized to receive service for Mitsubishi Heavy Industries, Mitsubishi Electric, and Mitsubishi International" (App. C–54).

40. Appendices C–25 through C–39 are advertisements placed by MIC in trade papers, magazines and brochures

that contain representations concerning the Mitsubishi corporate structure and sales network for MGA products manufactured by MELCO. The format for most of these ads was first circulated in or about July, 1970, and has been in continuous use since then. (App. C–8, pp. 51–52).

41. The advertising and promotional material referred to in paragraph 41 contain the representation that MGA products are sold "factory direct" to retail dealers with no middleman mark-up. Thus, the ads say that the MGA products are shipped directly from the factory in Japan to retail dealers throughout the United States and to the 37 MGA dealers located in New Jersey (e. g. App. C–28, C–31, C–35), MIC receiving only a commission. The ads also state that the MGA Division of MIC is the manufacturer of the MGA product line. Language such as "Next, MGA designs and builds all critical components," "all critical solid-state devices are engineered and manufactured by MGA . . .," "MGA produces over a million . . . TV sets," "MGA is one of the few companies in the world with the resources to design and build its own color and black and white picture tubes . . . ." These representations are coupled with: "MGA 7045 North Ridgeway Lincolnwood, Illinois" which is, of course, the headquarters for the MGA Division of MIC. If these representations be true, then MIC is apparently manufacturing MGA products in Japan under the name MELCO.

42. The inevitable conclusion is that MELCO-MIC is a single enterprise manufacturing, selling and promoting MGA products throughout the world and in the United States. That this is true is further demonstrated by the following: The Electronics Industries Association of Japan ("EIAJ"), of which Ken Okubo, the Chairman of the Board of MELCO, is the chief officer, and of which MELCO is a member, reported in 1969 that MELCO had an "overseas branch or agent" at 119 East Lake

Street, Chicago, Illinois, which in reality is an office of MIC (App. C–14; App. C–6, Vol. 2, pp. 84–85). In 1970, the EIAJ reported that MELCO had "overseas agents" in MIC, 277 Park Avenue, New York and MIC, 130 East Randolph Drive, Chicago (App. C–15). The Japan Light Machinery Information Center reported in 1970 and in 1971 that MELCO had a "branch" at 277 Park Avenue, New York, the principal place of business of MIC (App. C–16 and C–17). It also reported that MELCO had its United States office in 1970 at 119 East Lake Street, Chicago, and its United States office in 1971 at 7045 North Ridgeway, Lincolnwood, Illinois, the latter of which is headquarters of the MGA Division of MIC.

43. MELCO, MSK and MIC are members of what they themselves describe as the "Mitsubishi Group" (App. C–10, pp. 8–9; App. C–70, pp. 9–10). A history and description of the Mitsubishi Group is included in MELCO's Offering Circular (App. C–10):

"Mitsubishi Group

Prior to World War II, a distinctive feature of the Japanese economy was the existence of large and powerful combinations of commercial and industrial companies, each under the control of a single family group (known as a 'Zaibatsu') and each including a broad range of banking, trading, shipping, mining and industrial manufacturing companies. The principal Zaibatsu combinations were the Mitsubishi, the Mitsui and the Sumitomo groups. In the case of the Mitsubishi group, the largest of the three, which was founded in 1890, control over the companies included within the group was in the hands of the Iwasaki family, which exerted such control through large stockholding interests.

One of the principal purposes of the anti-monopoly laws passed in the immediate post-war years was to break up the Zaibatsu combinations. In ac-

cordance with these laws, the Iwasaki family holdings in the various Mitsubishi operating companies were to be distributed to the public, the family holding company was liquidated, and the Mitsubishi group was in effect dissolved.

In recent years there has been a trend toward renewed cooperation within the former Zaibatsu groups. However, the nature of the relationships among the companies within the groups today is basically different from the relationships existing prior to World War II. Whereas the pre-war relationship within a particular group was one of common control by a single family, the relationship today is one of cooperation in areas of common interest within a group of publicly-owned companies, each operating under its own separate management. Despite this arrangement, most members of the group do business freely outside the group. Each member is in a different industry.

At present, there are about 44 companies which are members of the Mitsubishi group. These include, in addition to Mitsubishi Electric Corporation, Mitsubishi Heavy Industries, Ltd., The Mitsubishi Bank, Ltd., Mitsubishi Shoji Kaisha, Ltd. (a trading company), Mitsubishi Estate Co., Ltd., Tokio Marine and Fire Insurance Co., Ltd., Mitsubishi Chemical Industries Limited, Mitsubishi Rayon Company, Limited, Nippon Kogaku K. K., a life insurance company, a trust company, and a warehouse company, and a broad range of industrial manufacturing companies. With several exceptions, all of these companies carry the Mitsubishi name and use the Mitsubishi 'Three Diamond' trade mark."

44. The MSK Offering Circular expounds upon the cooperation among the member companies of the Mitsubishi Group:

"In general, such cooperation is implemented through cross-holdings of shares, cross-directorships, and committees of executives of group companies."

45. In an S–1 Registration Statement filed with the Securities and Exchange Commission in 1962, the predecessor of Mitsubishi Heavy Industries stated (App. C–66):

"Within the Mitsubishi Group, the amounts of the cross-holdings of stock are generally small in each particular case, but such cross-holdings are widespread. In general, most of the Mitsubishi companies hold stock in most of the other Mitsubishi companies. The aggregate of the Mitsubishi-owned holding in each particular company ranges from a high of $36\frac{1}{4}\%$ (or, in the case of certain joint venture companies formed at the instance of other Mitsubishi companies, a high of 99.5%) to a low of 5.6% and in most cases exceeds 15%.

\* \* \* \* \* \*

There are a number of cases within the Mitsubishi Group where a director of one company is a director or a statutory auditor of another company. These cases occur most frequently with respect to the Mitsubishi Bank and Mitsubishi Shoji.

\* \* \* \* \* \*

Interchanges of personnel among the Mitsubishi companies, while not frequent by American standards, are fairly extensive by Japanese standards, the usual pattern in Japan being for an individual to spend his entire business career with the same company.

There are several informal groups of executives from different Mitsubishi companies which meet on more or less regular bases. The principal one of these groups is the Kinyokai, a group of the board chairmen and presidents of twenty-three Mitsubishi companies which meets monthly. In addition, regular meetings are held among the heads of the general affairs departments of a number of Mitsubishi companies and among the heads of the

financial departments of a smaller number of such companies.

\* \* \* \* \* \*

Substantially all of the Group companies have their principal banking connection with the Mitsubishi Bank. Most of them conduct a significant percentage of their selling and purchasing operations through Mitsubishi Shoji."

46. Both MELCO and MIC represent that their business success and welfare is closely related to the growth and prosperity of the Mitsubishi Group. In "A Progress Report from the Mitsubishi Electric Corporation—1969," in characterizing the "corporate profile" of MELCO, it is stated (App. C–12):

"The Mitsubishi Group

The progress of Mitsubishi Electric has been closely linked to the growth of the Mitsubishi Group, whose 44 member companies are involved in virtually every sector of the Japanese economy. The leading position held by each of these companies in its respective field is responsible for the reputation of integrity enjoyed by Mitsubishi's 'three diamonds', a trademark which in all corners of the world signifies quality products of every type."

47. MIC, likewise, makes similar representations in its advertising. In an advertisement in New Yorker Magazine for MGA color television receivers, the MGA Division of MIC states (C–34):

"MGA is among the newest of the 50 companies that comprise the century-old, world-wide Mitsubishi Group. Any MGA TV you buy benefits from the combined expertise of over 350,-000 employees, in more than 1,000 laboratories and factories.

\* \* \* \* \* \*

"The Mitsubishi Group's rich background as a world leader in solid state electronics gives us the opportunity to put together many of the parts that put together our TV sets.

\* \* \* \* \* \*

The Mitsubishi Group also manufactures quality lines of black and white TV sets, stereo systems and appliances."

MIC also advertises in trade publications directed to retail dealers (App. C–31):

"We promised a competitively-priced profit line, backed by the world's second largest industrial family: the century-old, world-wide Mitsubishi Group."

The same and similar representations have been continuously made by MIC (See App. C–25, C–26, C–27, C–28, C–29, C–30, C–31, C–32, C–33, C–34, C–35, C–36, C–37, C–38 and C–39).

48. In a Fortune Magazine advertisement, the following language appears (C–25):

"Perhaps you've heard of the Dodge Colt, the MU–2 business man's plane and MGA electrical appliances, Three Diamond's canned foods, as well as Kirin beer and the Nikon camera. They have all been imported from one of the Japanese companies belonging to the Mitsubishi Group.

As Japan's largest complex of industrial enterprises with an employee roster of 350,000 the Mitsubishi Group is made up of 50 separate companies.

Each one is a leader in its own particular field, yet all are united by what Mitsubishi people call 'family' cooperation. Its rich supply of capital, technology and human resources plus 100 years of business experience have made it possible for the Mitsubishi Group to flourish as a multiple, integrated organization that operates on a worldwide scale.

\* \* \* \* \* \*

For more information please contact Mitsubishi Corporation (Mitsubishi Shoji Kaisha, Ltd.) . . . In U.S.A. please contact Mitsubishi International Corporation, 277 Park Avenue, New York . . . ."

49. In the light of these repeated representations that MIC was part of a single integrated enterprise named the Mitsubishi Group, it was surprising that the Executive Vice-President of MIC, Mr. T. Kitayama, repeatedly claimed the term Mitsubishi Group was too "vague" for him to testify about its existence, including the fact that MIC is a member, MSK is a member, MELCO is a member or that any other company is a member. (App. C–7, Vol. 1, pp. 29–30, 41–50, Vol. 4, pp. 81 et seq.).

50. Mr. Kitayama himself referred to Ken Okubo, the Chairman of the Board of Directors of MELCO, as "our chairman" (App. C–7, Vol. 4, p. 18); MSK bears a part or all of MIC's advertising expenses for MGA products manufactured by MELCO and shipped directly by MELCO to MIC (App. C–5, Answer # 13; App. C–7, Vol. 4, pp. 56–57); the "three diamonds" logo and trademark is in common use by scores of companies having the name Mitsubishi (App. C–10, p. 10); "MGA" stands for "Mitsubishi Group of America" (App. C–8, pp. 18, 68–69; App. C–9, p. 74); in the reception area of MIC's offices in New York where Mr. Kitayama works is a plaque listing the member companies of the Mitsubishi Group (App. C–9, pp. 72–73); a Vice-President of MIC in a letter to Westinghouse Electric Corporation stated: "Westinghouse . . . and the Mitsubishi family has had a very close personal relationship for the past 30–40 years. Among the Mitsubishi family, the Mitsubishi Electric Corporation (MELCO) is a licensee of Westinghouse." (App. C–65); MIC welcomes its new MGA dealers by stating: "I am confident that you made a wise and far-sighted decision when you joined forces with MGA . . . a brand name backed by a major resource, The Mitsubishi Group, with a 100 year tradition of quality, service and integrity." (App. C–59).

51. Mr. Abe testified that officers of Mitsubishi Group companies meet on a regular basis (App. C–6, Vol. 1, pp. 27–28).

52. Mr. Abe testified that there are cross-holdings of stock among Mitsubishi Group companies. (App. C–6, Vol. 1, p. 43, Vol. 6, pp. 447 et seq.; see also App. C–52).

53. Mr. Abe testified that there are interlocking boards of directors among Mitsubishi Group companies (App. C–6, Vol. 1, p. 50; see also App. C–66 and App. C–7, Vol. 1, pp. 9–10).

54. Mr. Abe testified that business is done among Mitsubishi Group companies on a friendly basis, and that MSK "caters to other Mitsubishi companies" (App. C–6, Vol. 1, pp. 68–69, Vol. 3, p. 371).

55. Finally, in a letter dated October 6, 1966, from Mr. Abe to F. J. Delzio of Westinghouse Electric International Company, Mr. Abe states (App. C–65):

"I think you can appreciate what our position will be in this kind of case. Naturally we would like to work with MHI [Mitsubishi Heavy Industries] or otherwise Toshiba or Hitachi may come in."

56. MELCO and MIC hold themselves out to be, and actually are, a part of one large, integrated enterprise which carries on business throughout the world, in the United States and New Jersey.

C. *DENKI.*

1. Defendant Sanyo Electric Co., Ltd. ("Sanyo Denki") [15] is a corporation organized under the laws of Japan and has its principal place of business in Osaka, Japan. Sanyo Denki is engaged in the manufacture and sale of household electrical appliances, electronic products and business equipment (App. A–1, Answer #1).

2. Sanyo Denki was founded in 1950 by Toshio Iue ("T. Iue") (App. A–8). Since that time it has grown into an

---

15. "Denki" is the Japanese word for electric.

industrial giant with sales in 1967 of $358 million. As of November 1970, Sanyo Denki employed approximately 17,500 persons (App. A–8; App. A–7).

3. Sanyo Denki owns 81 percent of the shares of defendant Sanyo Electric Trading Co., Ltd. ("Sanyo Trading"), a corporation organized under the laws of Japan and having its principal offices next door to the Sanyo Denki Head Office in Osaka, Japan (App. A–1, Answer #57; App. A–8). Sanyo Trading is engaged in the export to and sale in the United States of the products manufactured by Sanyo Denki (App. A–2, Answers #1 and 3). The remaining 19 percent of Sanyo Trading stock is owned, at least in part, by the Iue family (App. A–5, p. 7).

4. Sanyo Denki also owns 100 percent of the common stock of defendant Sanyo Electric, Inc. ("Sanyo Inc."), a New York corporation with its principal place of business at 51 Joseph Street, Moonachie, New Jersey. Sanyo Inc. is engaged in the sale and distribution in the United States and in New Jersey of the products manufactured by Sanyo Denki (App. A–1, Answer #57; App. A–3, Answers #1, 3 and 10).

5. Prior to the incorporation of Sanyo Trading in 1960, Sanyo Denki performed its own export functions through a division of Sanyo Denki. That division was separately incorporated in 1960, assumed the export functions for Sanyo Denki, and was named Sanyo Electric Trading Co., Ltd. (App. A–2, Answer #1; App. A–6, Vol. 1, p. 13, Vol. 2, pp. 43–45).

6. Sanyo, Inc. was established in the United States in 1961 as the result of a decision by T. Iue, who was then President of Sanyo Denki and Chairman of the Board of Directors of Sanyo Trading (App. A–3, Answer #1; App. A–5, pp. 28–29).

7. At least 27 different product lines manufactured by Sanyo Denki have been and are being sold in the United States and in New Jersey. These products include consumer electronic products, home appliances and office equipment (App. A–1, Answer #3; App. A–3, Answer #10.)

8. Until 1970, the products manufactured by Sanyo Denki were sold in the United States solely to private label customers or OEM customers (App. A–6, p. 55). Thereafter, Sanyo Denki products were sold in the United States and New Jersey under the "Sanyo" tradename by Sanyo, Inc. All Sanyo Denki exports to the United States during the period 1961 through 1972, whether private label or otherwise, were channeled through Sanyo Trading, which shipped the products directly to private label customers or Sanyo, Inc. in the United States and New Jersey (App. A–5, pp. 26–28; App. A–1, Answers #1 and 3; A–8).

9. In 1971, Sanyo Denki's value of exports throughout the world totalled approximately $232,727,000. Of that amount approximately 46 percent, or $107,054,420, was directed to the United States (App. A–34).

10. The amount of commerce involved in the export to and sale and distribution of Sanyo Denki products in the United States and in New Jersey is obviously substantial. Sanyo Inc.'s sales in the United States of products manufactured by Sanyo Denki in 1969 and 1970 (the two years preceding the filing of the complaint herein) were $24,072,124 and $17,901,270 respectively (App. A–3, Answer to #3). The flow of commerce and trade in Sanyo Denki products in New Jersey has been continuous. Sanyo, Inc. sold Sanyo Denki products to approximately 55 retail dealers located in the State of New Jersey in 1970 (App. A–3, Answer #10). Sanyo Trading has sold Sanyo Denki products to over 70 private label customers located in the United States including the State of New Jersey, and in 1969 and 1970 such sales amounted to over $35,000,000 and $61,000,000 respectively (App. A–1, Exhibit F. #23).

11. Neither Sanyo Inc. nor Sanyo Trading have raised any defense on grounds of jurisdiction or venue as to them.

12. Sanyo Denki owns 100% of the stock of a New Jersey headquartered company (Sanyo Inc.), whose business is exclusively that of selling products manufactured by Denki (App. A–1, #57; App. A–3, Answers to #1 and 3).

13. Mr. K. Iue, President of Sanyo Denki, has visited Sanyo Denki customers located in New Jersey on 5 separate occasions during the period 1967 through 1970. Mr. S. Iue, a Managing Director of Sanyo Denki, has made trips within the State of New Jersey in connection with Sanyo Denki's business on 4 separate occasions during the period 1967 through 1970. In addition, other officers or directors of Sanyo Denki visited the United States for business purposes on numerous occasions. It is not known whether some of those occasions involved business visits within the State of New Jersey (App. A–1, Answer #15; App. A–6, Vol. 1, pp. 81–85).

14. Denki has during the period 1965 to 1970 sent technical employees and engineers to the United States for the purpose of examining and repairing its products sold to private label customers pursuant to Denki's product warranties. These employees have visited Inco's headquarters in Moonachie, New Jersey (App. A–6, Vol. 1, pp. 31, 79–81 and Vol. 2, p. 41).

15. Mr. T. Sohma, a Vice-President and Director of Sanyo, Inc., when asked to identify those Sanyo Denki personnel who have visited the offices of Sanyo Inc. in New Jersey replied that he could not name all of them because "there are so many" (App. A–6, Vol. 1, p. 60).

16. Sanyo Denki products have been shipped by Sanyo Trading to private label customers located in New Jersey, including Westinghouse Electric Corporation in Edison, New Jersey, and Emerson Television and Radio Co. in Jersey City, New Jersey (App. A–2, Answer to #23; App. A–24, 25 and 26; App. A–6, Vol. 2, pp. 43–45).

17. In addition, Sanyo Denki prepared technical specifications, drawings and designs for its products intended for sale to Emerson, which specifications, drawings and designs were sent to Emerson (App. A–6, Vol. 1, p. 78).

18. Engineers and technical personnel employed by Sanyo Denki established in 1967 a facility in Jersey City, New Jersey (Lackawanna Warehouse across the street from the Emerson plant) to perform repairs on Sanyo Denki television receivers which had been sold to Emerson and shipped to its plant in Jersey City, New Jersey, and which were found to be defective (App. A–32).

19. Sanyo Denki holds at least thirteen patent licenses from 9 United States corporations and pays royalties to those companies (App. A–1, Answer to #25).

20. Sanyo Inc., a wholly-owned subsidiary of Sanyo Denki, deals exclusively in products manufactured by Sanyo Denki (App. A–3, Answer to #3). Substantially all of Sanyo Trading's sales are of products manufactured by Sanyo Denki (App. A–2, Answer #83).

21. Mr. T. Sohma, a director of Sanyo Inc. since 1966 attended only one meeting of that company's Board of Directors, that meeting being held in New York City in 1971. Mr. Sohma did not remember whether any other meetings of the Board were held (App. A–6, Vol. 1, pp. 26–28). The 1969 meeting of Sanyo Inc.'s Board of Directors was held on October 6, 1969, at Sanyo Denki's principal office in Osaka, Japan (App. A–33).

22. Mr. Y. Takemoto, presently the President of Sanyo, Inc., was recommended for that position by Mr. E. Kamuro, Senior Managing Director of Sanyo Trading. The recommendation was made to Mr. K. Iue, the President of both Sanyo Denki and Sanyo Inc. (App. A–5, pp. 32–34). Mr. T. Sohma, a Director of Sanyo Inc. since 1966, recalled only being informed that Mr. Y. Takemoto was to become the President of the com-

pany of which Mr. Sohma was a Director (App. A–6, Vol. 1, p. 29). Moreover, Mr. Sohma had no knowledge of the election of Mr. Konishi to the office of Treasurer of Sanyo Inc., although he did know that Mr. E. Kamuro and Mr. Y. Takemoto had "promoted" Mr. Konishi to that position (App. A–6, Vol. 1, p. 34).

23. The directors of INCO are chosen by consultation between the President of Denki and Mr. E. Kamuro in his capacity as Senior Managing Director of Sanyo Trading. Mr. Kamuro recommends proposed directors, and they will become directors if no objection is voiced by the President of Sanyo Denki (App. A–5, pp. 32–34). In those subsidiaries in which Sanyo Denki's stock ownership amounts to at least 50 percent of the outstanding shares, either Y. Iue or K. Iue (and formerly T. Iue) hold a position superior to all others in that corporation, regardless of who may manage the day-to-day affairs of the subsidiary (App. A–4; App. A–1, Exhibits C, D and E).

24. In 1971, products manufactured by Sanyo Denki began for the first time to be sold in the United States under the "Sanyo" tradename. This new marketing idea was suggested by Mr. A. Kamuro, Senior Managing Director of Sanyo Trading, to Mr. K. Iue, President of Sanyo Denki, that "Denki might sell its products in the United States through Trading Company and INCO, by using the name 'Sanyo' for its products." Mr. Iue did not object to this suggestion (App. A–5, pp. 42–43).

25. Mr. T. Sohma, a director and officer of Sanyo Inc., had no knowledge of the plan to sell Sanyo Denki products through Sanyo Inc. under the "Sanyo" name, until after the decision had been made. In Mr. Sohma's words, "And somehow or other, some day, when I get up in the morning, the decision is made. I don't know who did it" (App. A–6, Vol. 2, pp. 96–97). The reason Mr. Sohma had no knowledge of what person or persons made the decision, was Mr. Sohma's own characterization of himself as "a soldier" (App. A–6, Vol. 2, p. 96).

26. The business policies of Sanyo Inc. are formulated, according to Mr. Sohma, by Mr. E. Kamuro and Mr. Y. Takemoto, and the officers and directors of Sanyo Inc. However, Mr. Kamuro, the Senior Managing Director of Sanyo Trading and a Vice-President and Director of Sanyo Inc., is authorized to formulate policy for Sanyo Inc. by the President of Sanyo Trading, Mr. K. Iue (App. A–6, Vol. 1, pp. 73–74).

27. As was shown above, Mr. Sohma in reality had no knowledge of the persons who controlled and made policy for Sanyo Inc. (App. A–6, Vol. 1, p. 75):

"Q. Are you saying now that the President of Denki, which owns 100 per cent of your company, doesn't control the activities of Inco.?

A. Doesn't control activity of Inco? Well, this I—from directly to him, I don't know, whether he's controlling us or not, but somehow the policy is made. So maybe he's doing something, I don't know. I can't tell you. I never got any order from him at all in my life."

28. In Paragraphs 7 to 11, *supra*, there is a description of Sanyo Denki's distribution and sale of its products for the United States market. The value of Sanyo Denki exports to the United States is substantial and has been continuous throughout the period 1966–1972. In 1971, for instance, the value of Sanyo Denki exports to the United States amount to over $100,000,000 (Paragraph 9, *supra*).

29. There are other indicia of Sanyo Denki's transaction of business in the United States. Sanyo Denki has communicated from Japan with officers of Sanyo Inc., by telephone (App. A–3, Answer #87). Those offices are located at 51 Joseph Street, Moonachie, New Jersey (headquarters) (prior to June 1969, 350 Fifth Avenue, New York, New York), 5940 West Touhy Avenue, Niles, Illinois (office) previously Sanyo, Inc. had its Chicago office at 221 North La-Salle Street, Chicago, Illinois), and 1200 West Walnut Street, Compton, California

(office and warehouse) (previously 7440 North Figueroa Street, Los Angeles, California) (App. A–6, Vol. 1, pp. 42–48).

30. Sanyo Denki products have been displayed at various trade shows, a NOMDA (National Office Machine Dealers Association) show in Pitsburgh, Pennsylvania, in July, 1970, the Consumer Electronics Show in New York, New York, in June, 1970, a NOMDA show in San Francisco, California, in October, 1970, and the Premium Show in New York, New York, in October, 1970. Sanyo Denki sent a representative, Mr. S. Furushita, to the Chicago Houseware Show in July, 1970 (App. A–1, Answer #46). Moreover, Sanyo Denki's director, Mr. E. Kamuro, of Osaka, Japan, attended the Consumer Electronics Show in New York in June, 1970 (App. A–3, Answer #46).

31. The Sanyo Denki executive responsible for exportation of Sanyo Denki products to the United States is Mr. E. Kamuro, a Director of Sanyo Denki (App. A–2, Answer #9). Mr. Kamuro is also Executive Managing Director of Sanyo Trading and a Vice-President and Director of Sanyo Inc. (App. A–1, Exhibits A, C and D; App. A–4). Mr. Kamuro has visited the United States several times each year from 1965 through 1970 to meet with representatives of Sanyo Denki's private label customers in the United States (App. A–2, Answer #15).

32. Sanyo Denki has entered into patent licensing agreements, technical assistance agreements, and know-how agreements with the following United States manufacturers: RCA Corporation, General Electric Co., Western Electric Co., Regency Electronics, Inc., Hazeltine Corporation, Burroughs Corporation, Advance Transformer Co., and Ampex Corporation (App. A–1, Answer #25, Exhibit B) and pays annual royalties under its existing patent licensing agreements. Several of these patent agreements cover television components, and Sanyo Denki has stated in its answers to plaintiff's interrogatories that it considers these patents to be important to its business (App. A–1, Answer #25).

33. Sanyo Inc. makes purchases of goods in the United States for ultimate use by Sanyo Denki (App. A–6, Vol. 2, pp. 63–65). In 1969, purchases for Sanyo Denki of goods manufactured in the United States totalled $1,616,415.21. In 1970, its purchases totalled $699,219.99 (App. A–1, Answer #17).

34. Sanyo Denki has availed itself of the American laws relating to registry of trademarks. On April 12, 1960 and February 14, 1967, Sanyo Denki had registered the trademark "SANYO" in the United States (App. A–1, Answer #27).

35. Sanyo's advertising invites the conclusion that "SANYO" is one entity conveniently departmentalized throughout the world, and the officers and directors of the Sanyo defendants so conceive of it, in Mr. T. Sohma's words, as "the total Sanyo" (App. A–6, Vol. 2, p. 37, and pp. 23, 35–36).

36. The record contains further proof that the three Sanyo defendants are in fact conceived of as one by the very directors and officers who run this giant business. There is, for example, the confusion of Mr. Sohma concerning whether or not Mr. Konishi, the Treasurer of Sanyo Inc., was not also an employee of Sanyo Trading (App. A–6, Vol. 1, pp. 34–35); his statement that he himself was employed by Denki to work for Trading (App. A–6, Vol. 1, pp. 10–12); his statement that Mr. Ishide, a director and branch manager for Sanyo Inc., was also associated with Sanyo Trading (App. A–6, Vol. 1, pp. 37–38); his statement that Mr. Arimoto, a director and branch manager of Sanyo Inc. was at the same time associated with Sanyo Trading (App. A–6, Vol. 1, pp. 38–40); his repeated references to Sanyo Trading, using the pronoun "our" and "we," even though Mr. Sohma is supposedly not an employee or officer of Sanyo Trading (App. A–6, Vol. 1, p. 60, Vol. 2, pp. 96–97).

37. The 1968 Annual Report of Sanyo Denki (App. A–8) states:

"All exports from Japan are channeled through the Sanyo Electric Trading Co., Ltd., a fully owned subsidiary with offices next door to the Sanyo Head Office Building in Osaka. Through this company, which serves as Sanyo Electric's International Division, Sanyo exports merchandise and, with increasing frequency, engineering technology and know-how. From 15,000,000,000 [yen] (approximately US $42 million) in 1965 exports rose to US $69 million in 1966, and the 1968 target calls for 100 million dollars in exports. For these energetic marketing efforts Sanyo Electric was awarded the Prime Minister's 'Japan Export Promotion Prize, 1967.' "

38. The business card of Mr. K. Iue himself, one of the founders of the Sanyo enterprise and now President of Sanyo Denki, President of Sanyo Trading and Chairman of the Board of Directors of Sanyo Inc., which was presented to Mr. Joseph J. McKee, then Executive Vice President of plaintiff National Union Electric Corporation, states that Sanyo Trading is the "International Division of Sanyo Electric Co., Ltd." (App. A–30). Furthermore, the stationery of Sanyo Trading states in bold-faced type that Sanyo Trading is the "International Division of Sanyo Electric Co., Ltd." (App. A–24, A–25 and A–26; see also App. A–16 which are four circulars bearing the legend "Distributed by: Sanyo Electric Co., Ltd. International Division: Sanyo Electric Trading Co., Ltd., Osaka, Japan").

39. In Sanyo Denki's Report for 1968 (App. A–8) the representations that the "total Sanyo" is a single enterprise are reinforced and confirmed:

"International ventures include . . a sales network covering 132 countries and territories.

\*    \*    \*    \*    \*    \*

" . . . gradually a worldwide network of manufacturing, sales and service facilities was established. In March, 1961, Sanyo Electric Incorporated was founded in New York. . .

\*    \*    \*    \*    \*    \*

"There is hardly a spot on earth today where no Sanyo products can be found. . . . Sanyo sales offices are located in the principal centers of world commerce, including New York, Chicago, Hong Kong and London. . .

\*    \*    \*    \*    \*    \*

"All Sanyo exports from Japan are channeled through the Sanyo Electric Trading Co., Ltd., a fully owned subsidiary with offices next door to the Sanyo Head Office Building in Osaka. Through this Company, which serves as Sanyo Electric's International Division, Sanyo exports merchandise and with increasing frequency, engineering technology and know-how.

\*    \*    \*    \*    \*    \*

"With more and more new products finding their way into more homes all over the globe, Sanyo's international activities will certainly show sustained growth."

40. The trade directories of the Japanese Electronic Industries Association, of which Sanyo Denki is a member, supply further examples of the manner in which the Sanyo defendants have held themselves out to the public as one company with local offices throughout the world. The 1968 Directory of this Association stated (App. A–12):

"Electronic Industries Association of Japan (EIA–J) is the sole industrial association in Japan organized by more than 500 electronic equipment and parts manufacturers. Companies herein listed are restricted to some 200 makers and firms who are members of the Export Div. of the Association."

In his deposition, Mr. K. Iue, President of Sanyo Denki, testified that Sanyo Denki supplies information about Sanyo for inclusion in the publications of this Association (App. A–6, p. 31).

Both the 1968 and 1969 editions of the Directory of the Association (App. A–12; App. A–15) list Sanyo Inc. as

the "Overseas Agent" or "Branch" of Sanyo Denki.

41. Moreover, in "Japan Electronics Buyers' Guide: 100 Leaders in the Electric & Electronic Industries" for 1970–1971, the headquarters of Sanyo Inc. at 50–52 Joseph Street, Moonachie, New Jersey is listed among the "Overseas Offices" of Sanyo Denki (App. A–11).

42. The 1969–1970 and 1971 editions of the catalogue entitled "United States Offices of Japanese Electronic Manufacturers," published by the Electronics Division of the Japan Light Machinery Information Center (App. A–13 and App. A–14), list Sanyo Inc. among the United States offices of Japanese electronics manufacturers and give its address in Moonachie, New Jersey.

43. The telephone number of Sanyo Denki and the telephone number of Sanyo Trading at their headquarters in Osaka, Japan are the same—"Phone: (06) 991–1181" (App. A–24; App. A–30).

## V. *ADDITIONAL FACTUAL FINDINGS ADOPTED BY THE COURT.*

### A. *Hitachi Limited and Hitachi Kaden.*

Limited distributed, for promotional purposes, a diary for the 1972 calendar year. The diary, which bears the Hitachi logo and trademark, identifies Tokyo as Hitachi's "Head Office." Under the heading of "Hitachi Overseas Representatives," it lists the offices of Hitachi America, Ltd. in New York City, Indianapolis, Chicago, San Francisco and Los Angeles. Under the same heading, it lists the offices of Hitachi Sales Corporation of America in Long Island City, New York, Elk Grove Village, Illinois, Dallas, Texas and Redondo Beach, California. Again under the same heading, it lists a showroom in San Francisco and the offices of Hitachi Sales Corporation of Hawaii, Inc. in

Honolulu. An insert in the diary states that as of August, 1971, Mr. G. Takiguchi had become an overseas representative of Hitachi at the Los Angeles office of Hitachi America, Ltd.

Limited's Annual Report for the year ending March 31, 1974 lists, under "Overseas Offices and Sales Corporations," the New York City, Atlanta, Chicago and San Francisco offices of Hitachi America, Ltd., the Compton, California, Long Island City, New York, Elk Grove Village, Illinois, and Dallas, Texas offices of Hitachi Sales Corporation of America, and the Honolulu office of Hitachi Sales Corporation of Hawaii. The report identifies Hitachi Sales Corporation,[16] Hitachi America, Ltd. and Hitachi Sales Corporation of America as major consolidated subsidiaries of Limited. An organizational chart in the report shows "Overseas Offices" as part of the "International Operations Group" of Limited itself.

### B. *DENKI.*

A promotional brochure published by Denki [17] lists technical agreements and joint ventures between Denki and 14 American corporations, including Zenith. It identifies the establishment of INCO in 1961 as one of the "History Highlights" of the company. It describes Sanyo Electric as a "growing international family," consisting in part of INCO, which is headquartered in New Jersey, and in part of offices in Chicago, Los Angeles and Hawaii, all of them associated with INCO.

In an April 2, 1970 letter from E. Kamuro, a managing director of TRADING, to the Bureau of Radiological Health in Rockville, Maryland, Mr. Kamuro identified TRADING as the international division of Denki, and designated INCO as Denki's agent for service of process pursuant to 42 U.S.C. § 263h (d). Mr. T. Sohma, vice president and general manager of INCO, countersign-

---

16. I presume this is Hitachi Kaden.

17. The brochure is not dated, but internal evidence points to a publication date sometime in 1973, prior to August of that year.

ed the letter, accepting the designation and again describing TRADING as Denki's international division.

Denki registered trademarks with the United States Patent Office for a variety of electronic products in 1964, 1967 and 1972.

A Sanyo advertisement that appeared in the April, 1974 issue of *Consumer Electronics*[18] contained the following statements:

(1) "Sanyo manufactures 6 of the best selling car stereo tape players in the industry."

(2) "We're one of the largest *prime* manufacturers of car stereo, so we don't merely assemble parts produced by others. Instead, we make almost all the components that go into your line ourselves."

(3) ". . . you'll be buying direct from an international manufacturer doing *over one billion dollars* a year in world trade. We're a company with 47,500 employees and 23 plants in Japan, Taiwan, Canada, Brazil, and an assembly plant in the United States."

The advertisment supplies only one address for Sanyo, that of INCO's Electronics Division in Compton, California. The advertisement, however, identifies Sanyo representatives in 34 cities of the United States, including Philadelphia and Pittsburgh.

Advertisements bearing the Sanyo trademark and advertising a variety of Sanyo appliances appeared in the August 13 and 27, September 10, October 1 and 29, 1970 issues of *Home Furnishings Daily*. The sole corporate address shown in these advertisements was that of Sanyo Electric Inc. in Moonachie, New Jersey.

On December 10, 1970, an advertisement bearing the Sanyo trademark and advertising Sanyo appliances appeared in *Home Furnishings Daily*. The sole address appearing in the advertisement was "Sanyo Electric, Inc., Joseph Street, Moonachie, New Jersey, 07074."

On January 6, 1971, an advertisement bearing the Sanyo trademark and advertising Sanyo consumer products, in particular color television sets, appeared in *Home Furnishings Daily*. The advertisement contained the following statements:

". . . we've been around."

"We produced our first color TV set in 1960."

". . . Sanyo is among the world's top manufacturers of consumer products."

The advertisement referred inquiries to "Consumer Electronics Division, Sanyo Electric Inc., 1200 West Walnut Street, Compton, California 90220."

Similar advertisements appeared in the January 12, 1971 and January 29, 1971 issues of *Home Furnishings Daily*.

On January 11, 1971, an advertisement bearing the Sanyo trademark and advertising a variety of Sanyo consumer electronic products appeared in *Home Furnishings Daily*. The only corporate address appearing in the advertisement was that of the "Appliance Division Headquarters" of Sanyo Electric Inc. in Moonachie, New Jersey.

### C. *MEI, MEC AND MET.*

An MEI advertisement from the August, 1963 issue of *Fortune*[19] consisted of an open letter signed by Mr. K. Matsushita, chairman of MEI's board. After discussing the evils of price wars and urging businessmen to avoid them, Mr. Matsushita noted that MEI had established MECA three years before "for the purpose of marketing such Matsushita products as transistor radios, TV receivers and tape recorders under the brand name of 'Panasonic.'" He pledged that in "our American operation," MEI would compete in quality and performance, but not in price.

18. Vol. 2, No. 4, at 3.

19. At 55.

■ Ralph Regula stated by affidavit that on or about November 1, 1974,[20] he had attended a "Panasonic Caravan" in King of Prussia, Pennsylvania. The specific purpose of the Caravan's visit was a presentation of new features in Panasonic television sets. Its general purpose, Mr. Regula said, was "the promotion for sale of the Panasonic products to the dealers in this area." The gathering was attended by many Panasonic dealer representatives in the Philadelphia area, by Mr. Edward Beatem, a representative of Leeds Fox, which was the Philadelphia area distributor for Panasonic products at the time, and by engineers from MEI. According to Mr. Regula, these engineers were under the supervision of Richard Miyagi, "supervisor of sales promotion for Panasonic's television export from the Panasonic factories in Japan."

An article from the March 18, 1974 issue of *Television Digest*, which discussed MEI's proposed purchase of Motorola's consumer television business,[21] contained the following statements:

(1) *"Entire Motorola consumer products staff* keeps jobs under agreement, and Matsushita says it will market product through same distributors—independent & company-owned—now handling Motorola line, and will take over Motorola warranty & replacement-parts obligations. Quasar line will be marketed in operation completely separate from Matsushita's Panasonic line, which is handled largely through reps."

(2) *"Quasar Electronics will be operation* of Matsushita Electric Co. of America (MECA), which markets Panasonic brand, although operations will be kept separate, according to Matsushita spokesman. Day after Galvin announced pending sale to employes over PA system, MECA Pres. Akira Harada appeared at plant for Q-&-A session. He also addressed distributors and answered questions at hastily called meeting March 15."

(3) *"Direct responsibility for Quasar Electronics* will be assumed by Kelichi Takioka, senior managing dir. of Japanese parent company, who will probably have title of Quasar chmn. Featuring prominently in speculation about resident mgr. representing Matsushita is name of I. B. (Bud) Fuji, longtime veteran of MECA and currently vp of its Industrial Div."

(4) *"What is Matsushita's motive?* Company has been shopping for some time for U. S. mainland manufacturing facilities. Like Sony, it knows it can't count on competing here by offering imported products under today's international monetary & energy realities. Unlike Sony, which is building own plants here from scratch, Matsushita gets plants already in place and operating, highly trained workforce of 8,000, executive & Sales administrators—and a going, highly reputable product."

(5) *"Takeover could significantly enhance future* of what is now Motorola Consumer Electronics Div. Matsushita isn't in business for quick buck, can be expected to concentrate on building up weak areas, infuse new money, embark on heavy ad programs (which Motorola has desperately needed in recent months), pave way for heavy switch to solid-state, bring in more engineering personnel. Matsushita officials have told Motorola staff that line would be broadened—perhaps

---

20. I recognize that the events described in the Regula affidavit took place after the filing of the Zenith complaint. Courts may, however, draw inferences from events that occur subsequent to the initiation of a suit if those events tend to show a pattern of conduct that existed prior to the start of the litigation. Cf. Leach Co. v. General Sani-Can Mfg. Corp., 393 F.2d 183, 185–86 (7th Cir. 1968).

21. The sale has since been completed. Zenith challenges this acquisition in Count III of the instant complaint, charging MEI, MET, MECA, Motorola and QEC with a violation of § 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

heralding return to stereo & radio, dropped by Motorola in belt tightening operation."

MEI filed Securities and Exchange Commission Form 6–K on May 31, 1974. The form, which reported on the purchase by MEI of certain assets of Motorola, Inc., contained the following statements:

"Matsushita will operate the acquired assets through a new company called Quasar Electronics Corporation, which will be a subsidiary of Matsushita Electric Corporation of America."

\* \* \* \* \* \*

"Matsushita's 'Panasonic' brand products will continue to be marketed through their established distribution systems in the United States, Canada and Puerto Rico."

MEI's authorized signatory of this report was H. Yamato, executive vice president of MECA.

MEI's Annual Report for the year ended November 20, 1973 listed MEC, MET, and MECA as consolidated companies. It also contained the following statements:

"Matsushita is a multi-national company, with a strong competitive position. Its pre-eminence is attributable to a strong sales network, both in Japan, its primary market, and worldwide. . . ."

\* \* \* \* \* \*

"Matsushita has extensive manufacturing and sales facilities throughout the world. . . . 25 manufacturing subsidiaries and 18 sales subsidiaries are operating in 28 different countries outside of Japan—in Europe, Africa, Asia, Australia and North and South America. A good portion of Matsushita's success stems from the parent company's unique decentralized system of operation consisting of 63 manufacturing departments; each a complete profit center; each managed independently and conducting its own research and development, production and sales activities."

\* \* \* \* \* \*

"Matsushita continued to expand its multi-national activities, enjoying strong export growth in the fact of trying world economic conditions."

\* \* \* \* \* \*

"Our overseas subsidiaries have been effectively increasing their production and sales."

\* \* \* \* \* \*

"Matsushita Electric has been developing new overseas operations planned from a global point of view since 1971. . . ."

Finally, the Report identifies MET as the "Export Division" of MEI, and MECA as one of MEI's "Sales Companies" in the United States.

### D. *MELCO*

Prior to oral argument, on January 16, 1975, Edwin P. Rome, Esq., trial counsel for Zenith, submitted an affidavit, accompanied by exhibits, in opposition to MELCO's motion to dismiss. Exhibit A to the affidavit was an advertisement from the July 10, 1974 issue of *Home Furnishings Daily*, and consisted of an open letter dated July 8, 1974, from Mr. Y. Yamaguchi, president of MELCO Sales, Inc. to "The Consumer Electronics Industry of America." Mr. Yamaguchi began: "Let's set the record straight about MGA." The letters "MGA" were immediately preceded in this sentence by the three diamond logo. MELCO owns both the tradename "MGA" and the three diamond trademark. Mr. Yamaguchi identified MELCO Sales as "a second tier marketing subsidiary of Mitsubishi Electric Corporation, the manufacturer of MGA's quality color television products." Mr. Yamaguchi promised that "MGA dealers will benefit from outstanding sales policies including: 1. Factory Direct Distribution. . . ."

Exhibit B to Mr. Rome's January 16 affidavit was an article from the Spring 1974 issue of *MSU Business Topics*, a publication of the Graduate School of Business Administration at Michigan

State University. The article was written by Robert E. Tindall, and was titled "Mitsubishi Group: World's Largest Multinational Enterprise?" While Mr. Tindall conceded that the Mitsubishi Group "is not a single juridic entity" and that it is questionable whether it "should be considered a single enterprise," he stated that "de facto family cohesion and cooperation give it the power and influence of an economic godfather." Id. at 28. After reviewing the history of industrial combines ("zaibatsu") in Japan, he described the process by which policy is presently made in the Mitsubishi Group:

". . . Current Group coordination is provided by the Kinyokai or Friday Conference, a weekly gathering, attended by the chief executive officers of approximately twenty-six major Mitsubishi companies. Leadership at the conference is in the hands of a triumvirate consisting of the top executive from Mitsubishi Shoji (renamed Mitsubishi Corporation in 1971), from Mitsubishi Bank, and from Mitsubishi Heavy Industries. Coordination and cooperation among the Group depends upon the collective guidance exercised at these meetings. . . ."

\* \* \* \* \* \*

"Unlike the centrally dominated prewar pattern, the present companies are a loose confederation of independent enterprises sharing common former zaibatsu ties and a certain community of interest. The council of twenty-six Kinyokai executives also differs in its power and function from the prewar holding company. The present organization, with a few exceptions, is a council of peers, each representing an independent firm. The officers of these firms do, in fact, place the interest of their own company over that of the Group. They are willing to cooperate only insofar as such collaboration will be beneficial to their own firm. But it usually is,

and although the council lacks the ultimate authority once vested in the holding company, its policy decisions are seldom ignored by the management of a member firm." [22] Id. at 30–31.

Mr. Tindall further stated that "the collusive practices of the Mitsubishi companies would be a U. S. Department of Justice nightmare." Id. at 33. Finally, he compared the Mitsubishi Group to large American and European companies. In the Western World,

". . . what the top officers are really managing is not simply one major company but an industrial combine consisting of a large number of firms, called divisions or subsidiaries, with corporate headquarters as the nucleus for coordination. Directors of International Telephone and Telegraph, for example, attempt to establish policies for the overall guidance of the company in the same way that Mitsubishi policies are set by Kinyokai members.

"The difference is mainly one of ownership. ITT owns its divisions and the shares of its subsidiaries. There is no single parent company that can make that claim for the Mitsubishi companies. Mitsubishi cohesion is based on cross-holding of stocks, a community of interest, and a tradition of cooperation."

Exhibit C to Mr. Rome's January 16 affidavit is a MELCO offering circular, dated March 12, 1970, for $15,000,000 worth of 7% Convertible Sinking Fund Debentures due March 13, 1985. In the circular, MELCO itself discusses the Mitsubishi Group, states that about 44 companies belong to it, most of them carrying the Mitsubishi name and using the Mitsubishi three diamond trademark, and remarks on a "trend toward renewed cooperation with the former zaibatsu groups," of which Mitsubishi is one.

22. At oral argument on February 3, 1975, counsel for MELCO read significant portions of this passage into the record. Pretrial Order No. 5 at 89–90.

Marvin Levin, an executive of a Philadelphia furniture firm, stated by affidavit that his firm belongs to the Marta Corporation of Pennsylvania, which purchases home entertainment electronic products from manufacturers and their marketing and sales organizations. On behalf of Marta, Mr. Levin orders MGA products manufactured by MELCO. From 1970 through 1974, he made these purchases through Mitsubishi International Corporation in New York.

In 1970, Mr. Levin visited Japan at the invitation of MELCO and MIC, and toured MELCO factories there. One of his hosts was Mr. Shigehiko Takahashi of MELCO's Consumer Products Division.

Mr. Levin further stated that on November 4, 1974, in Philadelphia, he had attended a presentation of a new MGA product line to be sold for MELCO by MELCO Sales, Inc. At the presentation, the aforementioned Mr. Takahashi, general manager of MELCO's Consumer Products Division, represented MELCO. During his talk, he thanked the 16 dealers present for the business they had done with MELCO in the past in MGA products.

On February 17, 1975, plaintiff submitted supplemental exhibits related to MELCO's motion to dismiss. Part I of these exhibits consists of documents from the files of the Federal Communications Commission. The documents include: letters from MELCO in Japan identifying an official of MIC as its representative in the United States; letters from the FCC to MELCO at a Lincolnwood, Illinois address; letters on MELCO stationery listing New York City and Lincolnwood, Illinois addresses for the corporation;[23] and letters from MELCO in Japan that are co-signed by persons who were either officials of

MIC in the United States, or American representatives of MELCO who used MIC addresses.[24]

Part 2 of these exhibits also consists of documents from the files of the FCC. They include letters from MELCO in Japan showing carbon copies to "Our Chicago branch" or "Representative in Chicago"; letters from MELCO identifying its representative in Chicago, whose address is that of MIC in Lincolnwood, Illinois; letters from MELCO in Japan that are co-signed by the manager of the western regional office of the MGA Division of MIC in Compton, California; letters from MELCO referring the FCC to the MIC office in Lincolnwood, Illinois, for answers to problems or questions about MELCO products; and a letter signed by MELCO's manager of "Field Operations—U.S.A. and Canada."[25]

Part 3 is the affidavit of Louis Caplan, dated October 18, 1973. Mr. Caplan, the president of Rex Trading Corporation, based in Newark, New Jersey, stated his firm had engaged in substantial business transactions with Elize, Incorporated, MELCO's export agent.[26] In 1966, Mr. S. Kajitani, chief engineer of the Nagoya Works of MELCO, visited Newark to discuss problems Mr. Caplan's firm was having with a motor manufactured by MELCO. At about the same time, Mr. Caplan visited Japan and negotiated an agreement with MELCO making REX the exclusive distributor for MELCO industrial sewing machines in seven states, including New Jersey.

Part 4 is the affidavit of Joseph Szabo, dated November 12, 1973. Mr. Szabo, president of a Los Angeles firm, Chicago Sewing Machine Co., stated that in April, 1966, after discussions with MELCO and MSK officials, he negotiated in Japan an agreement with MELCO making his firm

---

23. Other documents in the set place MIC, as well as MELCO, at these same addresses.

24. All the letters in Part 1 were written during the years 1969–1971.

25. All the letters in Part 2 were written during the years 1966–1971.

26. Letters from Elize were attached to Mr. Caplan's affidavit as exhibits. Elize's stationery identifies it as MELCO's export agent.

the exclusive distributor for MELCO industrial sewing machines and motors for California, Arizona and Northern Mexico.

The final exhibit in this submission is an advertisement placed by MGA in the January 15, 1971 issue of *Home Furnishings Daily*. The advertisement bore the MGA trademark, the letters "MGA" preceded by the MELCO-owned three diamond trademark, and contained the following statements:

(1) "53 years and many millions of electric fans ago, MGA's parent company, the Mitsubishi group, introduced its first fan to the market."

(2) "Self-lubricating, the Mitsubishi-built fan motors never need to be oiled."

(3) "Silent partners are another of MGA's factory-direct profit-line home products. Labor and parts warranty is built into the price; middle-man costs are locked out. MGA works direct with each of its carefully selected dealerships."

The advertisement carries a Lincolnwood, Illinois, address for MGA and urges its readers to write to MGA at addresses in New York City, Lincolnwood, and Compton, California.[27]

Plaintiff also submitted copies of documents in the public record of a pending case, *United States v. Westinghouse Electric Corp., Mitsubishi Electric Corp. and Mitsubishi Heavy Industries, Ltd.,* Civil Action No. C–70–852—SAW (N.D. Cal., complaint filed April 22, 1970). The copies were obtained from the Patent Section of the Antitrust Division of the Department of Justice in Washington, D. C.

Part 1 of this submission is a License and Technical Exchange Agreement, signed September 17, 1965 and effective April 1, 1966, between Westinghouse Electric International Company, a division of Westinghouse Electric Corporation, and MELCO. The agreement notes that for many years MELCO "has received from Westinghouse valuable advice and services useful in the conduct of Mitsubishi's operations" (p. 1). It provides that Westinghouse will offer consultation and advice to MELCO, and gives MELCO the right to send trainees to Westinghouse plants (p. 7). It requires Westinghouse to permit MELCO to maintain up to five resident representatives at the East Pittsburgh works of Westinghouse, and to permit MELCO representatives to visit other Westinghouse plants (p. 9). And it specifies how MELCO shall make royalty payments to Westinghouse for the rights secured to it by the agreement (pp. 11–14). Mr. K. Okubo, president of MELCO, signed the agreement for his firm.

Part 2 of the submission is a Westinghouse response to interrogatories in the aforementioned case. In Answer to Interrogatory No. 13(C), Westinghouse averred that it had purchased licensed products from MELCO, and that it knew that certain licensed products manufactured by MELCO had been sold in the United States.

Part 3 of the submission is MELCO's Answer in the aforementioned case. In Paragraph 8 of the Answer MELCO admits that it sells its products to purchasers located in California and elsewhere in the United States.

Part 4 of the submission is a MELCO response to interrogatories in the aforementioned case. In Answer to Interrogatory No. 20(d), MELCO avers that its products have been sold throughout the world in the stream of international commerce.

Part 5 of the submission consists of documents related to the second annual top management meeting between executives of MELCO and Westinghouse. The meeting, held in Pittsburgh in June, 1967, was also attended by representa-

---

27. The correspondence in Parts 1 and 2 of this submission reveals that MIC has used all three of these addresses, and MELCO has used two of them.

tives of MIC. The topics discussed at the meeting included integrated sales, sub-licensing by MELCO, joint ventures, license and technical exchange implementation, MELCO's manufacturing plans for licensed material, and joint research and development. One letter in this submission shows a carbon copy to be sent to MELCO's "Resident Representative" at the East Pittsburgh works of Westinghouse. The submission also contains a summary of a speech by Mr. Okubo, where he spoke of MELCO's desire to keep abreast of Hitachi, Toshiba and Matsushita in the overseas market. Finally, a letter in this part of the submission, which discusses elevator installation in Hawaii, suggests that MIC will act as MELCO's agent in any negotiations.

Part 6 of the submission deals with the first annual top management meeting of MELCO and Westinghouse executives. Held in Tokyo in 1966, the meeting was also attended by MSK representatives. A summary of the meeting notes a presentation by MELCO of "Mitsubishi Electric group objectives." A letter from the president of Westinghouse Electric International Company states that MELCO brought up the question of increasing its sales into the United States.

Part 7 of the submission consists of documents related to proposals for joint sales and research by Westinghouse and MELCO. A 1966 letter from MIC notes the close relationship between Westinghouse and the Mitsubishi family, especially MELCO, a Westinghouse licensee. The same letter speaks of sales by MIC of MELCO products either to Westinghouse or directly to other customers. In a 1967 letter, an executive vice president of MELCO suggests that Westinghouse "take a little more resilient attitude with regard to our sales of our products into the United States." A 1967 Westinghouse memorandum tells of MELCO's desire to sell integrated circuits directly to customers in the United States.

Part 8 of the submission includes documents related to sales by MELCO into the United States and to visits by MELCO personnel to Westinghouse facilities in the United States. A 1965 letter expresses MELCO's desire to increase sales of silicon diodes, and the only method is "to supply the device to foreign countries, especially to the United States." Two 1965 letters were sent to Westinghouse Electric International Company from MELCO's "Resident Representative Office" in East Pittsburgh, Pennsylvania, and were signed by Toshiya Hiraoka, who was identified as "Resident Representative, Mitsubishi Electric Corporation." Finally, a 1967 Westinghouse memorandum discusses a visit by Mr. S. Takeuchi, general manager of MELCO's Itami Works, to certain Westinghouse facilities to explore component and product sales by MELCO to Westinghouse. According to the memo, MIC would handle the actual negotiations and price and delivery quotations for such sales. Plaintiff has also submitted an article from the April 9, 1969 issue of *Home Furnishings Daily*. The article was headlined "Mitsubishi Set To Sell U. S. In Own Name," and reports on an interview with a MELCO spokesman in Tokyo. The article contains the following statements:

(1) "Mitsubishi Electric Corp. is preparing to move into the American market in home electronics."

(2) "Mitsubishi Electric, one of the Mitsubishi group, is the last of the Japanese electronics giants to decide on this step."

(3) " 'We have been thinking about this for several years,' a source at Mitsubishi said."

(4) " 'We feel that we should market in the United States under our own name.' "

(5) "The Mitsubishi spokesman said that an independent sales subsidiary will not be formed, but that U. S. marketing will be through Mitsubishi International Corp., American

subsidiary of Mitsubishi Shoji Kaisha Trading Co."

(6) "Mitsubishi Electric will augment its present staff at Mitsubishi International, Inc., in sales and service personnel."

### E. *The Moving Defendants Generally.*

1. John J. Pederson, Zenith's general Patent Counsel and Director of Patents, stated by affidavit that Limited, MEI, MELCO, Sharp and DENKI have accepted licenses under certain United States patents of Zenith. Each of the aforementioned companies has made and is making periodic royalty reports and payments pursuant to these license agreements.

2. Walter C. Fisher, Executive Vice President of Zenith for Sales and Marketing, stated by affidavit that the Philadelphia metropolitan area is the fourth most important market in the United States for the sale of color television receivers, radio receivers, and modular and stereo home entertainment equipment, and the fifth most important market for the sale of monochrome television receivers.

3. Myra G. Hunter, owner of Myra G. Hunter Patent Services, Arlington, Virginia, stated by affidavit that MEI, MEC, MECA, Limited, Sharp, MELCO and DENKI have all held one or more United States patents at one time or another during the years 1959–1974.

4. Both Sharp and MEI have registered numerous trademarks with the United States Patent Office.

5. Pursuant to the Electronic Product Radiation Control Act, 42 U.S.C. § 263h (d), DENKI has designated INCO as its agent for the service of process; MELCO has designated the MGA Division of MIC; Hitachi Kaden, which identifies itself as a "Japanese corporation engaged in the manufacture of electronic products in Japan," has designated HSCA; and Sharp has designated SEC.

## DISCUSSION

### I. Venue

The threshold issue raised by the eight moving defendants in the *Zenith* action and by the three moving defendants in the *NUE* action is whether a proceeding under the antitrust laws may properly be brought against them in the Eastern District of Pennsylvania and the District of New Jersey respectively. This threshold issue is the critical issue as well, for on its resolution hinge the related issues of jurisdiction and service of process. See *Eastman Kodak Company v. Southern Photo Materials Company,* 273 U.S. 359, 370, 47 S.Ct. 400, 71 L.Ed. 684 (1927). If venue is proper for the moving defendants in the forums where Zenith and NUE have filed these antitrust suits, then personal jurisdiction may be obtained over the moving defendants by extraterritorial service of process, and the forums where these actions have been filed may exercise judicial power over them.

Venue in antitrust actions is controlled by § 12 of the Clayton Act, 15 U.S.C. § 22. It reads as follows:

"§ 22. District in which to sue corporation

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

The key phrase in § 12 is "transacts business." Previously, under § 7 of the Sherman Act,[28] a corporation was not amenable to suit in a district unless it resided there or was "found" there. The 1914 Congressional insertion of "or transacts business" in § 12 of the Clayton Act transformed the concept of cor-

---

28. Act of July 2, 1890, 26 Stat. 210, superseded by Act of October 15, 1914, § 4, 38 Stat. 731, repealed by Act of July 7, 1955, § 3, 69 Stat. 283.

porate venue in antitrust suits.[29] In the words of Justice Sanford, by the use of the phrase in the Clayton Act, "the local jurisdiction of the district courts was materially enlarged in reference to suits against corporations." *Eastman Kodak Company v. Southern Photo Materials Company, supra,* 273 U.S. at 372, 47 S.Ct. at 403. The Court defined "or transacts business" as follows:

". . . a corporation is engaged in transacting business in a district, within the meaning of this section, in such sense as to establish the venue of a suit—although not present by agents carrying on business of such character and in such manner that it is 'found' therein and is amenable to local process—if in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character."

And the Court further stated that:

". . . a corporation is none the less engaged in transacting business in a district, within the meaning of this section—which deals with suits respecting unlawful restraints upon interstate trade—because of the fact that such business may be entirely interstate in character and be transacted by agents who do not reside within the district."

In *United States v. Scophony Corporation,* 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948), the Court resumed the discussion of § 12 that it had begun in *Eastman Kodak, supra.* It noted "the plain remedial purpose" of the section, see *Eastman Kodak, supra,* at 373, 47 S.Ct. 400, and stated that the concept of "transacting business" had a "much broader meaning" than the previously operative requirement that a corporation be "found" in a district. *Scophony, supra,* 333 U.S. at 806, 807, 68 S.Ct. 855. For "found," the Court in *Eastman Kodak* had "substituted the practical and broader business conception of engaging in any substantial business operations";

after *Eastman Kodak,* "[t]he practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character' became the test of venue." *Scophony, supra,* 333 U.S. at 807, 68 S.Ct. at 862. Because the "or transacts business" language of § 12, as interpreted by the Court in *Eastman Kodak,* had supplied a "practical, non-technical business standard" for corporate venue, "[a] foreign corporation no longer could come to a district, perpetrate there the injuries outlawed, and then by retreating or even without retreating to its headquarters defeat or delay the retribution due." *Scophony, supra,* 333 U.S. at 810, 808, 68 S.Ct. at 862 (footnote omitted).

In an attempt to invalidate service of process upon it, the appellee in *Scophony,* a British corporation which manufactured and sold television equipment, and which owned and licensed inventions and patents covering television reception and transmission, had relied on, *inter alia, Cannon Manufacturing Company v. Cudahy Packing Company,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), a case upon which the instant defendants also place heavy reliance. The *Scophony* appellee sought to bring itself within the scope of *Cannon* and like decisions by use of a catalogue of incidents of business activity which did *not* apply to it. The Court specifically rejected this method of determining corporate presence within a district:

"Obviously this view of the facts and of the determinative legal approach is at wide variance from the ones we have taken in dealing with the questions of venue." *Scophony, supra,* 333 U.S. at 813, 68 S.Ct. at 864.

The Court focused instead on the complex licensing agreements by which Scophony tried to achieve one of its basic corporate objectives, the exploitation of its patents and inventions. "The contracts created controls in Scophony, and in the American interests as well,

29. For a detailed discussion of the legislative history of § 12, see *United States v. National*

*City Lines,* 334 U.S. 573, 581–88, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948).

which taken in conjunction with the stock controls called for continuing exercise of supervision over and intervention in American Scophony's affairs." Id. 333 U.S. at 814, 68 S.Ct. at 865 (footnote omitted). This supervision and intervention, the Court said, were "beyond normal excercise of shareholders' rights." Id. 333 U.S. at 816, 68 S.Ct. at 866.

The manufacturing and selling cases upon which the appellee relied "concerned entirely different facts and enterprises." Id. Rules governing service of process that had evolved for "the very different businesses and activities of manufacturing and selling" therefore did not apply. Id. 333 U.S. at 817, 68 S.Ct. at 866. The determination of the propriety of service on a corporation was to be made by examining "the actual unity and continuity of the whole course of conduct," not by "atomizing it into minute parts or events," a procedure followed in some close manufacturing and selling cases. Id. The Court left these decisions "untouched for the facts and situations in which they have arisen and to which they have been applied." Id. It refused, however, to expand "their pulverizing approach" to different and distinct situations, especially those actions where § 12 of the Clayton Act controls venue and service, that is, antitrust suits against corporations. Id. As the Court explained:

"For, in cases against companies incorporated outside the United States, that extension would bring back all the obstacles to enforcement of antitrust policies and remedies which existed for domestic corporations before § 12 was enacted to give relief from those obstacles. Even though venue were clearly established, as here, the extension often would make valid service impossible, since process could not be issued to run for such corporations to the foreign countries of which they are 'inhabitants.' We are unwilling to construe § 12 in a manner to bring back the evils it abolished, for situations not foreclosed by prior decisions, and thus to defeat its policy together with that of the antitrust laws, so as to make another amendment necessary."

The Court then held that venue was proper for *Scophony* in the Southern District of New York, and that it was amenable to service of process there. And this ruling, the Court concluded, could not conceivably violate the due process standards for jurisdiction announced in *International Shoe Company v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

In light of the unmistakably clear teaching of *Scophony, supra,* I cannot agree with defendants' basic argument, that my decision on venue, jurisdiction and service of process in the instant matters should be governed by *Cannon Manufacturing Company v. Cudahy Packing Company, supra.* It may well be, as defense counsel asserted during oral argument, that *Cannon* is still good law. The problem, as I see it, is that *Cannon* is not applicable law, and I submit that the courts which have applied *Cannon* in the context of antitrust actions against corporations, see, e. g., *O. S. C. Corporation v. Toshiba America, Inc.,* 491 F.2d 1064 (9th Cir. 1974), and *United States ex rel. Martin–Trigona v. Bankamerica Corporation,* 1974 Trade Cases ¶ 74,916 (D.D.C.1974), have misread *Scophony.*[30] As I read that case, it specifically rejects the application of the *Cannon* doctrine to antitrust suits against corporations. Both the *NUE* and the *Zenith* actions are antitrust suits against corporations. *Cannon* does not control them.

---

30. The opinions in neither of these cases give any indication that the respective plaintiffs there built the kind of substantial evidentiary record on the questions of venue, jurisdiction and service of process that NUE and Zenith have compiled in the instant matters. Accordingly, the *O.S.C.* case and the *Bankamerica* case are distinguishable on this ground as well.

In spite of the Supreme Court's explicit refusal to extend the "pulverizing approach" of *Cannon* and similar cases to antitrust suits against corporations, *Scophony, supra*, 333 U.S. at 817, 68 S.Ct. 855, defendants have nevertheless employed it in an attempt to rebut the legal sufficiency of NUE's and Zenith's factual allegations that relate to jurisdiction, venue and service of process. They isolate each of plaintiffs' allegations, then argue, with some support in the case law,[31] that the particular allegation has been found insufficient to constitute "transacting business."

If defendants' technique is adopted, their argument is flawless. They contend that a parent corporation may not be deemed to transact business in a district merely because it owns all or most of the stock in companies that do transact business there. *Cannon Manufacturing Company v. Cudahy Packing Company, supra; Peterson v. Chicago, R. I. & P. R. Company*, 205 U.S. 364, 27 S.Ct. 513, 51 L.Ed. 841 (1907); that interlocking directorates between a parent corporation and its subsidiaries do not, absent a showing of daily parental control, permit the inference that the parent and its subsidiaries are the same entity for purposes of venue and jurisdiction, *Cannon Manufacturing Company v. Cudahy Packing Company, supra; Frito Lay, Inc. v. Procter & Gamble Company*, 364 F.Supp. 243 (N.D.Tex. 1973); that representations in reports, advertisements and the like that the parent and the subsidiary are one enterprise are insufficient to ground a finding of jurisdiction and venue, *Peterson v. Chicago, R. I. & P. R. Company, supra; Fisher Baking Company v. Continental Baking Corporation*, 238 F.Supp. 322 (D.Utah 1966); that a subsidiary's purchase, for resale, of its parent's products does not support an inference of parental control, *Zwingle v. Tyson's Foods, Inc.*, 241 F.Supp. 940 (W.D.Okl. 1965); that neither does communication

between parent and subsidiary corporations, *Cannon Manufacturing Company v. Cudahy Packing Company, supra; Fisher Baking Company v. Continental Baking Corporation, supra;* that the presence in a district of products manufactured by a parent is similarly inadequate to support a finding of jurisdiction and venue, *O.S.C. Corporation v. Toshiba America, Inc., supra; Intermountain Ford Tractor Sales Company v. Massey-Ferguson, Ltd.*, 210 F.Supp. 930 (D.Utah 1962); that isolated and peripheral contacts with the forum district, for example, a limited number of one or two-day visits by a small number of the parent corporation's personnel, are likewise insufficient to establish venue and jurisdiction, *Stern Fish Company v. Century Seafoods, Inc.*, 254 F.Supp. 151 (E.D.Pa.1966) that the mere listing or trading of the parent corporation's stock at an exchange within a district does not constitute "transacting business," *Gilson v. Pittsburgh Forgings Co.*, 284 F.Supp. 569 (S.D.N.Y.1968); that license agreements with corporations that do transact business in a district do not support a finding of proper venue or jurisdiction for the other parties to the agreements, *S. S. Kresge Company v. Kamei-Auto Komfort*, 363 F.Supp. 257 (D.Minn.1973); *Independent School District No. 454, Fairmont, Minnesota v. Marshall and Stevens Company*, 337 F.Supp. 1278 (D.Minn.1971); and finally, that the placement of advertising for parent brand products in national publications which circulate in a district are not a transaction of business in that district, *San Antonio Telephone Company v. American Telephone and Telegraph Company*, 499 F.2d 349 (5th Cir. 1974); *Fox-Keller, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 338 F.Supp. 812 (E.D.Pa. 1972).

On its terms, then, defendants' technique is most effective. When the factual allegations on which NUE and Zenith base their claims that venue is

---

31. It should be noted, however, that many of the cases cited, for example, the *Cannon* decision itself, do not apply in the instant actions.

proper in the District of New Jersey and the Eastern District of Pennsylvania respectively are considered serially, they do not support a finding that venue is proper. The difficulty with this serial consideration is that it is not to be employed in antitrust suits brought under § 12 of the Clayton Act. Serial consideration of factual allegations related to venue "atomizes" and "pulverizes" the incidents of a corporation's business activity, and ignores "the actual unity and continuity of its whole course of conduct." *Scophony, supra,* 333 U.S. at 817, 68 S.Ct. at 866. Yet it is the latter which courts must examine when they seek to determine whether venue is proper. See id. at 813, 68 S.Ct. 855.

The moving defendants have referred me to one antitrust case, *Fisher Baking Company v. Continental Baking Corporation, supra,* where the court apparently followed the command of *Scophony* to review "the actual unity and continuity of the whole course of conduct." I do not believe, however, that *Fisher Baking* is a reliable guide to my decision here. The Court there did not address itself to "the plain remedial purpose of § 12." Moreover, in its discussion of the interorganizational detail between the parent and subsidiary corporations involved there, it relied on *Cannon,* a case which does not apply to § 12 proceedings, and on *Peterson v. Chicago, R. I., & P. R. Co., supra,* a case decided before § 12 was enacted. Its conclusion that the evidence before it showed only the mere relationship of parent and subsidiary and the natural concomitants of that relationship, may well have been correct, but I decline to follow its reasoning since it applied standards for the determination of venue which, in my judgment, do not control antitrust actions against corporations brought pursuant to § 12 of the Clayton Act.

On the other hand, a steadily lengthening line of antitrust cases that have in fact applied the § 12 venue criteria announced in *Scophony* does point the way to the result I should reach here. In *Waldron v. British Petroleum Co., Ltd.,* 149 F.Supp. 830 (S.D.N.Y.1957), the court pierced the veil of two wholly-owned subsidiaries to find Standard Oil of California present in the Southern District of New York. One subsidiary, California Commercial Company, Inc., used the same facilities that its parent had used prior to the formation of the subsidiary; it had the same address and telephone number as the parent; a number of its directors were officers of the parent; its principal business was servicing the parent corporation and the parent's other subsidiaries. The other subsidiary, California Oil Company, distributed advertising material for the parent; it sold a substantial volume of the parent's products to wholesalers in New York; with the parent's authorization, it used the "Calso" trademark owned by the parent, and in turn authorized its customers to use the same trademark. Moreover, employees of the parent had visited the district for 32 business days in a single year. The court remarked that:

"A person would have to be blind to the economic facts of business life if he did not recognize that the activities of Commercial and California Oil in this District are activities which in another less elaborate corporate setup would be conducted directly by branch offices or agents within the District." Id. at 834.

The Court then asked rhetorically:

"Does the fact that this large business entity, for tax reasons or otherwise, decides to fragmentize its operations into numerous corporate subsidiaries, make the resulting operations of the subsidiaries any the less a part of transaction of business by Socal?" Id.

The answer to this rhetorical question was emphatically negative. The court offered the following explanation for this result:

"A corporation may be a fiction of the law but there is no reason to carry the fiction to the extreme of saying that a corporation which has wholly

owned subsidiaries performing services in the local jurisdiction which ordinarily would be performed by service employees, or making sales which ordinarily would be made by a sales department, is in fact not transacting business in that jurisdiction, particularly when the entire corporate set-up of the defendant shows that it is designed to operate to a substantial degree through separate corporate entities responding to the wishes and directions of the parent and providing the revenues sought by the parent. We would be exalting fiction over fact if were were [sic] to conclude that under those circumstances the parent company was not in fact transacting business in this District through the instrumentality of its wholly owned subsidiaries."

In two grand jury proceedings, *In re Electric & Musical Industries, Ltd., Middlesex, England,* 155 F.Supp. 892 (S.D.N.Y.1957), and *In re Siemens & Halske A. G., Berlin, Germany,* 155 F. Supp. 897 (S.D.N.Y.1957), the court applied the *Scophony* criteria and found service proper on three foreign corporations, one British, the other two German, whose contacts with the forum district were far less substantial than those of the moving defendants in the instant actions.[32]

In the first case, the British corporation held United States patents, had entered into license agreements with United States corporations, and held all or a majority of the stock in two United States subsidiaries, on whose boards of directors it had placed several of its own representatives. The Court, relying on *Scophony,* rejected the *Cannon* analysis and found service proper, even though the parent did not interfere with the management of its subsidiaries. The latter, it reasoned, were the parent's partners in a world-wide competition for the phonograph record market. In the second case, the two German corporations had established a jointly-owned subsidiary to represent them in the United States. Though the subsidiary enjoyed freedom from day-to-day control by its parents, its sole business was to provide services for those parents. Despite the parents' reliance on *Cannon,* the court found that their subsidiary acted as their agent or alter ego in the United States. The court held that *Cannon* and similar cases were distinguishable:

"While not overruling these cases, *United States v. Scophony Corp.* * * * narrowly restricted them to other cases presenting identical facts and to controversies of a private nature which are not within Congressional policy manifested by the liberalization of the venue provision of Section 12 of the Clayton Act. (15 U.S. C.A. § 22). See 333 U.S. at pages 816–818, 68 S.Ct. at pages 865–866." *In re Siemens & Halske A. G., Berlin, Germany, supra,* 155 F.Supp. at 898.

In *Flank Oil Company v. Continental Oil Company,* 277 F.Supp. 357 (D.Colo. 1967), the plaintiff had asserted that Standard Oil of New Jersey could be sued in Colorado because of Standard's relationship to its wholly-owned subsidiary, Humble Oil. In response, Standard had protested that Humble controlled its own day-to-day operations, and made its own pricing and marketing decisions, without seeking Standard's approval. In its inquiry, the court focused on Standard's 100 percent stock ownership of Humble, in reliance on *Steinway v. Majestic Amusement Company,* 179 F.2d 681, 684 (10th Cir. 1949). "The effort is to ascertain from the total facts the extent of actual control exercised by the parent over the internal affairs of its subsidiary, and if such control is adequately shown, 'it is immaterial wheth-

---

32. The strong public policy favoring disclosure to grand juries undoubtedly was a factor in both of these cases. See *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The impact of that policy on both decisions does not, however, invalidate the court's analyses of the applicability of § 12.

er [business activities] are conducted through a branch or a subsidiary corporation, even though the latter's formal independence has been scrupulously preserved.' *Boryk v. deHavilland Aircraft Company*, 341 F.2d 666, 668 (2d Cir. 1965)." *Flank Oil, supra*, 277 F.Supp. at 363 (footnote omitted). The Court then compared the *Cannon* and *Scophony* doctrines. The *Cannon* line of cases enjoyed the virtue of certainty as a guide for decision. "This is, however, faint praise when it is considered that the rule leads to virtual immunity from the antitrust suit in a case such as this in which Jersey Standard, the nerve center of a petroleum empire, has painstakingly withdrawn from the mundane daily activity, leaving this to its hundreds of subsidiaries including its giant operating company, Humble." *Flank Oil, supra*, at 364. The court concluded that *Scophony*, a case brought under § 12 of the Clayton Act, which established "a more broad gauge test" for venue, id., was "a more accurate guide to decision." Id. at 365.[33]

> "There are underlying policy reasons in an antitrust case which call for a more penetrating analysis of business activity within a state in search of potential antitrust activity. So where, as here, there exists a great concentration of economic power capable of making a tremendous economic impact while at the same time presenting a picture of formal separation, one must look beyond formalism." Id. at 364.

Standard, the court reasoned, had not acquired its subsidiaries for investment, but to "promote its oil interests domestically and on the world market." Id. at 365.

> "No doubt it could have achieved similar objectives by creating departments or branches within itself. We perceive little difference resulting from the creation of subsidiary corpo-

rations and we can see no justification for insulating Standard from jurisdiction and venue on this account." Id.

Standard's 100 percent stock ownership, its contact directors on Humble's board, and its advisory committee for the supervision of Humble's investments provided more than enough control to ground a finding of venue and jurisdiction. The Court concluded that:

> "*Scophony* teaches that the parent need not control day-to-day activity of the subsidiary as a prerequisite to jurisdiction. Rather the important test in that case appears to be whether the parent's control is sufficient to influence and control those decisions which might involve violation of the antitrust laws." Id.

In *K. J. Schwartzbaum, Inc. v. Evans, Inc.*, 44 F.R.D. 589 (S.D.N.Y.1968), yet another court considered whether the activities of a wholly-owned subsidiary made venue proper for its parent corporation in an antitrust suit. It noted that "there are many ways in which the corporate veil can be lowered to conceal the true structure of a corporate enterprise." Id. at 590. In light of this fact, and of the more liberal venue standards of § 12, the court ruled that:

> "Where a corporation has a wholly-owned subsidiary performing services which would ordinarily be performed by its own service employees, or where its subsidiary exists for the purpose of making product purchases which otherwise would be made by purchasing agents of defendant corporation, the present company should not be allowed to hide behind the corporate fiction but, rather, should be required to submit to the jurisdiction of the court located in the District in which the parent corporation, for all intents and purposes, transacts its business." Id. at 590–91.

---

33. The Court also noted that *Cannon* involved a manufacturer and seller, and *Scophony* involved a holding company. I do not find that this distinction is crucial in an antitrust proceeding under § 12.

The issues in the case, as the court saw them, were "what part the subsidiary plays in the activity of the parent company and what degree of control the parent corporation exercises over the day-to-day operations of the subsidiary." Id. at 591.[34] The court found, *inter alia,* that the parent represented itself as maintaining a New York office, which was in fact an office of the subsidiary, and that these executives had made significant decisions for the subsidiary about purchases, suppliers, and the quality of its goods.

> "This appears to be a classic example of a company which, rather than sending its own agents into an area in furtherance of the business purposes of its enterprise, has formally created a seemingly independent subsidiary to accomplish that end." Id. at 592.

Accordingly, a finding of venue and jurisdiction as to the parent was entirely proper, for

> "a corporation which conducts its business activities in a certain District and profits from those activities conducted therein should not be immune from the jurisdiction of that District's courts of law solely on the basis of the formal design which the corporation has structured for its organization." Id.

In *Sunrise Toyota, Ltd. v. Toyota Motor Company,* 55 F.R.D. 519 (S.D. N.Y.1972), the district court considered the amenability to venue under § 12 of two Japanese corporations, identified as "Factory" and "Sales," part of a world wide distribution network for Toyota automobiles which included two American corporations as well, "Importer" and "Distributor." It applied the *Scophony* test for venue—the "practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character.'" *United States v. Scophony Corporation, supra,* 333 U.S. at

807, 68 S.Ct. at 862 and ruled that the presence of a foreign corporation by its agents in the ordinary business sense satisfies this test. *Sunrise Toyota, supra,* at 524; see *Scophony, supra,* 333 U. S. at 808, n. 19, 68 S.Ct. 855. The court then outlined the relevant jurisdictional facts: Factory owned 26 percent of sales; both owned 50 percent of Importer, which in turn owned 100 percent of Distributor; the boards of all four corporations significantly overlapped; Importer took title to automobiles from Sales in Japan, the autos themselves being shipped to the Port of Newark; Distributor allocated the autos to franchised dealers, contracting with independent dealers for both sales and services; Distributor's personnel came to New York for both sales and service purposes; neither Factory nor Sales dealt directly with persons in New York; Factory and Sales viewed their sales system as part of an integrated operation; telephone director listings did not distinguish among Importer, Distributor and Sales; and on important maters, Importer communicated with the parent Japanese corporations, Factory and Sales. On this record, the Court found that under New York law the parents were doing business in New York through the activities of their agent-subsidiaries, for the subsidiaries were doing all the business the parents could do if their own officials had been present in the district. This finding of agency under state law, the court held, satisfied the "transacting business" requirement of § 12. "Certainly the distribution and servicing of Toyota vehicles and dealerships to the extent demonstrated on the record here constitute transacting business." *Sunrise Toyota, supra,* at 531.

In another antitrust action, *Call Carl, Inc. v. BP Oil Corporation,* 391 F.Supp. 367 (D.Md.1975) the District Court conceded that Standard Oil of Ohio

---

**34.** I decline to follow the *Schwartzbaum* decision insofar as it holds that a parent must supervise the day-to-day operations of a subsidiary before venue is proper for the parent. Such a rule would revive the *Cannon* doctrine and, since *Scophony,* that doctrine does not apply to § 12 antitrust proceedings.

neither inhabited, nor was found in, nor itself transacted business in the district where the plaintiff had sought to establish venue. The court's inquiry, however, did not end there:

". . . plaintiffs' allegations require a more far-reaching and complicated analysis of 'transacting business' under section 12. More and more courts, in antitrust cases, are finding that venue over a foreign parent may be based on the activities of its local subsidiary if the relationship between the parent and the subsidiary is such that the subsidiary may be considered the agent or alter ego of the parent." Id. at 371:

The nature and purpose of § 12 demanded this "more far-reaching and complicated analysis":

"Section 12 is a venue provision peculiar to antitrust law. It is meant to provide injured plaintiffs with the opportunity to reach large corporate enterprises which seek to insulate themselves through the proliferation of subsidiaries which undertake the marketing, purchasing and selling functions of the parent in the local jurisdiction where the activities of the subsidiary are guided by the parent. Control in such cases is a very elusive phenomenon." Id. at 371.

Though some courts have continued to apply the test of corporate separation announced in *Cannon Manufacturing Company v. Cudahy Packing Company, supra,*

"other courts have rejected the *Cannon* day-to-day control test in antitrust cases on the ground that the liberal provisions of Section 12, as interpreted by the Supreme Court in *Scophony,* allow courts to disregard the formalities of corporate structure and to consider the fundamental relationship between the parent and the subsidiary which exists behind the veil of corporate 'separateness.'" Id. at 372. (footnote omitted)

"In *Scophony,* the Supreme Court disregarded and left 'untouched' the *Cannon* decision and its progeny and

disavowed their use in situations such as that presented in *Scophony.* Since *Scophony* laid *Cannon* to rest, there is no need to resurrect it here." Id. at 372. (footnote omitted)

Applying the *Scophony* "substantial business operations" test, the court held that SOHIO's control of its subsidiary's marketing decisions justified a piercing of the corporate veil. The evidence showed, *inter alia,* that the subsidiary, BP, was a marketing arm of SOHIO and figured in SOHIO's over-all marketing plans, that officers of the parent and the subsidiary overlapped and transferred back and forth between the two corporations, and that the parent owned the trademark used by the subsidiary and had provided a variety of services for the subsidiary.

Finally, in *Audio Warehouse Sales, Inc. v. U. S. Pioneer Electronics Corporation,* 1975 Trade Cases ¶ 60, 213 (D.D.C. 1975), yet another suit brought under the antitrust laws against a foreign parent corporation, the defendant had moved to dismiss for lack of personal jurisdiction. The court, noting that the issue of jurisdiction turned on the related issue of venue under § 12 and that venue would be proper under § 12 if the subsidiary served as the parent's alter ego, rejected the *Cannon* doctrine on which the foreign parent corporation had relied.

"The Court believes that in this era of multinational corporations and world-wide corporate empires, the *Cannon* test has little vitality and does not comport with the remedial purposes of the antitrust laws." Id. at 65,832.

Applying the *Scophony* test of "any substantial business operations," it considered the totality of the relationship between the parent and its subsidiary, see *Scophony, supra,* 333 U.S. at 816–17, 68 S.Ct. 855, especially the potential for parental control of decisions that might lead to antitrust violations, *Flank Oil, supra,* at 365. The plaintiffs' evidence showed that "Pioneer-Japan is considerably more to U. S. Pioneer than the own-

er of an independent subsidiary." 1975 Trade Cases ¶ 60,213, at 65,832. The directors and officers of the two corporations overlapped; personnel had shifted back and forth between them; Pioneer-Japan had granted preferential prices to U. S. Pioneer; Pioneer-Japan had licensed its trademark to U. S. Pioneer alone, retained approval rights over any sublicensing of the trademark, charged U. S. Pioneer no fee for this license, and promised to indemnify U. S. Pioneer for the expense of any suit involving the trademark; Pioneer-Japan had the right to enter and inspect the premises of U. S. Pioneer; U. S. Pioneer was a marketing arm of Pioneer-Japan, and was described in Pioneer-Japan literature as the latter's "sales agent"; the two corporations presented a common marketing image; and U. S. Pioneer performed services for Pioneer-Japan that the latter would otherwise have had to perform for itself. On the basis of this evidence and the reasonable inferences that could be drawn from it, the court held that Pioneer-Japan was "transacting business" within the meaning of § 12, and was therefore amenable to venue and jurisdiction.

A parallel line of cases, dealing specifically with jurisdictional questions, provides additional guidance as to when a court may properly pierce the corporate veil.

Jurisdiction, not venue under § 12 of the Clayton Act, was the crucial issue in *SCM Corporation v. Brother International Corporation*, 316 F.Supp. 1328 (S.D.N.Y.1970), a patent infringement action.[35] The court's analysis of intercorporate relationships is nevertheless most instructive and can fairly be applied to analogous relationships in a proceeding under § 12. In *SCM Corporation, supra,* one Japanese corporation, Limited,[36] sold to another Japanese corporation, Brother Japan, which sold in turn to an American corporation, Brother New York. Though corporate formalities were observed between and among all three corporations, other evidence suggested that they were in fact intimately related. Brother New York was the exclusive United States distributor for Limited's products. Those products were advertised in magazines as manufactured by "Brother Company." The latter's trademark was prominently displayed in those advertisements. After considering this evidence, the court said:

"[i]t is unimaginable that these advertisements could be intended to suggest anything other than the unity and singularity of the Brother network." Id. at 1332.

Advertisements in the Yellow Pages of the telephone directory likewise suggested "a single compartmentalized business," for they identified Brother New York as the manufacturer of the goods it sold. Id. at 1332–33. The court commented:

"If this be true, then Brother N.Y. is apparently manufacturing typewriters in Japan under the name of Ltd. In any event, is seems clear that such advertising invites the conclusion that 'Brother' is one entity conveniently departmentalized throughout the world." Id. at 1333.

Because Brother New York's stationery displayed the Brother trademark and listed offices in Tokyo and Nagoya, the court found that:

"Here, again, is an indication that 'Brother' is an international corporation with divisions and departments located throughout the world." Id. at 1333.

The court enumerated several other factors that were relevant to a finding of personal jurisdiction: two officers of Brother Japan lived in New York and were officers of Brother New York as well; Limited owned fifty percent of the stock of both Brother New York

---

35. The court held that defendant alien corporations were amenable to suit under the Alien Venue Statute, 28 U.S.C. § 1391(d). Section 12 of the Clayton Act, of course, does not apply in patent infringement actions.

36. This corporation should not be confused with Hitachi Limited, a corporate defendant in both the *NUE* and *Zenith* actions.

and Brother Japan; the other fifty percent of the stock of both corporations was owned by officers and/or directors of Brother New York; Brother New York and Brother Japan had common boards of directors; one customer ordered from Brother New York, but paid Brother Japan; another ordered from Brother New York, but received direct shipments from Brother Japan; and Brother New York performed services for the two affiliated corporations without reimbursement. Addressing itself to the jurisdictional question, the court held that:

"No doubt the above-described activities of movants, e. g., the advertising, Brother Japan's direct shipments to and direct receipt of payments from New York, and visitation to New York of Ltd.'s personnel, justify a finding of personal jurisdiction over Ltd. and Brother Japan, especially since the underlying action arises out of and is closely connected with this conduct and activity." Id. at 1334.

Crucial to this finding of jurisdiction were the services the American corporation performed for the two Japanese corporations. Absent the former, the latter would have had to engage in the same activities themselves.

"These services and activities are the lifeblood and business strength of the three corporations, without which there would probably be no New York market for their products." Id. at 1335.

In *Tokyo Boeki (U.S.A.) Inc. v. S.S. Navarino*, 324 F.Supp. 361 (S.D.N.Y. 1971), jurisdiction was sought over a Japanese parent corporation pursuant to § 301 of the New York CPLR. Obviously, this case did not involve § 12 of the Clayton Act either, but as in *SCM Corporation, supra,* its analysis of parent-subsidiary relationships is entirely relevant to the question of whether the activities of a subsidiary in a district will establish venue for its parent as well. The court found that the parent Japanese corporation was present in New York through the activities of its subsidiary:

"The regular interchange of managerial and supervisory personnel, the complete ownership of the subsidiary with the parent deriving the benefit of all the subsidiary's profits, the listing of the subsidiary as an overseas office or branch of the parent, the exchange of a variety of records and documents, the delegation to Boeki USA of a majority of Boeki Japan's steel products trade with American customers, the request by Boeki Japan that Boeki USA solicit business from Cambridge Lee Metal Company (which since 1965 had accounted for one-fourth of Boeki USA's sales), the overlap of directors on the boards of the parent and the subsidiary, and the very frequent communications between New York and Tokyo: all these facts illustrate that Boeki USA was both, in practical effect, the same entity as Boeki Japan for some purposes and its agent for other purposes." *Tokyo Boeki, supra,* 324 F.Supp. at 366.

■ From these cases, some involving venue, others jurisdiction, emerges a comprehensive set of factors which a court should examine in order to determine whether a corporation, though superficially absent from a district, is in fact transacting business there through a subsidiary or affiliated corporation. Among these factors is the performance by the subsidiary or affiliate of business activities in a district, for example, sales and servicings, that in a less elaborate corporate scheme the absent corporation would perform directly by its own branch offices or agents. *Waldron v. British Petroleum Co., Ltd., supra.* Another is a partnership in world-wide business competition between the absent corporation and the corporation that is present in a district. *In re Electric & Musical Industries, Ltd., Middlesex, England, supra.* A third factor is the capacity of the absent corporation to influence decisions of the subsidiary or affiliate that might have antitrust consequences. Controlling

stock ownership and interlocking directorates are, of course, indices of such a capacity. *Flank Oil Company v. Continental Oil Company, supra; Tokyo Boeki (U.S.A.) Inc. v. S.S. Navarino, supra.* Yet another factor is the part that the subsidiary or affiliated corporation plays in the over-all business activity of the absent corporation. *K. J. Schwartzbaum, Inc. v. Evans, Inc., supra.* A fifth factor is the existence of an integrated sales system involving manufacturing, trading and sales corporations. *Sunrise Toyota, Ltd. v. Toyota Motor Company, supra.* A related factor is the status of the subsidiary or affiliate as a marketing arm of the absent corporation. *Call Carl, Inc. v. BP Oil Corporation, supra.* A seventh factor is the use by the subsidiary or affiliate of a trademark owned by the parent. Id. The transfer of personnel back and forth between the absent corporation and its subsidiary or affiliate is another factor that a court may properly consider. *Audio Warehouse Sales, Inc. v. U.S. Pioneer Electronics Corporation, supra.* So is the presentation of a common marketing image by the related corporations. Id. This is especially true when those corporations hold themselves out to the public as a single entity that is conveniently departmentalized either nationally or worldwide. *SCM Corporation v. Brother International Corporation, supra.* Yet another factor is the granting of an exclusive distributorship by the absent corporation to its subsidiary or affiliate. Id.

▮▮ It would unnecessarily prolong an already extensive opinion to apply these controlling principles of law individually to each of the corporations that are contesting venue in the *Zenith* and *NUE* actions. The voluminous findings of fact compiled in both cases speak for themselves. They and the inferences that can reasonably be drawn from them reveal that each of the corporations contesting venue have relationships of sufficient intimacy with corporations that are transacting business in the Eastern District of Pennsylvania and the District of New Jersey that the former may fairly be said to transact business in those districts as well.[37] Hence, the requirements of § 12 of the Clayton Act, 15 U.S.C. § 22, are satisfied, and venue is proper as to all the moving defendants in the Eastern District of Pennsylvania and the District of New Jersey respectively.[38]

## II. Jurisdiction: The Constitutional Test

▮ In light of the foregoing analysis, it is clear that the exercise of personal jurisdiction over the moving de-

---

[37] I am well aware of my responsibility to make individual determinations as to venue for each of the moving defendant corporations. I have in fact made such determinations. With one exception, all of the moving defendants fall so squarely within the scope of § 12's "transacting business" requirement that it is clearly appropriate to make a single general finding of proper venue for them. The lone exception, where the existence of proper venue is at least arguable, is Matsushita Electronics Corporation (MEC), a subsidiary of MEI. MEC, the Zenith complaint alleges, "is engaged in the development, manufacture and sale of a variety of electronic components used in the manufacture of television receivers and other consumer and industrial electronic products, including television picture tubes, solid state and micro-electronic circuitry devices." (¶ 7) It thus does not fit neatly into the manufacturing/trading/sales pattern that embraces all of the other moving defendants and their subsidiary or affiliated corporations. Nevertheless, on the basis of its numerous close connections with, and important contribution to, the manufacturing, trading and sales system of the other Matsushita defendants, I find that venue is proper as to MEC as well.

[38] In both actions, plaintiffs have alleged causes of action under the Antidumping Act of 1916, 15 U.S.C. § 72. Defendants have argued that even if venue is proper under § 12 of the other counts of the two complaints, it is not proper for the counts arising under 15 U.S.C. § 72. I see no need, however, to rule on the validity of this argument. It would be senseless for this court to bifurcate these two exceedingly complex antitrust cases by dismissing or transferring the antidumping counts while retaining the antitrust counts since the facts underlying both sets of issues are essentially the same. If ever cases cried out for the exercise of pendent venue, these two antitrust actions

fendants by this Court in the *Zenith* action and by the District Court for the District of New Jersey over the moving defendants in the *NUE* action "presents no conceivable element of offence to 'traditional notions of fair play and substantial justice.' See *International Shoe Co. v. Washington, supra,* 326 U.S. at page 316, 66 S.Ct. at page 158; *cf. Hutchinson v. Chase & Gilbert,* 2 Cir., 45 F.2d 139, 141." *United States v. Scophony Corporation, supra,* 333 U.S. at 818, 68 S.Ct. at 866. In both cases, the moving defendants are "transacting business" within the meaning of § 12 of the Clayton Act, 15 U.S.C. § 22. They therefore fully satisfy the constitutional due process tests of "minimum contacts" as announced in *International Shoe Company v. Washington, supra,* 326 U.S. at 316, 66 S.Ct. 154, and of "purposeful availment" as mandated by *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1957). Indeed, "traditional notions of fair play and substantial justice" would be offended only if I were to hold, as a matter of constitutional due process, that the moving defendants were *not* amenable to jurisdiction in the Eastern District of Pennsylvania and the District of New Jersey respectively.

### III. Service of Process

In the *Zenith* action, service was made on October 1, 1974, when Zenith, pursuant to 42 P.S. § 8307, the Pennsylvania longarm statute, sent 21 copies of the summons and complaint, one for each defendant, to the Secretary of the Commonwealth of Pennsylvania, and when Zenith directed United States marshals to send a copy of the complaint by registered mail, to each of the defendants at its last known address.

In the *NUE* action, DENKI was served with process by registered mail, return receipt requested, at its principal place of business in Osaka, Japan, pursuant to Rule 4(i)(1)(D) of the Feder-

al Rules of Civil Procedure. Service was made in similar fashion on Kaden and MELCO at their principal places of business.

■ My ruling on the issue of venue as to the moving defendants effectively disposes of the related issue of the sufficiency of service of process. Section 12 of the Clayton Act authorizes service upon a corporation "in the district of which it is an inhabitant, or wherever it may be found." Thus, when venue is properly laid in a judicial district under § 12, as it is in both of the actions at bar, extraterritorial service of process, running from the district where the action was filed to "wherever [the corporation] may be found," is proper. *C.C.P. Corp. v. Wynn Oil Co.,* 354 F.Supp. 1275 (N.D.Ill.1973); *Luria Steel & Trading Corp. v. Ogden Corp.,* 327 F.Supp. 1345 (E.D.Pa.1971), and *Waldron v. British Petroleum Co., Ltd.,* 149 F.Supp. 830, 836–837 (S.D.N.Y.1957). Such service is likewise proper upon a corporate defendant in a foreign country. *Hoffman Motors Corporation v. Alfa Romeo, S. p. A.,* 244 F.Supp. 70 (S.D.N.Y.1965). The manner of such service upon a foreign defendant is controlled by Rule 4(i)(1) of the Federal Rules of Civil Procedure, which provides in pertinent part:

"(i) Alternative Provisions for Service in a Foreign Country.

(1) *Manner.* When the federal or state law referred to in subdivision (e) of this rule authorizes service upon a party not an inhabitant of or found within the state in which the district court is held, and service is to be effected upon the party in a foreign country, it is also sufficient if service of the summons and complaint is made: (A) in the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction; or (B) as directed by the for-

---

do. Accordingly, in the interest of judicial economy, this court will retain jurisdiction over the antidumping counts under the doctrine of pendent venue. See Dolly Toy Co.

v. Bancroft-Rellim Corp., 97 F.Supp. 531, 536 (S.D.N.Y.1951); Ferguson v. Ford Motor Co., 77 F.Supp. 425, 436 (S.D.N.Y.1948).

eign authority in response to a letter rogatory, when service in either case is reasonably calculated to give actual notice; or (C) upon an individual, by delivery to him personally, and upon a corporation or partnership or association, by delivery to an officer, a managing or general agent; or (D) by any form of mail, requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served; or (E) as directed by order of the court. Service under (C) or (E) above may be made by any person who is not a party and is not less than 18 years of age or who is designated by order of the district court or by the foreign court. On request, the clerk shall deliver the summons to the plaintiff for transmission to the person or the foreign court or officer who will make the service."

Accordingly, in both actions, service upon the moving defendants at their principal places of business pursuant to Rule 4(i)(1)(D) was entirely proper. These defendants were also adequately served when service was made on their wholly-owned subsidiaries, *K. J. Schwartzbaum, Inc. v. Evans, Inc.*, 44 F.R.D. 589 (S.D.N.Y.1968); *Flank Oil Co. v. Continental Oil Co.*, 277 F.Supp. 357 (D.Colo.1967); *In re Electric & Musical Industries, Ltd., Middlesex, England,* '155 F.Supp. 892 (S.D.N.Y. 1957); *United States v. Watchmakers of Switzerland Information Center, Inc.*, 133 F.Supp. 40 (S.D.N.Y.1955); *United States v. Imperial Chemical Industries*, 100 F.Supp. 504 (S.D.N.Y.1951); see *Boryk v. deHavilland Aircraft Co.*, 341 F.2d 666 (2d Cir. 1965); *Raul International Corp. v. Nu-Era Gear Corp.*, 28 F.R.D. 368 (S.D.N.Y.1961), or on affiliated corporations who are co-defendants in these actions, *Riss & Company v. Association of Western Railways,*

159 F.Supp. 288 (D.D.C.1958), *motion to vacate order denying motion to dismiss for lack of venue denied,* 162 F. Supp. 69 (D.C.1958); *Siemens & Halske A. G., Berlin, Germany,* 155 F.Supp. 897 (S.D.N.Y.1957) (dictum); *United States v. Watchmakers of Switzerland Information Center, supra.*

The moving defendants can scarcely complain that they have been prejudiced by the manner of service. In both suits, the notice they received has been more than adequate. The law requires no more.

### CONCLUSION

In view of my decisions on the instant matters, I need not and do not reach the other issues briefed and argued by the respective plaintiffs and defendants.[39] In both the *NUE* and the *Zenith* actions, the moving defendants are, through their subsidiary or affiliated corporations, "transacting business" in the District of New Jersey and the Eastern District of Pennsylvania respectively. They therefore satisfy the venue requirements of § 12 of the Clayton Act, 15 U.S.C. § 22. Since venue is proper as to these defendants, this Court may, without offense to the Constitution, assert personal jurisdiction over them, for the transaction of business in a judicial district easily passes the "minimum contacts/purposeful availment" test of due process announced in the *International Shoe* trilogy. Finally, because § 12 authorizes extraterritorial service of process on corporate defendants and Rule 4(i)(1)(D) of the Federal Rules of Civil Procedure permits service by registered mail on defendants found in a foreign country, the moving defendants were adequately served with process. Their motions to dismiss for improper venue, lack of personal jurisdiction and insufficient service of process must therefore be denied. An appropriate order will be entered.

39. These issues include the constitutionality of the Alien Venue Statute, 28 U.S.C. § 1391 (d), the waiver of jurisdictional defenses by the moving defendants in the *Zenith* action, the injury theory of jurisdiction as approved in *Honeywell, Inc. v. Metz Apparatewerke*,

No. 72–1987 (7th Cir., January 7, 1975) (Slip Opinion), and the propriety of service of process pursuant to the Pennsylvania long-arm statute, 42 P.S. § 8301 et seq., and the New Jersey long-arm statute, formerly R.R. 4:4–4(d), now R.R. 4:4–4(c)(1).